**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BRUCE SAFRIET, DERIVATIVELY AND ON BEHALF OF NOMINAL DEFENDANT AKORN, INC., | ) ) ) | Case No. |
| | ) | **VERIFIED SHAREHOLDER** |
| | ) | **DERIVATIVE COMPLAINT FOR:** |
| Plaintiff, | ) | |
| | ) | **(1) BREACH OF FIDUCIARY DUTY;** |
| v. | ) | **(2) CORPORATE WASTE;** |
| | ) | **(3) GROSS MISMANAGEMENT;** |
| RAJAT RAI, TIMOTHY A. DICK, BRUCE | ) | **(4) UNJUST ENRICHMENT; AND** |
| KUTINSKY, JOSEPH BONACCORSI, | ) | **(5) VIOLATIONS OF § 14(A) OF THE** |
| JOHN R. SABAT, MARK M. | ) | **SECURITIES EXCHANGE ACT of 1934** |
| SILVERBERG, JOHN N. KAPOOR, | ) | |
| RONALD M. JOHNSON, BRIAN TAMBI, | ) | **JURY TRIAL DEMANDED** |
| STEVEN J. MEYER, ALAN WEINSTEIN, | ) | |
| KENNETH S. ABRAMOWITZ, AND | ) | |
| ADRIENNE L. GRAVES | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| AKORN, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

Plaintiff Bruce Safriet ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Akorn, Inc. ("Akorn" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Rajat Rai, Timothy A. Dick, Bruce Kutinsky, Joseph Bonaccorsi, John R. Sabat, Mark M. Silverberg, John N. Kapoor, Ronald M. Johnson, Brian Tambi, Steven J. Meyer, Alan Weinstein, Kenneth S. Abramowitz, and Adrienne L. Graves (collectively, the "Individual Defendants") for breaches of their

1

fiduciary duties as Directors and/or Officers of Akorn, gross mismanagement, abuse of control, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), (the "Exchange Act"), for his complaint against Individual Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Akorn, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action which seeks to remedy wrongdoing committed by Akorn's directors and officers between April 10, 2014, inclusive, through the present (the "Relevant Period").

2.      Akorn is a specialty pharmaceutical company that develops, manufactures and markets multisource and branded pharmaceuticals alongside prescription animal health products and over-the-counter consumer health products. Akorn markets its portfolio of close to 200 different products to retail pharmacies, ophthalmologists, optometrists, physicians, veterinarians, hospitals, clinics, wholesalers, distributors, group purchasing organizations, and government agencies.

3.      Akorn completed two significant acquisitions in 2014.

4.     On April 17, 2014, Akorn completed its acquisition of Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") for $640 million in cash.

5.     On August 12, 2014, Akorn completed its acquisition of VPI Holdings Corp., the parent company of VersaPharm Incorporated ("VersaPharm") for $440 million.

6.     After close of trading on March 2, 2015, Akorn filed a Form 12b-25, Notification of Late Filing, with the SEC and issued a press release announcing that it was extending its deadline to file with the SEC its Annual Report for fiscal year 2014 on Form 10-K. According to Akorn, it had experienced unforeseen delays in collecting and compiling certain financial and other related data relating to the VersaPharm and Hi-Tech Pharmacal subsidiaries, which were not integrated into Akorn's centralized accounting department and accounting systems as of December 31, 2014.  Additionally, Akorn stated that it believed that material weaknesses existed as of December 31, 2014, relating to the completeness and accuracy of underlying data used in the determination of significant estimates and accounting transactions and accurate and timely reporting of its financial results and disclosures in its 2014 Form 10-K.

7.     As a result of this news, the price per share of Akorn stock fell $4.38, or over 8%, on unusually heavy volume, to close at $49.33 on March 3, 2015.

8.     After close of trading on April 24, 2015, the Company issued a press release announcing that the Company's previously disclosed financial reports for the annual period ending December 31, 2014 and the quarterly periods ending June 30, 2014, September 30, 2014 and December 31, 2014 should not be relied upon and that those statements would be restated. According to Akorn, management's report and the opinion of its independent auditor KPMG on the effectiveness of internal control over financial reporting as of December 31,2014 should no

longer be relied upon. According to management's preliminary assessment, the errors related to the understatements of rebates and other sales allowances caused an estimated overstatement to net revenue and pretax income from continuing operations of $20 million to $35 million for fiscal year 2014.

9.     As a result of this news, the price per share of Akorn stock fell $12.14, nearly 22%, on unusually heavy volume, to close at $43.10 on April 27, 2015.

10.     As a result of the Individual Defendants' false and misleading statements of material fact, the price of Akorn common stock traded at artificially inflated prices throughout the Relevant Period.

11.     The Individual Defendants breached their fiduciary duties by causing the Company to issue the aforementioned false and misleading statements in order for the value of their large Company stock ownership to be artificially inflated and in order to receive excessive compensation and to make lucrative insider sales that were directly related to the false statements before the fraud was exposed to the investing public -- including insider sales by Silverberg and exercise of warrants by Kapoor made during the five-and-a-half-week period between the Company's two announcements of 2014 financials restatements on March 17, 2015, and April 24, 2015!

12.     The Individual Defendants breached their fiduciary duties by causing the Company to lack adequate internal and financial controls during the Relevant Period. Additionally, the Individual Defendants caused Akorn to fail to disclose the same.

13.     Akorn's lack of adequate internal controls has caused the Company to make the aforementioned false and misleading statements and to allow the management to receive

excessive compensation and to make lucrative insider sales in connection with the false and misleading statements.

14.    As a result of the Individual Defendants' breaches of fiduciary duty, the Company is now the subject of two federal securities fraud class action lawsuits, to an internal investigation, and to losses due to the unjust enrichment of Individual Defendants and Company employees who were improperly over-compensated by the Company, including through excessive compensation connected to Defendants' false and misleading statements that were made intentionally or recklessly, and who made lucrative insider sales -- including insider sales by Silverberg and exercise of warrants by Kapoor made during the five-and-a-half-week period between the Company's two announcements of 2014 financials restatements on March 17, 2015, and April 24, 2015!

15.    As a result, Akorn has expended, and will continue to expend millions of dollars to rectify the Individual Defendants' wrongdoing.

16.    In light of the Individual Defendants' conduct, which has subjected the Company and Defendants Rai, Dick, and Kutinsky to being named as defendants in two federal securities fraud class action lawsuits and to an internal investigation, and the fact that the Defendants received excessive compensation and made lucrative insider sales in connection with the Company's deliberate fraud, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

17.    The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and other misconduct.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Exchange Act. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

19.     Additionally, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

20.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this state, or is an individual who is a citizen of Illinois or who has minimum contacts with this state to justify the exercise of jurisdiction over them.

21.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiff**

22.     Plaintiff is a current shareholder of Akorn.  Plaintiff has been a shareholder of Akorn common stock since before the beginning of the Relevant Period, and has continuously held Akorn common stock at all relevant times.  Plaintiff is a citizen of Ohio.

**Nominal Defendant Akorn**

23.     Akorn is a Louisiana Corporation and is headquartered at 1925 W. Field Ct., Suite 300, Lake Forest, IL 60045.  Akorn is a specialty pharmaceutical company that develops, manufactures and markets multisource and branded pharmaceuticals alongside prescription animal health products and over-the-counter consumer health products. Akorn markets its portfolio of close to 200 different products to retail pharmacies, ophthalmologists, optometrists, physicians, veterinarians, hospitals, clinics, wholesalers, distributors, group purchasing organizations, and government agenc1es.  During the Relevant Period, the Company's stock was listed on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "AKRX." Akorn is a citizen of Louisiana and Illinois.

**Defendant Rai**

24.     Defendant Rajat Rai ("Rai") has been the Company's CEO since May 2010.

25.     According to the Schedule 14A that the Company filed with the SEC on April 10, 2014 (the "2014 Proxy Statement"), as of March 7, 2014, Rai beneficially owned, 3.966 million shares, or 3.94%, of the Company's common stock.  Before the Company's fraud was exposed after market-close on April 24, 2015, one share of Akorn stock sold at a high during intra-day trading for $57.10.  Thus, on April 24, 2015, Rai's Akorn stock was worth over $226.46 million.

26.     In 2014, Rai received $8.61 million in compensation, $1.95 million of which was paid in Company stock options and $4.41 million of which was paid in Company stock.

27.     According to the 2014 Proxy Statement, "Mr. Rai was appointed Interim Chief Executive Officer in June 2009, and appointed Chief Executive Officer in May 2010.  He had been appointed Strategic Consultant to the Special Committee of the Board in February 2009, following the departure of our former President and Chief Executive Officer.  Prior to joining Akorn, Mr. Rai was the President and CEO of Option Care, Inc., a leading provider of home infusion pharmacy and specialty pharmacy services, which was acquired by Walgreen Co. in August 2007.  Mr. Rai previously served on the board of directors of SeQual Technologies Inc., and currently serves on the board of directors of Aciex Therapeutics."

28.     Rai was previously the CEO and president of Option Care, Inc., Company COO Kutinsky was previously the COO and senior vice president of Option Care, Inc., Company CFO Dick was a vice president at Option Care, Inc., Company Senior Vice President, General Counsel, and Secretary Bonaccorsi was the senior vice president, general counsel, secretary, and compliance officer at Option Care, Inc., and Company Director Abramowitz was previously a director at Option Care, Inc., for which Kapoor was the founder, at which Kapoor was previously its CEO and president, and at which Kapoor had been the chairman from 1990 and controlling shareholder until it was sold to Walgreen Co. in 2007 for $850 million.

29.     The Company's 2014 Proxy Statement failed to state Kapoor's former position at Option Care, Inc.

30.     In July 2014, Nicox SA entered an agreement to acquire all of the outstanding equity of Aciex Therapeutics, Inc. for $120 million. According to a Nicox SA press release, "Existing investors in Aciex include Akorn, Inc., Bay City Capital, HealthCare Ventures, New Enterprise Associates and Ora Investment Group."  According to the Company's Form 10-Q/A

filed with the SEC on April 9, 2015, "As consideration for its carried investment in Aciex, the Company received from the Aciex Acquisition pro-rata shares of Nicox which are publically traded on the Euronext Paris exchange." According to the 2014 Proxy Statement, Rai is a director at Aciex.

31.     Rai sold 903,659 shares of Akorn stock on August 7, 2014 for $30,381,015. On September 8, 2014, he sold 147,000 shares of Company stock for $5,406,660. On January 22, 2015, he sold 340,610 shares of Company stock for $14,053,568. On January 23, 2015, he sold 314,375 shares of Company stock for $13,235,187. On January 26, 2015, he sold 219,000 shares of Company stock for $9,318,450. Thus, in the total during the Relevant Period, but before the fraud was exposed, Rai made net sales for a total of 1,924,644 shares of Akorn stock for net proceeds of over $72 million.

32.     His insider sales made with knowledge of material non-public information before the fraud was exposed demonstrates his motive in facilitating and participating in the fraud.

33.     Upon information and belief, Rai is a citizen of Illinois.

**Defendant Dick**

34.     Defendant Timothy A. Dick ("Dick") has been the Company's CFO between June 2009 through August 3, 2015, when he resigned.

35.     According to the 2014 Proxy Statement, as of March 7, 2014, Dick beneficially owned 802,099 shares of the Company's common stock. Before the Company's fraud was exposed after market-close on April 24, 2015, Dick's Akorn stock was worth over $45.8 million.

36.     In 2014, Dick received $2.49 million in compensation, $428,777 of which was paid in Company stock options and $1.67 million of which was paid in Company stock.

37.     According to the 2014 Proxy Statement, "Most recently, he was Vice President, Operations Improvement & Analysis of Option Care, Inc., a division of Walgreen Co. Mr. Dick has previously held various leadership positions in the areas of financial planning, analysis, and acquisitions at Option Care, Inc.  Prior to joining Option Care, Inc. in September 2001, Mr. Dick held various management positions in finance and acquisitions with both Johnson & Johnson and Peace Health, a Seattle-based regional health care system."

38.     Company CEO Rai was previously the CEO and president of Option Care, Inc., Company COO Kutinsky was previously the COO and senior vice president of Option Care, Inc., Company CFO Dick was a vice president at Option Care, Inc., Company Senior Vice President, General Counsel, and Secretary Bonaccorsi was the senior vice president, general counsel, secretary, and compliance officer at Option Care, Inc., and Company Director Abramowitz was previously a director at Option Care, Inc., for which Kapoor was the founder, at which Kapoor was previously its CEO and president, and at which Kapoor had been the chairman from 1990 and controlling shareholder until it was sold to Walgreen Co. in 2007 for $850 million.

39.     The Company's 2014 Proxy Statement failed to state Kapoor's former position at Option Care, Inc.

40.     Dick sold 122,222 shares of Akorn stock on September 2, 2014 for $4,739,769. On September 8, 2014, he sold 45,000 shares of Company stock for $1,692,450.  On October 1, 2014, he sold 122,222 shares of Company stock for $4,307,103.  On November 3, 2014, he sold 122,222 shares of Company stock for $5,387,545.  On December 1, 2014, he sold 30,875 shares of Company stock for $1,211,226.  On January 2, 2015, he sold 30,150 shares of Company stock

for $1,086,304.  On February 1, 2015, he sold 30,750 shares of Company stock for $1,297,342. Thus, in total during the Relevant Period, but before the fraud was exposed, Dick made net sales for a total of 503,441 shares of Akorn stock for net proceeds of over $19.7 million.

41.     His insider sales made with knowledge of material non-public information before the fraud was exposed demonstrates his motive in facilitating and participating in the fraud.

42.     Upon information and belief, Dick is a citizen of Illinois.

**Defendant Bonaccorsi**

43.     Defendant Joseph Bonaccorsi ("Bonaccorsi") has been the Company's Senior Vice President, Secretary and General Counsel since 2009.

44.     According to the 2014 Proxy Statement, as of March 7, 2014, Bonaccorsi beneficially owned 802,099 shares of the Company's common stock.  Before the Company's fraud was exposed after market-close on April 24, 2015, Bonaccorsi's Akorn stock was worth over $45.8 million.

45.     In 2014, Bonaccorsi received $4.83 million in compensation, $389,703 of which was paid in Company stock options and $3.91 million of which was paid in Company stock.

46.     According to the 2014 Proxy Statement, "Mr. Bonaccorsi came to Akorn from Walgreen Co., where he served as Senior Vice President Mergers & Acquisition and Counsel for the Walgreens-Option Care Home Care division. Mr. Bonaccorsi joined Option Care, Inc. in 2002, where he served as Senior Vice President, General Counsel, Secretary and Corporate Compliance Officer through 2007. Prior to joining Option Care, Inc., he was in private law practice in Chicago, Illinois.  He received his BS degree from Northwestern University and his Juris Doctorate from Loyola University School of Law, Chicago."

47.     Company CEO Rai was previously the CEO and president of Option Care, Inc., Company COO Kutinsky was previously the COO and senior vice president of Option Care, Inc., Company CFO Dick was a vice president at Option Care, Inc., Company Senior Vice President, General Counsel, and Secretary Bonaccorsi was the senior vice president, general counsel, secretary, and compliance officer at Option Care, Inc., and Company Director Abramowitz was previously a director at Option Care, Inc., for which Kapoor was the founder, at which Kapoor was previously its CEO and president, and at which Kapoor had been the chairman from 1990 and controlling shareholder until it was sold to Walgreen Co. in 2007 for $850 million.

48.     The Company's 2014 Proxy Statement failed to state Kapoor's former position at Option Care, Inc.

49.     Bonaccorsi purchased 5,000 shares of Akorn stock on May 16, 2014 for $134,150.  On September 11, 2014, he sold 116,800 shares of Company stock for $4,425,552. On February 18, 2015, he sold 40,827 shares of Company stock for $1,932,341.  Thus, in total during the Relevant Period, but before the fraud was exposed, Bonaccorsi had net sales for a total of 152,627 shares of Akorn stock for net proceeds (less payment for 5,000 shares) of over $6.2 million.

50.     His insider sales made with knowledge of material non-public information before the fraud was exposed demonstrates his motive in facilitating and participating in the fraud.

51.     Upon information and belief, Bonaccorsi is a citizen of Illinois.

**Defendant Silverberg**

52.     Defendant Mark M. Silverberg ("Silverberg") is the Company's Executive Vice President, Global Quality Assurance and Alliance Management.

53.     According to the 2014 Proxy Statement, as of March 7, 2014, Silverberg beneficially owned 500,351 shares of the Company's common stock.  Before the Company's fraud was exposed after market-close on April 24, 2015, Silverberg's Akorn stock was worth over $28.57 million.

54.     In 2014, Silverberg received $1.44 million in compensation, $213,770 of which was paid in Company stock options and $821,259 of which was paid in Company stock.

55.     According to the 2014 Proxy Statement, before serving in his current position, Silverberg was the Company's "Senior Vice President, Global Quality Assurance since May 2006.  He joined us in April 2005 as Vice President, Global Compliance.  Prior to joining us, Mr. Silverberg served as Director of Division Quality for the Diagnostics Division of Abbott Laboratories."

56.     Silverberg sold 72,491 shares of Company stock on October 21, 2014 for $2,899,640.  On November 3, 2014, he sold 24,311 shares of Company stock for $1,076,247.  He sold 38,602 shares of Company stock for $1,582,682 on January 12, 2015.  On April 21, 2015, he sold 29,000 shares of Company stock for $1,595,000.  Thus, in total during the Relevant Period, but before the fraud was exposed, Silverberg made net sales for a total of 164,404 shares of Akorn stock for net proceeds of over $7.15 million.

57.     Silverberg's insiders sales on April 21, 2015 were made during the five-and-a-half-week period between the Company's two announcements of 2014 financials restatements on March 17, 2015, and April 24, 2015!

58.     His insider sales made with knowledge of material non-public information before the fraud was exposed demonstrates his motive in facilitating and participating in the fraud.

59.     Upon information and belief, Silverberg is a citizen of Illinois.

**Defendant Sabat**

60.     Defendant John R. Sabat ("Sabat") has been the Company's Senior Vice President, National Accounts and Trade Relations since June 2009.

61.     According to the 2014 Proxy Statement, as of March 7, 2014, Sabat beneficially owned 183,522 shares of the Company's common stock.  Before the Company's fraud was exposed after market-close on April 24, 2015, Sabat's Akorn stock was worth about $10.48 million.

62.     In 2014, Sabat received $760 thousand in compensation, $213,770 of which was paid in Company stock options and $71,301 of which was paid in Company stock.

63.     According to the 2014 Proxy Statement, before serving in his current position, Sabat was the Company's "Senior Vice President Sales, Marketing and National Accounts since February 2009.  He had served as our Senior Vice President, National Accounts since October 2004.  He joined us in June 2003 as Vice President, National Accounts.  Prior to joining us, he served as Vice President, Sales and Marketing with Major Pharmaceuticals, a division of Apotex, Inc., and a manufacturer and worldwide distributor of proprietary, multi-source prescription and over-the-counter pharmaceuticals."

64.     Sabat sold 25,000 shares of Company stock for $1,001,000 on December 8, 2014.  On December 9, 2014, he sold 18,173 shares of Company stock for $748,909.  Thus, in total

- 14 -

during the Relevant Period, but before the fraud was exposed, Silverberg made net sales for a total of 43,173 shares of Akorn stock for net proceeds of about $1.75 million.

65. His insider sales made with knowledge of material non-public information before the fraud was exposed demonstrates his motive in facilitating and participating in the fraud.

66. Upon information and belief, Sabat is a citizen of Illinois.

**Defendant Kutinsky**

67. Defendant Bruce Kutinsky ("Kutinsky") has been the Company's Chief Operating Officer since September 2012.

68. According to the 2014 Proxy Statement, as of March 7, 2014, Kutinsky beneficially owned 413,531 shares of the Company's common stock. Before the Company's fraud was exposed after market-close on April 24, 2015, Kutinsky's Akorn stock was worth about $23.61 million.

69. In 2014, Kutinsky received $1.42 million in compensation, $552,102 of which was paid in Company stock options and $184,140 of which was paid in Company stock.

70. According to the 2014 Proxy Statement, "Dr. Kutinsky joined Akorn in late 2009 as Senior Vice President of Corporate Strategy and was named President, Consumer Health Division following the Company's acquisition of Advanced Vision Research, Inc. in May 2011. In September 2012, Dr. Kutinsky was appointed to serve as Akorn's Chief Operating Officer. Before joining Akorn, Dr. Kutinsky was Vice President – Strategic Solutions for Walgreens. Prior to that, Dr. Kutinsky served in various roles at Option Care from 1997 to 2007, most recent of which was as Executive Vice President, Specialty Pharmacy. Dr. Kutinsky holds a Doctor of Pharmacy degree from the University of Michigan."

71. Upon information and belief, Kutinsky is a citizen of Illinois.

**Defendant Kapoor**

72. Defendant John N. Kapoor ("Kapoor"), has been the Company's Chairman since October 1990.

73. According to the 2014 Proxy Statement, as of March 7, 2014, Kapoor beneficially owned 31.58 million shares, or 30.4%, of the Company's common stock. Before the Company's fraud was exposed after market-close on April 24, 2015, Kapoor's Akorn stock was worth over $1.8 billion.

74. In 2013, Kapoor received $160,000 in Director compensation, $70,000 of which was paid in Company stock. In 2014, Kapoor received $202,000 in Director compensation, $95,000 of which was paid in Company stock options.

75. According to the 2014 Proxy Statement, "Dr. Kapoor served as our interim Chief Executive Officer from March 2001 to May 2002 and as our Chief Executive Officer from May 2002 to December 2002. Dr. Kapoor is the President of EJ Financial Enterprises, Inc. (a health care consulting and investment company). Dr. Kapoor is the chairman of the board of directors of Insys Therapeutics, Inc. (NASDAQ: INSY) a publicly held drug development company focused on pain and oncology, into which NeoPharm, Inc. (previously a publicly held biopharmaceutical company) merged in October 2010. Prior to NeoPharm's merger, Dr. Kapoor was the chairman of its board of directors. Under agreements between us and the John N. Kapoor Trust dated 9/20/89 (the "Kapoor Trust"), the beneficiary and sole trustee of which is Dr. John N. Kapoor, our Chairman of the Board, the Kapoor Trust is entitled to designate one

individual to be nominated and recommended by our Board for election as a director. Dr. Kapoor was designated by the Kapoor Trust for this purpose."

76.    Kapoor is the executive chairman and largest shareholder of INSYS Therapeutics, Inc. at which Tambi and Meyer are directors.

77.    The 2014 Proxy Statement failed to state that Kapoor is INSYS Therapeutics, Inc.'s executive chairman and largest shareholder, but refers to him as merely the chairman.

78.    EJ Financial Enterprises, Inc., at which Kapoor is the President, is the general partner of EJ Funds LP, at which Tambi is a director. Kapoor, through his John N. Kapoor Trust, is the principal shareholder of both EJ Financial Enterprises, Inc. and EJ Funds LP. EJ Funds together with Kapoor have been a substantial creditor of the Company.

79.    In consideration for Kapoor's and EJ Funds' loans to the Company, Kapoor received 7.2 million warrants, which he exercised on April 10, 2014, just two weeks before the Company's fraud was exposed. Kapoor's exercise of warrants was done during the five-and-a-half-week period between the Company's two announcements of 2014 financials restatements on March 17, 2015, and April 24, 2015!

80.    Kapoor purchased 19,000 shares of Company stock on March 10, 2015 for $840,940. He sold a total of 100,000 shares of Akorn stock at the end of 2014, before the fraud was exposed -- on August 26, December 10, and December 11 -- for proceeds of just over $4 million.

81.    His insider sales and exercise of his warrants made with knowledge of material non-public information before the fraud was exposed demonstrates his motive in facilitating and participating in the fraud.

- 17 -

82.     Company CEO Rai was previously the CEO and president of Option Care, Inc., Company COO Kutinsky was previously the COO and senior vice president of Option Care, Inc., Company CFO Dick was a vice president at Option Care, Inc., Company Senior Vice President, General Counsel, and Secretary Bonaccorsi was the senior vice president, general counsel, secretary, and compliance officer at Option Care, Inc., and Company Director Abramowitz was previously a director at Option Care, Inc., for which Kapoor was the founder, at which Kapoor was previously its CEO and president, and at which Kapoor had been the chairman from 1990 and controlling shareholder until it was sold to Walgreen Co. in 2007 for $850 million.

83.     The Company's 2014 Proxy Statement failed to state Kapoor's former position at Option Care, Inc.

84.     Santen entered a licensing agreement with an Akorn subsidiary in April 2014 in which Akorn was granted the rights to sell and market tafluprost, trademarked as ZIOPTAN.

85.     In January 2014, Akorn acquired the NDA and all rights to BETIMOL from Santen, which the Company expected to add $8 to $9 million in revenues in 2014.

86.     Santen and Akorn have established an alliance management between them.

87.     The 2014 Proxy Statement failed to state the fact that since Director Graves resigned as Santen Inc.'s CEO and president, she has continued as Santen Inc.'s strategic consultant and advisor, according to a Santen press release dated March 10, 2010.  The press release stated further that "Dr. Graves will continue her active involvement in ophthalmology, both in her advisory role with Santen and in her active participation in key industry boards."

88.     In August 2014, Director Graves was appointed director-designate at Nicox SA.

- 18 -

89. In July 2014, Nicox SA entered an agreement to acquire all of the outstanding equity of Aciex Therapeutics, Inc. for $120 million. According to a Nicox SA press release, "Existing investors in Aciex include Akorn, Inc., Bay City Capital, HealthCare Ventures, New Enterprise Associates and Ora Investment Group." According to the Company's Form 10-Q/A filed with the SEC on April 9, 2015, "As consideration for its carried investment in Aciex, the Company received from the Aciex Acquisition pro-rata shares of Nicox which are publically traded on the Euronext Paris exchange." According to the 2014 Proxy Statement, Company CEO Rai is a director at Aciex.

90. In February 2015 InSite Vision Inc. granted a license to Nicox SA for the development, manufacture, and commercialization of AzaSite, BromSite, and AzaSite Xtra in Europe, the Middle East, and Africa. AzaSite is marketed in the U.S. by Akorn.

91. According to the Form 10-K filed with the SEC on March 17, 2015, "As of December 31, 2014, Dr. Kapoor beneficially owns approximately 30% of our common stock. As a result, Dr. Kapoor can strongly influence, and potentially control, the outcome of our corporate actions, including the election of our directors and transactions involving a change of control. This concentrated control limits other shareholders' ability to influence corporate matters and, as a result, the Company may take actions that other shareholders do not view as beneficial. Further, decisions made by Dr. Kapoor with respect to his and his related parties' ownership or trading of our common stock could have an adverse effect on the market value of our common stock and an adverse effect on our business."

92. Upon information and belief, Kapoor is a citizen of Illinois.

**Defendant Johnson**

93.     Defendant Ronald M. Johnson ("Johnson") has been a Company Director since May 2003.

94.     On March 12, 2015 the Company filed a Form 8-K that stated that Johnson would not stand for reelection as a Director at the next annual shareholders meeting, but that he would remain as a Director until the reelection.  Since March 12, 2015 the Company did not hold an annual stockholders meeting.  Thus, according to the March 12, 2015 8-K, Johnson remains a Company Director today.   Indeed, the Company's website today states that Johnson is a Company Director.

95.     According to the 2014 Proxy Statement, as of March 7, 2014, Johnson beneficially owned 201,557 shares of the Company's common stock.  Before the Company's fraud was exposed after market-close on April 24, 2015, Johnson's Akorn stock was worth over $11.51 million.

96.     In 2013, Johnson received $140,000 in Director compensation, half of which was paid in Company stock.  In 2014, Johnson received $176,000 in Director compensation, $95,000 of which was paid in Company stock options.

97.     Johnson, on September 4, 2014, sold 2,947 shares of Akorn stock for $113,488. On January 2, 2015, he sold another 14,300 shares of Company stock for $516,515.  On January 9, 2015, he sold another 17,173 shares of Company stock for $694,819.  On February 10, 2015, he sold another 17,173 shares of Company stock for $797,514.   Thus, in total, during the Relevant Period, but before the fraud was exposed, Johnson made net sales of a total of 51,593 shares of Akorn stock for net proceeds of over $2.12 million.

98.     His insider sales made with knowledge of material non-public information before the fraud was exposed demonstrates his motive in facilitating and participating in the fraud.

99.     According to the 2014 Proxy Statement, "Mr. Johnson served as president of Becker & Associates Consulting, a firm which provides consulting services to the pharmaceutical, biologics and medical device industries on United States Food and Drug Administration ("FDA") regulatory requirements, until retiring from that firm April 2013. Mr. Johnson currently serves as an independent consultant. Previously, Mr. Johnson was Executive Vice President of The Lewin Group, a subsidiary of Quintiles Transnational, Inc., which provides various healthcare consulting services to state and federal governments, healthcare insurers and healthcare institutions. Prior to joining The Lewin Group, Mr. Johnson served as Executive Vice President of Quintiles Consulting, a business unit of Quintiles Transnational, Inc. from 1997 to 2006. Quintiles Consulting provides consulting services to the pharmaceutical, medical device, biologic and biotechnology industries in their efforts to meet FDA regulatory requirements. Mr. Johnson also spent 30 years with the FDA, holding various senior level positions primarily in the compliance and enforcement areas."

100.     Johnson has been a member of the Audit Committee and the chairman of the Compensation Committee.

101.     Upon information and belief, Johnson is a citizen of Illinois.

**Defendant Weinstein**

102.     Defendant Alan Weinstein ("Weinstein") has been a Company Director since July 2009.

- 21 -

103. According to the 2014 Proxy Statement, as of March 7, 2014, Weinstein beneficially owned 134,057 shares of the Company's common stock. Before the Company's fraud was exposed after market-close on April 24, 2015, Weinstein's Akorn stock was worth over $7.65 million.

104. In 2013, Weinstein received $140,000 in Director compensation, half of which was paid in Company stock. In 2014, Weinstein received $174,000 in Director compensation, $95,000 of which was paid in Company stock options.

105. During the Relevant Period, but before the fraud was exposed, Weinstein, on September 4, 2014, sold 5,000 shares of Akorn stock for $192,450.

106. His insider sales made with knowledge of material non-public information before the fraud was exposed demonstrates his motive in facilitating and participating in the fraud.

107. According to the 2014 Proxy Statement, "Since 2000, Mr. Weinstein has provided consulting services to supplier clients in the areas of hospital organization, hospital operations, and working with group purchasing   organizations. Previously, Mr. Weinstein was the Founder and President of Premier, Inc., an organization which provides various shared services to member hospitals. Mr. Weinstein serves as a director on the boards of Vascular Pathways, Inc., Precyse, SutureExpress and OpenMarkets, and serves on the board of trustees of the Rosalind Franklin University of Medicine and Science."

108. Weinstein has been a member of the Compensation Committee and the chairman of the Nominating and Corporate Governance Committee.

109. Upon information and belief, Weinstein is a citizen of Illinois.

**Defendant Meyer**

- 22 -

110.    Defendant Steven J. Meyer ("Meyer") has been a Company Director since June 2009.

111.    According to the 2014 Proxy Statement, as of March 7, 2014, Meyer beneficially owned 101,456 shares of the Company's common stock.  Before the Company's fraud was exposed after market-close on April 24, 2015, Meyer's Akorn stock was worth over $5.79 million.

112.    In 2013, Meyer received $140,000 in Director compensation, half of which was paid in Company stock.  In 2014, Meyer received $177,000 in Director compensation, $95,000 of which was paid in Company stock options.

113.    According to the 2014 Proxy Statement, "Since 2005, Mr. Meyer has served as the Chief Financial Officer of JVM Realty, a private firm specializing in the acquisition, re-positioning and management of multi-family housing for qualified investors.  Mr. Meyer sits on the Board of Directors for INSYS Therapeutics, Inc.  Mr. Meyer also served as the Corporate Treasurer and International Controller and VP of Global Operations during a 23-year career at Baxter International, Inc."

114.    Meyer is a director of INSYS Therapeutics, Inc. along with Tambi and Kapoor, its executive chairman and largest shareholder.

115.    The 2014 Proxy Statement failed to state that Kapoor is INSYS Therapeutics Inc.'s executive chairman and largest shareholder, but refers to him as merely the chairman.

116.    Meyer has been a member of the Nominating and Corporate Governance Committee and the chairman of the Audit Committee.

117.    Upon information and belief, Meyer is a citizen of Illinois.

**Defendant Tambi**

118.     Defendant Brian Tambi ("Tambi") has been a director at the Company since June 2009.

119.     According to the 2014 Proxy Statement, as of March 7, 2014, Tambi beneficially owned 89,557 shares of the Company's common stock.  Before the Company's fraud was exposed after market-close on April 24, 2015, Tambi's Akorn stock was worth over $5.11 million.

120.     In 2013, Tambi received $140,000 in Director compensation, half of which was paid in Company stock.  In 2014, Tambi received $475,000 in Director compensation!  $95,000 of his 2014 compensation was paid in Company stock options and $307,000 was paid in Company stock

121.     During the Relevant Period, Tambi purchased 1,000 shares of Company stock and sold 15,000 shares of Company stock.  Specifically, on June 13, 2014, he purchased 1,000 shares of Akorn stock for $27,620.  On September 12, 2014, he sold 13,800 shares of Company stock for $524,400.  On December 15, 2015, he sold another 1,200 shares of Company stock for $50,232.  Thus, in total, during the Relevant Period, but before the fraud was exposed, Tambi made net sales for a total of 14,000 shares of Akorn stock for net proceeds (less payment for 1,000 shares) of over $547 thousand.

122.     His insider sales made with knowledge of material non-public information before the fraud was exposed demonstrates his motive in facilitating and participating in the fraud.

123.     According to the 2014 Proxy Statement, "Since August 2006, Mr. Tambi has served as the Chairman of the Board, President & CEO of BrianT Laboratories and has been a

member of the Board of Directors of Insys Therapeutics, Inc. since July 2007.  From November 1995 to July 2006, Mr. Tambi was the Chairman of the Board, President & CEO of Morton Grove Pharmaceuticals, Inc., a leading manufacturer and marketer of oral liquid and topical pharmaceuticals.   Mr. Tambi has over 30 years of executive management experience with companies such as IVAX Corporation, Fujisawa Pharmaceutical Company USA, LyphoMed Inc., and Bristol-Myers International Group.  EJ Funds nominated Mr. Tambi to serve on the Board of Directors pursuant to its rights under the April 13, 2009 Modification, Warrant and Investor Rights Agreement with EJ Funds that, among other things, granted EJ Funds the right to require us to nominate two directors to serve on our Board of Directors."

124.    Tambi is a director of INSYS Therapeutics, Inc. along with Meyer and Kapoor, its executive chairman and largest shareholder.

125.    The 2014 Proxy Statement failed to state that Kapoor is INSYS Therapeutics, Inc.'s executive chairman and largest shareholder, but refers to him as merely the chairman.

126.    EJ Financial Enterprises, Inc., at which Kapoor is the President, is the general partner of EJ Funds LP, at which Tambi is a director.  Kapoor, through his John N. Kapoor Trust, is the principal shareholder of both EJ Financial Enterprises, Inc. and EJ Funds LP.  EJ Funds together with Kapoor have been a substantial creditor of the Company.  In consideration for Kapoor's and EJ Funds' loans to the Company, Kapoor received 7.2 million warrants, which he exercised on April 10, 2014, just two weeks before the Company's fraud was exposed.

127.    Upon information and belief, Tambi is a citizen of Illinois.

**Defendant Abramowitz**

128.     Defendant Kenneth S. Abramowitz ("Abramowitz") became a Director of Akorn in May 2010.

129.     According to the 2014 Proxy Statement, as of March 7, 2014, Abramowitz beneficially owned 72,872 shares of the Company's common stock.  Before the Company's fraud was exposed after market-close on April 24, 2015, Abramowitz's Akorn stock was worth over $4.16 million.

130.     In 2013, Abramowitz received $140,000 in Director compensation, half of which was paid in Company stock.  In 2014, Abramowitz received $169,000 in Director compensation, $95,000 of which was paid in Company stock options.

131.     Abramowitz, on May 14, 2014, sold 2,557 shares of Akorn stock for $68,502.  On September 8, 2014, he sold another 4,500 shares of Company stock for $164,430.  Thus, in total, during the Relevant Period, but before the fraud was exposed, Abramowitz made net sales for a total of 8,800 shares of Akorn stock for net proceeds of about $233 thousand.

132.     His insider sales made with knowledge of material non-public information before the fraud was exposed demonstrates his motive in facilitating and participating in the fraud.

133.     According to the 2014 Proxy Statement, "Mr. Abramowitz is a co-founder and Managing General Partner of NGN Capital.  He joined NGN Capital from The Carlyle Group in New York where he was Managing Director from 2001 to 2003, focused on U.S. buyout opportunities in the healthcare industry.  Prior to that, Mr. Abramowitz worked as an Analyst at Sanford C. Bernstein & Company where he covered the medical supply, hospital management and Health Maintenance Organization (HMO) industries for 23 years.  Mr. Abramowitz earned a B.A. from Columbia University in 1972 and an M.B.A. from Harvard Business School in 1976.

Mr. Abramowitz currently sits on the Board of Directors of EKOS Corporation, OptiScan Biomedical Corporation, Cerapedics, Inc., Valtech Cardio and Small Bone Innovations, Inc. He previously served as a director at Option Care, Inc., Sightline Technologies Ltd and Power Medical Interventions, as well as MedPointe and ConnectiCare Holdings, Inc."

134.    Company CEO Rai was previously the CEO and president of Option Care, Inc., Company COO Kutinsky was previously the COO and senior vice president of Option Care, Inc., Company CFO Dick was a vice president at Option Care, Inc., Company Senior Vice President, General Counsel, and Secretary Bonaccorsi was the senior vice president, general counsel, secretary, and compliance officer at Option Care, Inc., and Company Director Abramowitz was previously a director at Option Care, Inc., for which Kapoor was the founder, at which Kapoor was previously its CEO and president, and at which Kapoor had been the chairman from 1990 and controlling shareholder until it was sold to Walgreen Co. in 2007 for $850 million.

135.    The Company's 2014 Proxy Statement failed to state Kapoor's former position at Option Care, Inc.

136.    Abramowitz has been a member of the Audit Committee.

137.    Upon information and belief, Abramowitz is a citizen of Connecticut.

**Defendant Graves**

138.    Defendant Adrienne L. Graves ("Graves") has been a Director at Akorn since March 2012.

139.    According to the 2014 Proxy Statement, as of March 7, 2014, Graves beneficially owned 29,557 shares of the Company's common stock.  Before the Company's fraud was

exposed after market-close on April 24, 2015, Graves' Akorn stock was worth over $1.69 million.

140.    In 2013, Graves received $140,000 in Director compensation, half of which was paid in Company stock.  In 2014, Graves received $176,000 in Director compensation, $95,000 of which was paid in Company stock options.

141.    During the Relevant Period, but before the fraud was exposed, Graves, on December 12, 2014, sold 9,557 shares of Akorn stock for $392,697.

142.    Her insider sales made with knowledge of material non-public information before the fraud was exposed demonstrates her motive in facilitating and participating in the fraud.

143.    According to the 2014 Proxy Statement, "Dr. Graves is a visual scientist by training and a global industry leader in ophthalmology. From 2002 to 2010, Dr. Graves was President and Chief Executive Officer of Santen Inc., the U.S. subsidiary of Santen Pharmaceutical Co., Ltd.  She joined Santen Inc. in 1995 as Vice President of Clinical Affairs to initiate the company's clinical development efforts in the U.S. Prior to joining Santen Inc., Dr. Graves spent nine years with Alcon Laboratories, Inc. in various roles.  She currently serves on the Boards of TearLab Corporation, Encore Vision, the American Academy of Ophthalmology Foundation, the Pan-American Ophthalmology Foundation, the American Association for Cataract and Refractive Surgery, the Glaucoma Research Foundation, KeepYourSight Foundation, the Corporation Committee for the Brown University Medical School, Aerpio Therapeutics, Himalayan Cataract Project and the Advisory Board for Amach Capital Partners.  Dr. Graves also co-founded Ophthalmic Women Leaders and Glaucoma 360.  She received her B.A. in Psychology with honors from Brown University, her PhD in Psychobiology from the

University of Michigan and completed a postdoctoral fellowship in visual neuroscience at the University of Paris."

144.    Santen entered a licensing agreement with an Akorn subsidiary in April 2014 in which Akorn was granted the rights to sell and market tafluprost, trademarked as ZIOPTAN.

145.    In January 2014, Akorn acquired the NDA and all rights to BETIMOL from Santen, which the Company expected to add $8 to $9 million in revenues in 2014.

146.    Santen and Akorn have established an alliance management between them.

147.    The 2014 Proxy Statement failed to state the fact that, since Graves resigned as Santen Inc.'s CEO and president, she has continued as Santen Inc.'s strategic consultant and advisor, according to a Santen press release dated March 10, 2010.  The press release stated further that "Dr. Graves will continue her active involvement in ophthalmology, both in her advisory role with Santen and in her active participation in key industry boards."

148.    In August 2014, Graves was appointed director-designate at Nicox SA.

149.    In July 2014, Nicox SA entered an agreement to acquire all of the outstanding equity of Aciex Therapeutics, Inc. for $120 million. According to a Nicox SA press release, "Existing investors in Aciex include Akorn, Inc., Bay City Capital, HealthCare Ventures, New Enterprise Associates and Ora Investment Group."  According to the Company's Form 10-Q/A filed with the SEC on April 9, 2015, "As consideration for its carried investment in Aciex, the Company received from the Aciex Acquisition pro-rata shares of Nicox which are publically traded on the Euronext Paris exchange."  According to the 2014 Proxy Statement, Company CEO Rai is a director at Aciex.

150.    In February 2015 InSite Vision Inc. granted a license to Nicox SA for the development, manufacture, and commercialization of AzaSite, BromSite, and AzaSite Xtra in Europe, the Middle East, and Africa.  AzaSite is marketed in the U.S. by Akorn.

151.    Graves has been a member of the Nominating and Corporate Governance Committee and a member of the Compensation Committee.

152.    Upon information and belief, Graves is a citizen of California.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

153.    By reason of their positions as officers, directors and/or fiduciaries of Akorn and because of their ability to control the business and corporate affairs of Akorn, the Individual Defendants owed Akorn and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Akorn in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Akorn and its shareholders so as to benefit all shareholders equally.

154.    Each director and officer of the Company owes to Akorn and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

155.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Akorn, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

- 30 -

156.     To discharge their duties, the officers and directors of Akorn were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

157.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Akorn, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Akorn's Board at all relevant times.  Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing to Akorn to make false and misleading statements of material fact related to their receiving excessive compensation and their making lucrative insider sales, and by not maintaining adequate internal controls.

158.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and

- 31 -

present and future business prospects, and management bonuses, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Akorn to make false and misleading statements and omissions of material facts.

159. To discharge their duties, the officers and directors of Akorn were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Akorn were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Louisiana, the United States, and pursuant to the Akorn's own Code of Ethics and internal guidelines;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Akorn conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Akorn and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Akorn's operations would comply with all laws and Akorn's financial statements filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

160.     Each of the Individual Defendants further owed to Akorn and the shareholders the duty of loyalty requiring that each favor Akorn's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

161.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Akorn and were at all times acting within the course and scope of such agency.

- 33 -

162.    Because of their advisory, executive, managerial, and directorial positions with Akorn, each of the Individual Defendants had access to adverse, non-public information about the Company.

163.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Akorn.

164.    In addition, as a result of the Individual Defendants' actions and course of conduct, the Company is now the subject of two federal securities fraud class action lawsuits and an internal investigation, and to losses due to the unjust enrichment of Individual Defendants and Company employees who were improperly over-compensated by the Company, including through excessive connection connected to Defendants' false and misleading statements that were made intentionally or recklessly, and who made lucrative insider sales.  As a result, Akorn has expended, and will continue to expend millions of dollars to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

165.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct throughout the Relevant Period. During the Relevant Period, the Individual Defendants caused the Company to conceal the true facts as alleged herein.

166.    The purpose and effect of the conspiracy, common enterprise and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, lucrative insider-nature of their sales of Company stock, and unjust enrichment; and (ii) to conceal adverse information

concerning the Company's operations, financial condition, future business prospects, internal controls, and bonuses provided to employees.

167.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently fail to maintain effective accounting and internal control policies and procedures. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

168.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

169.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Akorn, and was at all times acting within the course and scope of such agency.

## CODE OF ETHICS
## AND AUDIT COMMITTEE CHARTER

170.     Pursuant to the Code of Ethics (sometimes referred to herein as the "Code"), the conduct of all of the Company's officers, directors, and employees is governed by the Code of Ethics.

171.    Pursuant to the Audit Committee Charter, the Audit Committee's conduct must comply with the Audit Committee Charter, which sets forth the powers and responsibilities of the Audit Committee.

### Code of Ethics

172.    The Code of Ethics provides, as to "Conflicts of Interest," that:

Employees shall devote their best efforts and attention to the performance of their jobs. They are expected to use good ethical judgment, and to avoid situations that create an actual or potential conflict between the employee's personal interests and the interests of Akorn. A conflict of interest also exists where the employee's loyalties or actions are divided between Akorn 's interests and those of another, such as a competitor, supplier, or customer. Both the fact and the appearance of a conflict should be avoided. Employees unsure as to whether a certain transaction, activity, or relationship constitutes a conflict of interest should discuss it with their immediate supervisor.

....

You should not have a direct or indirect financial interest in a customer, supplier, competitor or others with whom Akorn does business.  The ownership of less than one percent (1%) of the publicly traded stock of a corporation will not be considered a conflict. The employee that has a conflict of interest may not perform a job in which he has influence or makes decisions in connection with Akorn's business. If you or someone with whom you have a close relationship (for example, a family member) has a financial or employment relationship with a competitor, customer, supplier, or potential supplier, you must disclose this fact in writing to the Audit Committee of the Akorn Board of Directors (the "Audit Committee").

... You should not work for, become directly or indirectly involved with, or receive compensation of any sort from, a customer, supplier or competitor of Akorn or others with whom Akorn does business. You should not engage in any activity, including self-employment, which may be competitive with or contrary to the interests Akorn, or which reduces your efficiency in performing your duties at Akorn. If you have a second job, including self-employment, or if you are considering working in a second job, including self-employment, you must notify the Ethics Officer for approval.

....

You may not conduct Akorn business with related parties without the prior written consent of the Audit Committee. Related parties are those who do not deal with you at

arm's length, e.g., family members, friends or organizations with which you have a close relationship.

173.    The Code of Ethics provides, as to "Business and Accounting Practices," that:

**A. <u>Internal Controls</u>**

You should ensure that:

• Transactions are executed in accordance with the management authority; and

• Transactions are recorded in sufficient detail to maintain and keep proper accounting systems.

**B. <u>SEC Reporting</u>**

If you assist with preparation of reports to be filed with the Securities and Exchange Commission or with preparation of information to be included in such reports you must strive to provide full, fair, accurate, timely, and understandable disclosure.

**C. <u>Accounting Irregularities</u>**

If Employees have any complaints about handling of Akorn's SEC reporting, internal accounting, or auditing matters, it should be immediately reported through Akorn's anonymous, confidential reporting system using the means described in Akorn's Whistleblower Policy, which is accessible on Akorn's website.

**D. <u>Written Terms of Purchase and Sale</u>**

All terms of purchase and sale and other significant business transactions must be in writing. No oral agreements or amendments should be made.

**E. <u>Undisclosed Funds Prohibited</u>**

You should not under any circumstances keep Akorn funds in undisclosed or unrecorded accounts for any purpose. All accounts must be disclosed to Akorn's Chief Financial Officer.

**F. <u>No False Entries</u>**

No false or misleading entries should be made in Akorn's books or records for any reason.

**G. <u>Proper Documentation</u>**

No payment (or reimbursement) of expenses should be made without adequate supporting original documentation or authentic and official invoices which establish the business purpose for such expenditure.

174.    The Code of Ethics provides, as to "Insider Trading," that:

Akorn's common stock is publicly traded. Akorn has adopted an Insider Trading Policy which restricts trading in Akorn's securities by employees and directors of Akorn and their families. Trading restricted by the Insider Trading Policy includes activities involving short sales, puts, calls or other options on Akorn's securities. This Insider Trading Policy also applies to trading in securities of competitors, suppliers, customers, or any other company if you have material non-public information. It is required that you comply with the Insider Trading Policy.

175.    The Code of Ethics provides, as to "Violation of the Guidelines," that:

Failure to adhere to the guidelines contained in this Code, including failure to disclose any conflicts or to seek an exception, will result in discipline, up to and including termination of employment. Violations of these guidelines will also be a factor in determining eligibility for promotion, as well as eligibility for bonuses and benefits.

176.    Throughout the Relevant Period, in violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting of transactions and financial statements and of the Company's engagement in the scheme to make false and misleading statements in connection with the receipt of excessive compensation by the Individual Defendants and their making lucrative insider sales, consciously disregarded their duties to monitor such controls over reporting and engagement in transactions, and consciously disregarded their duties to protect corporate assets, engage in fair dealing, avoid using corporate opportunities for personal gain, avoid conflicts of interest, appropriately maintain the Company's books, records, accounts, and financial statements, and make accurate filings with the SEC. The Individual Defendants' complete failure to perform their duties in good faith resulted in

fraudulent misrepresentations to the SEC, the investing public, and the Company's shareholders, and in engagement in transactions that were not in the best interest of the Company.

**Audit Committee Charter**

177.   At all times during the Relevant Period, Defendants Abramowitz, Johnson, and Meyer have served on the Company's audit committee.   Meyer is the chairman of the audit committee.

178.   The Audit Committee Charter provides, as to "Purpose," that:

The primary function of the Audit Committee (the "Audit Committee") of Akorn, Inc. (the "Company") is to assist the Board of Directors (the "Board") in fulfilling its oversight responsibilities by reviewing: the financial reports and other financial information provided by the Company to designated regulatory bodies or the public; the Company's systems of internal controls regarding finance, accounting, legal compliance and ethics that management has established; and the Company's auditing, accounting and financial reporting processes.

179.   The Audit Committee Charter provides, as to "Membership," that:

The Audit Committee shall be comprised of three or more Directors as determined by the Board, each of whom shall be Directors who are independent of management, and free from any relationship that, in the opinion of the Board, would interfere with the exercise of his or her independent judgment as a member of the Audit Committee. All members of the Audit Committee shall be determined by the Board to meet the independence and financial literacy requirements of the American Stock Exchange ("Amex") Company Guide or the NASDAQ Marketplace Rules, as applicable to the Company at such time, and applicable federal law, including Section 10A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Board shall review the number of audit committees of other public companies upon which each of the Audit Committee members serve, and shall make a determination as to whether such service would prohibit each of the members from effectively serving on the Company's Audit Committee.

180.   The Audit Committee Charter provides, as to "Responsibilities, Duties and Powers" that:

· Evaluate whether management is setting the appropriate "tone at the top" by communicating the importance of the Company's ethical and business practice standards, including the importance of internal accounting controls. Establish, review and update

- 39 -

periodically the Company's Code of Ethics and ensure that management has established a system to enforce this Code.

· Serve as an independent and objective party to monitor the Company's financial reporting process and internal control system.

· Review and approve all related-party transactions.

· Review and appraise the audit efforts of the Company's independent auditor, including the scope, fees and timing of the audit.

· Provide an open avenue of communication among the independent auditor, financial and senior management and the Board.

· Review and discuss reports from the independent auditor on (a) all critical accounting policies and practices used by the Company, (b) alternative accounting treatments within GAAP related to material items that have been discussed with management, including the ramifications of the use of the alternative treatments and the treatment preferred by the independent auditor, and (c) other material written communications between the independent auditor and management.

· Review and discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work and management's responses, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

· Review with the independent auditor its judgments as to the quality, not just the acceptability, of the Company's accounting principles and such matters as are required to be discussed with the Audit Committee under generally accepted auditing standards.

· (a) Discuss with management and the independent auditor (i) quarterly earnings press releases, including the interim financial information included therein, and (ii) all annual and quarterly reports to be filed with the Securities and Exchange Commission, (b) review the year-end audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and, (c) if deemed appropriate, recommend to the Board that the audited financial statements be included in the Annual Report on Form 10-K.

· Review and discuss with management and the independent auditor various topics and events that may have significant financial impact on the Company or that are the subject of discussions between management and the independent auditor.

· Review and discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

· Review and discuss with management and the independent auditor: (a) the adequacy and effectiveness of the Company's internal controls (including any significant deficiencies and significant changes in internal controls reported to the Audit Committee by the independent auditor or management; (b) the Company's internal audit procedures; and (c) the adequacy and effectiveness of the Company's disclosures controls and procedures, and management reports thereon.

· Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

· Receive reports on legal compliance and litigation matters and review the significant reports to management prepared by the internal auditors as well as management's responses thereto.

· Receive and review all significant reports and documents required to be produced by the Company under agreements with third parties.

· Appoint, replace, compensate and oversee the work of the Company's independent auditor (including resolutions of disagreements between management and the independent auditor regarding financial reporting). The independent auditor shall report directly to the Audit Committee.

· Ensure the rotation of the audit partners as required by Section 10A(j) of the Exchange Act. Consider whether, in order to assure continuing auditor independence, it is appropriate to adopt a policy of rotating the independent registered public accounting firm on a regular basis.

· Publish the report of the Audit Committee required by the rules of the Securities and Exchange Commission to be included in the Company's annual proxy statement.

· Review and approve, in advance, all permissible non-audit services to be performed by the Company's independent auditor, with exceptions provided for de minimus amounts under certain circumstances as described by law.

· Review and discuss the written statement from the independent auditor concerning any relationship between the auditor and the Company or any other relationships that may adversely affect the independence of the auditor, and, based on such review, assesses the independence of the auditor.

· Set and periodically review a clear policy with respect to the hiring of employees and former employees of independent auditor.

· Obtain and review annually a report by the independent auditor describing such independent auditor's internal quality-control procedures; any material issues raised by the most recent internal quality-control review or peer review or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues.

· Conduct an annual self-assessment, including a review of its Charter, and recommend any changes to the full Board.

· Engage independent legal, accounting and other advisers, as it determines necessary to carry out its duties, with the Audit Committee having sole authority to approve related fees and retention terms.

· Conduct or authorize investigations into matters within the Audit Committee's scope of responsibilities and retain independent counsel, accountants or others to assist it in the conduct of an investigation.

181.    The Audit Committee Charter provides, as to "Meetings" that:

The Audit Committee shall meet in person or telephonically at least four times annually, or more frequently as circumstances dictate, however, at least one such meeting shall take place in person. As part of its job to foster open communications, the Audit Committee shall meet at least annually with management and the independent auditor in separate executive sessions to discuss any matters that the Audit Committee or either of these groups believe should be discussed.

182.    Throughout the Relevant Period, in violation of the Audit Committee Charter, the

Individual Defendants who were members of the Audit Committee conducted little, if any,

oversight of the Company's internal controls over public reporting of transactions and of the

Company's engagement in a scheme to conceal the Defendants' violations of the federal

securities laws in connection with the Defendants' receipt of excessive compensation from the

Company and insider sales, consciously disregarded their duties to monitor such controls over

reporting and engagement in the scheme to conceal the fraud, and consciously disregarded their

duties to ensure that they and other officers, directors, and employees of Akorn protect corporate assets, engage in fair dealing, avoid insider trading on material non-public information, avoid using corporate opportunities for personal gain, and avoid conflicts of interest. The Audit Committee members' complete failure to perform their duties in good faith resulted in fraudulent misrepresentations to the SEC, the investing public, and the Company's shareholders, and in engagement in a scheme that was not in the best interest of the Company.

## DEFENDANTS' MISCONDUCT

183. On March 3, 2014, the Company issued a press release titled "2013 Q4 and Year-End Financial Results" and filed a Form 12b-25, Notification Of Late Filing, with the SEC, announcing that Akorn filed an extension to file its annual report on Form 10-K for the fiscal year 2013. The press release disclosed that the delay was due to the discovery of material weaknesses in the Company's internal controls relating to accounting transactions, as well as the existence of inadequate segregation of duties. Therein, the Company stated, in pertinent part:

> today the Company filed a Form 12b-25, Notification of Late Filing with the Securities and Exchange Commission that allows the Company to extend the deadline to file its Form 10-K for the year-ended December 31, 2013. The Company has not completed its testing and assessment of the effectiveness of its internal control over financial reporting due in part to identified control deficiencies related to completeness and accuracy of underlying data used in the determination of certain significant estimates and accounting transactions as well as the existence of inadequate segregation of duties. The Company believes that these deficiencies, or combination of deficiencies, represent material weaknesses in its internal control over financial reporting. There is a possibility that upon completion of its testing and assessment of the effectiveness of internal controls over financial reporting, the Company may determine that there are additional material weaknesses. The Company expects to file within the 15-day extension period and expects final financial results will be consistent with those reported in this release.

184. On April 10, 2014, the Company filed the 2014 Proxy Statement with the SEC, which contained omissions of material fact, as set forth below.

185.     The Company's 2014 Proxy Statement failed to state Kapoor's former position at Option Care, Inc.  In fact, Company CEO Rai was previously the CEO and president of Option Care, Inc., Company COO Kutinsky was previously the COO and senior vice president of Option Care, Inc., Company CFO Dick was a vice president at Option Care, Inc., Company Senior Vice President, General Counsel, and Secretary Bonaccorsi was the senior vice president, general counsel, secretary, and compliance officer at Option Care, Inc., and Company Director Abramowitz was previously a director at Option Care, Inc., for which Kapoor was the founder, at which Kapoor was previously its CEO and president, and at which Kapoor had been the chairman from 1990 and controlling shareholder until it was sold to Walgreen Co. in 2007 for $850 million.

186.     The Company's 2014 Proxy Statement failed to state that Kapoor is INSYS Therapeutics, Inc.'s executive chairman and largest shareholder, but refers to him as merely the chairman.  As the 2014 Proxy Statement states, Meyer and Tambi are also directors at INSYS Therapeutics, Inc.

187.     The 2014 Proxy Statement failed to state that since Graves resigned as Santen Inc.'s CEO and president, she has continued as Santen Inc.'s strategic consultant and advisor, according to a Santen press release dated March 10, 2010.  In fact, Santen entered a licensing agreement with an Akorn subsidiary in April 2014 in which Akorn was granted the rights to sell and market tafluprost, trademarked as ZIOPTAN.  Moreover, in January 2014, Akorn acquired the NDA and all rights to BETIMOL from Santen, which the Company expected to add $8 to $9 million in revenues in 2014.  Indeed, Santen and Akorn have established an alliance management between them.

188.    The 2014 Proxy Statement also failed to state that Akorn's internal control over financial reporting was ineffective and material weaknesses existed relating to the completeness and accuracy of underlying data used in the determination of significant estimates and accounting transactions and accurate and timely reporting of its financial results and disclosures.

189.    On April 17, 2014, the Company issued a press release titled, "Akorn Completes Acquisition of Hi-Tech Pharmacal."  Therein, the Company stated, in pertinent part:

> LAKE FOREST, IL— April 17, 2014 – Akorn, Inc. (NASDAQ: AKRX), a niche pharmaceutical company, announced today that it has completed its previously announced acquisition of Hi-Tech Pharmacal Co., Inc. (NASDAQ: HITK) for $640 million in cash. The combination of Akorn and Hi-Tech will transform the Company into a larger, more diversified generic player. This combination also brings critical mass and scale to Akorn's business and strengthens the Company's position with retail and institutional customers.

> **Key Acquisition Highlights:**

> - Diversifies revenue base and strengthens R&D pipeline
> - Expands manufacturing capabilities into additional niche dosage forms including nasal sprays, topical gels, creams, ointments, and oral liquids
> - Provides additional breadth in retail OTC market
> - Expect $15-20 million in annual run-rate synergies within 12 months post-close
> - Anticipate strong combined cash flow to allow for rapid debt pay-down

> "We are excited to announce that we have completed the acquisition of Hi-Tech, our largest acquisition to date," said Raj Rai, Chief Executive Officer of Akorn. "This transformative acquisition diversifies our revenue base and strengthens our capabilities in both manufacturing and R&D."

> Rai further added, "We welcome our new colleagues from the Hi-Tech team and look forward to collaborating with them on the future direction of our company. Our priority now turns to executing on our integration plan. We expect that the acquisition will be immediately accretive to non-GAAP earnings."

190.    On May 6, 2014, the Company issued a press release titled, "Akorn Reports 2014 First Quarter Results." Therein, the Company stated, in pertinent part:

> **- Reports Record Q1 Revenue of $90.6 million and Q1 Adjusted EPS of $0.16 -**

**- Completes Acquisition of Zioptan® ophthalmic solution -**
**- Raises 2014 Adjusted EPS Guidance Range to between $0.79 and $0.82 -**

LAKE FOREST, IL— May 6, 2014 -- Akorn, Inc. (NASDAQ: AKRX), a niche generic pharmaceutical company, today reported financial results for the first quarter ended March 31, 2014.

### First Quarter 2014 Key Highlights and Accomplishments

- Achieved record first quarter consolidated revenue of $90.6 million, an increase of 23% over last year's first quarter.
- Generated record operating cash flow of $23.4 million.
- Completed the acquisition of Hi-Tech Pharmacal Co., Inc. (Hi-Tech) on April 17. The acquisition adds scale, breadth of products and dosage forms, and further diversification of the Company's product portfolio.
- Acquired the rights to two branded ophthalmic products, Betimol® and Zioptan®, in January and April respectively.

Raj Rai, Chief Executive Officer commented, "We are excited with the great start that we've seen for 2014. Our team continues to execute on multiple growth initiatives. In addition to completing the transformative acquisition of Hi-Tech a few weeks ago, we also acquired two more branded ophthalmic products, bringing to five the branded ophthalmic products acquired over the last few months. The acquisition of Hi-Tech further diversifies our niche branded and generic product base and brings with it capabilities that will help us continue to grow and diversify our pipeline and revenue base into the future."

### Financial Results for the Quarter Ended March 31, 2014

Consolidated revenue for the first quarter of 2014 was $90.6 million, an increase of 23% over the first quarter 2013 consolidated revenue of $73.9 million. The increase in consolidated revenue was largely driven by the newly acquired branded ophthalmic products – Azasite®, Cosopt®, CosoptPF®, and Betimol®. Consolidated gross margin for the first quarter of 2014 was 54.8% compared to 53.0% in the comparable prior year period. The increase in the Company's consolidated gross margin was also due to the newly acquired branded ophthalmic products which generate gross margins higher than the Company's historical average.

Net income for the first quarter of 2014 was $9.8 million, or $0.08 per diluted share, compared to net income of $10.8 million, or $0.10 per diluted share, in the prior year quarter. First quarter 2014 net income included $6.4 million of acquisition-related expenses, the largest component of which was fees incurred pre-close on the Hi-Tech term loan commitments. Non-GAAP adjusted net income for the first quarter of 2014 was

- 46 -

$18.4 million, or $0.16 per diluted share, compared to non-GAAP adjusted net income of $14.4 million, or $0.13 per diluted share, in the prior year quarter.

191.    On May 12, 2014, the Company filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal first quarter.

192.    The May 12, 2014 Form 10-Q reaffirmed the Company's statements made in the Company's May 6, 2014 press release.

193.    The May 12, 2014 10-Q was signed by Defendant Dick.

194.    Accompanying the May 12, 2014 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934 and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Rai and Dick attesting to their accuracy.

195.    On August 5, 2014, the Company issued a press release titled, "Akorn Reports Preliminary 2014 Second Quarter Results."  Therein, Akorn stated, in pertinent part:

**- Reports Record Q2 Revenue of $150.7 Million and Adjusted EPS of $0.25; Raises 2014 Outlook -**

LAKE FOREST, Ill., Aug. 5, 2014 (GLOBE NEWSWIRE) -- Akorn, Inc. (Nasdaq:AKRX), a niche generic pharmaceutical company, today reported preliminary financial results for the second quarter ended June 30, 2014.

**Second Quarter 2014 Key Highlights and Accomplishments**

- Achieved record second quarter consolidated revenue of $150.7 million, an increase of 96% over last year's second quarter and record adjusted net income per diluted share of $0.25, an increase of 79% over last year's second quarter.
- Raises 2014 outlook to a revenue range of $580 to $600 million and an adjusted net income per diluted share range of $1.00 to $1.05.
- Announced acquisition of VersaPharm which is expected to add $90 to $100 million in annual revenue and $0.10 to $0.12 adjusted net income per diluted share. The acquisition is projected to close mid-August.
- Successfully completed syndication of $445 million term loan to finance the VersaPharm acquisition.
- Received FDA approval on five new products with a combined IMS market size of $560 million. Product approvals included: Atropine Sulfate Ophthalmic

Solution, USP 1%; Dronabinol Capsules USP, 2.5mg, 5mg, 10mg; Tobramycin Inhalation Solution USP, 300mg/5mL; Zoledronic Acid Injection, 4mg/5mL; and Famotidine for Oral Suspension, USP 40mg/5mL.

- Filed an additional twelve ANDAs within the quarter. The Company now has 78 ANDAs filed with the FDA with a combined annual IMS market size of approximately $8.0 billion.
- Divested ECR Pharmaceuticals, a non-core asset which was acquired through the Hi-Tech Pharmacal acquisition, for $41 million in cash and assumption of certain liabilities.

Raj Rai, Chief Executive Officer commented, "We've had another great quarter and with the acquisition of Hi-Tech, we are seeing more opportunities for growth for the remainder of 2014 and beyond. Additionally, we received five new product approvals in the second quarter, which positions Akorn for stronger organic growth in 2015. As a result, we are raising our 2014 guidance."

**Financial Results for the Quarter Ended June 30, 2014**

Consolidated revenue for the second quarter of 2014 was $150.7 million, an increase of 96% over the second quarter 2013 consolidated revenue of $77.0 million. The increase in consolidated revenue was largely driven by the Hi-Tech acquisition, which contributed $51.5 million in revenue for the partial quarter, as well as by the addition of several branded ophthalmic products which were acquired in late 2013 and early 2014.

Consolidated gross margin for the second quarter of 2014 was 50.9% compared to 54.7% in the comparable prior year period. Second quarter 2014 gross margin included $3.6 million in amortization of the step-up of Hi-Tech's acquired inventory. Excluding this impact, second quarter 2014 gross margin was 53.2%.

Net income for the second quarter of 2014 was $8.5 million, or $0.07 per diluted share compared to net income of $12.6 million, or $0.11 per diluted share in the comparable prior year quarter. Second quarter 2014 net income included a number of items related to the Hi-Tech and VersaPharm acquisitions, including acquisition and disposition-related expenses, $3.6 million of amortization of inventory step-up, a gain from product divestitures, financing-related fees on the Hi-Tech and VersaPharm term loan commitments, and a loss from discontinued operations for the ECR Pharmaceuticals divestiture. Non-GAAP adjusted net income for the second quarter of 2014, excluding the impact of these items, was $29.3 million, or $0.25 per diluted share, compared to non-GAAP adjusted net income of $15.3 million, or $0.14 per diluted share in the comparable prior year quarter.

196.    On August 11, 2014, the Company filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal second quarter.

197. The August 11, 2014 Form 10-Q reaffirmed the Company's statements made in the Company's August 5, 2014 press release.

198. The August 11, 2014 10-Q was signed by Defendant Dick.

199. Accompanying the August 11, 2014 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934 and the SOX signed by Defendants Rai and Dick attesting to their accuracy.

200. On August 12, 2014, the Company issued a press release titled, "Akorn Completes Acquisition of VersaPharm." Therein, Akorn stated, in pertinent part:

> Akorn, Inc. (Nasdaq:AKRX), a niche pharmaceutical company, announced today that it has completed its previously announced acquisition of VPI Holdings Corp., the parent company of VersaPharm Incorporated, for $440 million.
>
> **Key Acquisition Highlights:**
>
> - Increases Akorn's presence in the highly attractive niche dermatology market
> - Provides a complementary product portfolio to bolt on to the Hi-Tech acquisition that closed earlier this year
> - Straightforward integration process due to VersaPharm's outsource manufacturing model
> - Expected to add $90 to $100 million in annual revenues and $0.10 to $0.12 in earnings per share, excluding new pipeline launches, deal amortization and acquisition-related expenses
>
> "We are excited to announce that we have completed the acquisition of VersaPharm," said Raj Rai, Chief Executive Officer of Akorn. "This highly strategic acquisition further strengthens our niche portfolio and accelerates our long-term growth opportunities."

201. On November 6, 2014, the Company issued a press release titled, "Akorn Reports Preliminary 2014 Third Quarter Results." Therein, Akorn stated, in pertinent part:

> **Expects Strong Fourth Quarter With Revenues Between $215 Million and $225 Million and Adjusted EPS Between $0.44 and $0.46**

LAKE FOREST, Ill., Nov. 6, 2014 (GLOBE NEWSWIRE) -- Akorn, Inc. (Nasdaq:AKRX), a niche pharmaceutical company, today reported preliminary financial results for the fiscal third quarter ended September 30, 2014.

Consolidated revenues for the third quarter were $132.7 million and included $39.9 million of costs associated with price increases. Excluding these costs, third quarter adjusted net income per diluted share was $0.27. The Company's prior full year guidance for revenue and adjusted net income per diluted share included an estimated $25 million in costs associated with price increases.

**Third Quarter 2014 Key Highlights and Accomplishments**

- Received FDA approval on four new products with a combined IMS market size of $228 million. Product approvals included: Zoledronic Acid Injection 5mg/100 mL; Adenosine Injection USP, 3mg/mL 20mL and 30mL; Tobramycin Injection USP, 40mg/mL 2mL and 30mL; and Gatifloxacin Ophthalmic Solution, 0.5%.
- Completed the acquisition of VPI Holdings Corp., the parent company of VersaPharm Incorporated, in early August.
- In early October, completed the acquisition of Xopenex® inhalation solution from Sunovion Pharmaceuticals, which is expected to add $18 million to $20 million in annual revenue and $0.07 to $0.08 adjusted net income per diluted share in 2015.
- In early October, completed the acquisition of five FDA (CVM) approved veterinary injectable brands: AnaSed®, Tolazine®, Yobine®, Butorphic® and VetaKet®, and a pipeline of four injectable drugs from LLOYD, Inc.
- Adjusts fourth quarter 2014 outlook to reflect the full impact of improved pricing. Fourth quarter revenue, excluding the impact of costs associated with price increases are projected between $215 and $225 million. Adjusted net income per diluted share is projected between $0.44 and $0.46.

Raj Rai, Chief Executive Officer commented, "Our strong business momentum continued this quarter, with double digit organic growth and strong performance from the acquisitions that were completed over the last 12 months. Our strategic initiatives to diversify our portfolio of products have allowed us to reinvent the business, which has opened numerous new market opportunities and has positioned Akorn as a much broader provider of specialty generics. Our current portfolio of marketed and pipeline products operate in strong markets with favorable competitive dynamics, which will provide us with sustainable growth opportunities as we move forward. We expect to close 2014 with record sales and earnings, which will set us firmly on the path to achieve over $1 billion in annual sales in the future."

**Financial Results for the Quarter Ended September 30, 2014**

Consolidated revenue for the third quarter of 2014 was $132.7 million, an increase of 62% over the third quarter 2013 consolidated revenue of $81.9 million. Third quarter

2014 consolidated revenue was reduced by $39.9 million in costs associated with third quarter price increases. The year-over-year increase, excluding the impact of these costs, was largely driven by the Hi-Tech and VersaPharm acquisitions, the addition of several branded ophthalmic products which were acquired in late 2013 and early 2014, as well as strength in Akorn's established base business.

Consolidated gross margin for the third quarter of 2014 was 39% compared with 53% in the third quarter of 2013. In addition to the costs associated with price increases, third quarter 2014 consolidated gross margin included $6.3 million in amortization of the step-up of Hi-Tech and VersaPharm acquired inventories. Excluding the impact of these items, third quarter 2014 gross margin was 57%.

GAAP net loss for the third quarter of 2014 was ($11.7) million, or a loss of ($0.11) per share compared to GAAP net income of $12.2 million, or $0.11 per diluted share in the comparable prior year quarter. Excluding the impact of costs associated with price increases and other non-GAAP adjustments, adjusted net income for the third quarter of 2014 was $32.6 million, or $0.27 per diluted share compared to adjusted net income of $16.7 million, or $0.15 per diluted share in the comparable prior year quarter. Third quarter 2014 adjustments to net income included a number of items described in the GAAP to non-GAAP reconciliation later in this release.

202.    On November 10, 2014, the Company filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal third quarter.

203.    The November 10, 2014 Form 10-Q reaffirmed the Company's statements made in the Company's November 6, 2014 press release.

204.    The November 10, 2014 10-Q was signed by Defendant Dick.

205.    Accompanying the November 10, 2014 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934 and the SOX signed by Defendants Rai and Dick attesting to their accuracy.

206.    On February 26, 2015, the Company issued a press release titled, "CORRECTING and REPLACING -- Akorn Reports Preliminary Fourth Quarter and Full Year 2014 Results."  Therein, Akorn stated, in pertinent part:

**- Fourth Quarter GAAP EPS of $0.29; Non-GAAP Adjusted EPS of $0.50 -**

**- 2015 Revenue Guidance of Between $960 million and $980 million -**

**- 2015 Non-GAAP Adjusted EPS Guidance of $1.88 - $1.98 -**

LAKE FOREST, Ill., Feb. 26, 2015 (GLOBE NEWSWIRE) -- In a release issued under the same headline earlier today by Akorn, Inc. (Nasdaq:AKRX) please note that an incorrect Table 8, Reconciliation of 2015 Non-GAAP Revenue, EPS and EBITDA Guidance to GAAP Revenue, EBITDA and EPS, was included in the original version of this press release. The corrected release follows:

Akorn, Inc. (Nasdaq:AKRX) today reported preliminary financial results for the fiscal fourth quarter and full year ended December 31, 2014 and provided initial 2015 financial guidance.

Consolidated revenue for the fourth quarter was $227.8 million and included $12.4 million of costs associated with competitive pricing actions during the fourth quarter. GAAP diluted earnings per share (EPS) was $0.29 in the fourth quarter of 2014, compared to GAAP EPS of $0.14 in the prior year period. Adjusted non-GAAP diluted EPS for the fourth quarter 2014 increased to $0.50 compared to $0.14 in the fourth quarter of 2013.

Consolidated revenue for full year 2014 was $601.9 million and included $52.2 million of costs associated with competitive pricing actions during the second half of the year. GAAP diluted EPS was $0.38 for the full year 2014, compared to GAAP EPS of $0.46 for the full year 2013. Adjusted non-GAAP diluted EPS for full year 2014 increased to $1.16 compared to $0.55 in full year 2013.

Akorn expects 2015 net revenue between $960 million and $980 million, representing growth of at least 47 percent from non-GAAP adjusted full year 2014 revenue. Full year 2015 non-GAAP adjusted diluted EPS is expected to be between $1.88 and $1.98, representing growth of at least 62 percent from full year 2014 non-GAAP adjusted EPS levels.

**Fourth Quarter 2014 Key Highlights and Accomplishments**

- Total revenue of $227.8 million, up 168 percent versus the prior year period. Excluding one-time costs associated with competitive pricing actions, adjusted total revenue for the quarter was $240.2 million, up 183 percent versus the prior year period.
- GAAP gross margin of 56.4 percent, compared to 55.3 percent in the prior year period; excluding $7.8 million in costs in the fourth quarter 2014 from amortization of inventory step-up and costs associated with competitive pricing

actions, non-GAAP adjusted gross margin was 61.8 percent, up from 55.3 percent in the prior year period.

- GAAP diluted EPS of $0.29, up 107 percent from the prior year period; non-GAAP adjusted diluted EPS of $0.50, up 257 percent from the prior year period.

- Four products were approved by the U.S. Food and Drug Administration (FDA) in the fourth quarter: Adenosine Injection, USP 3mg/mL, 20mL and 30mL; Dexmedetomidine Hydrochloride (HCl) Injection; Phenylephrine HCl and Promethazine HCl Syrup; and Codeine Phosphate, Phenylephrine HCl and Promethazine HCl Syrup.

- Three products were launched in the fourth quarter: Gatifloxacin Ophthalmic Drops 0.5%; Adenosine Injection, USP 3mg/mL, 20mL and 30mL; and Atropine Sulfate Ophthalmic Solution 1%.

**2014 Represented a Key Transformative Year for Akorn**

- In 2014, Akorn received 14 unique product approvals, representing a combined IMS annual market size of $850 million.

- Akorn launched five of these products in 2014 and expects to be in a position to launch the remaining nine products approved in 2014 throughout 2015.

- The Company completed the acquisition of Hi-Tech Pharmacal on April 17, adding over 50 new products to the Akorn portfolio.

- Akorn completed the acquisition of VersaPharm on August 12, complementing the Hi-Tech acquisition through the addition of 20 products along with a robust pipeline of dermatology-focused pipeline products.

- In early October, Akorn acquired rights to Xopenex® Inhalation Solution from Sunovion, adding a leading established respiratory product to the Akorn portfolio.

- Akorn acquired five marketed and four pipeline veterinary products from Lloyd, Inc. in early October, supplementing Akorn's growing presence in the veterinary market.

"2014 was a transformative and rewarding year for Akorn," said Raj Rai, Akorn's Chief Executive Officer. "In a short period of time we have built a robust and well-diversified specialty generics platform that will provide future growth opportunities through a growing pipeline of products and a reliable acquisition strategy. I remain confident in the long term prospects of our business."

207.    The statements made in the press releases the Company issued on March 3, 2014,

April 17, 2014, May 6, 2014, August 5, 2014, August 12, 2014, November 6, 2014, and February

26, 2015 and in the Form 10-Qs filed by the Company with the SEC on May 12, 2014, August

11, 2014, and November 10, 2014, as set forth above, were materially false and/or misleading

because they omitted the following adverse facts, which were known to the Individual Defendants or recklessly disregarded by them:

A) Akorn had errors in its manual reconciliation of chargeback reserve data for a customer;

B) that, as a result, Akorn overstated Hi-Tech's charge back reserve;

C) Akorn understated rebates and other sales allowances;

D) Akorn did not properly integrate Hi-Tech's and VersaPharm's accounting systems;

E) that, as a result, Akorn's revenue was overstated;

F) Akorn's financial statements were not prepared in accordance with GAAP; and

G) Akorn's internal control over financial reporting was ineffective and material weaknesses existed relating to the completeness and accuracy of underlying data used in the determination of significant estimates and accounting transactions and accurate and timely reporting of its financial results and disclosures.

208.    After close of trading on March 2, 2015, the Company issued a press release titled, "Akorn Announces Filing Extension for Form 10-K," and filed a Form 12b-25, Notification of Late Filing, with the SEC, announcing that Akorn would need an extension to file its annual report on Form 10-K for fiscal year 2014.   Akorn stated, in the press release, in pertinent part:

Akorn, Inc. (Nasdaq:AKRX), today announced that the Company filed a Form 12b-25, Notification of Late Filing with the U.S. Securities and Exchange Commission that allows the Company to extend the deadline to file its Form 10-K for the year ended December 31, 2014. The Company has experienced unforeseen delays in collecting and compiling certain financial and other related data that would be included in the Form 10-K relating to the VersaPharm and Hi-Tech Pharmacal subsidiaries which were not

integrated into the Company's centralized accounting department and accounting systems as of December 31, 2014.

In addition, the Company has not yet completed its assessment of the effectiveness of its internal control over financial reporting as of December 31, 2014 due to the aforementioned factors. The Company believes that material weaknesses exist as of December 31, 2014 relating to the completeness and accuracy of underlying data used in the determination of significant estimates and accounting transactions and accurate and timely reporting of its financial results and disclosures in its Form 10-K. There is a possibility that upon completion of its assessment, the Company may determine that there are additional material weaknesses as of December 31, 2014.

The Company is in the process of completing the Form 10-K and its assessment of the effectiveness of internal control over financial reporting as of December 31, 2014. The finalization of financial information is not expected to result in any material change to previously reported financial statements or the financial results reported in our earnings release on February 26, 2015. Additionally, the Company expects to be able to complete its Form 10-K by the extended deadline of March 17, 2015.

209.     After close of trading on March 17, 2015, the Company issued a press release titled, "Akorn Files Annual Report on Form 10-K for Year Ended December 31, 2014; Restates Second and Third Quarter 2014 Financial Statements."  Akorn stated in the press release, in pertinent part:

**Second Quarter and Third Quarter 2014 Restatement Related to an Error in Hi-Tech's Opening Balance Sheet**

During the 2014 year-end audit process, an error was identified in the fair value allocation of assets acquired and liabilities assumed in connection with the acquisition of Hi-Tech Pharmacal Co., Inc. (Hi-Tech), which resulted in an overstated chargeback reserve as of April 17, 2014. The error, which was identified on March 11, 2015, resulted from an overstatement of Hi-Tech's chargeback reserve in connection with applying the acquisition method of accounting at the closing of the Hi-Tech acquisition.

The overstatement in the chargeback reserve was caused by a manual error made in preparing the data related to the chargeback reserve whereby there was a duplication of inventory units held by one customer utilized in the calculation of the reserve amount for Hi-Tech products at the acquisition date. The duplication resulted in an overstatement of chargeback reserves by approximately $8.9 million for the opening balance sheet of Hi-Tech as of April 17, 2014. The chargeback reserve at the end of the quarter ended June 30, 2014 was then calculated correctly, resulting in the earlier overstated reserve amount

being included in revenue during the quarter ended June 30, 2014. The correction of the error in the quarter ended June 30, 2014 resulted in a reduction of previously reported revenue by approximately $8.9 million, a reduction of previously reported pre-tax income by approximately $8.9 million and a reduction of previously reported net income, goodwill and retained earnings by approximately $5.6 million, for the Company's three and six month periods ended June 30, 2014.

As a result of that error, the Audit Committee of the Akorn Board of Directors, upon the recommendation of the Company's management, concluded that the previously issued financial statements contained in the Company's Quarterly Reports on Form 10-Q for the quarters ended June 30, 2014 and September 30, 2014 should not be relied upon due to an error in the financial statements as of and for the three and six month periods ended June 30, 2014 and as of and for the nine month period ended September 30, 2014, and that those financial statements would be restated to make the necessary accounting adjustments.

The relevant financial statements for the fiscal quarters ended June 30, 2014 and September 30, 2014 will be restated to make the necessary accounting adjustments in Forms 10-Q/A that the Company expects to file shortly. The error has been corrected in the full year financial statements included in the Company's Annual Report on Form 10-K that will be filed today. In addition, corrected GAAP financial statements (and GAAP reconciliations for adjusted non-GAAP measures) for the year ended December 31, 2014 accompany this release.

The error had the following effects:

**Revenue & Pre-Tax Income Impact.** The error resulted in an overstatement of revenue and pre-tax income of approximately $8.9 million (GAAP and non-GAAP adjusted) for each of the three and six months ended June 30, 2014, as well as the year-to-date results for the nine months ended September 30, 2014 and the preliminary results for the year ended December 31, 2014. *The revenue and pre-tax income (GAAP and non-GAAP adjusted) reported for the three months ended March 31, 2014 and September 30, 2014 and reflected in the preliminary results for the three months ended December 31, 2014 were not impacted by this error.*

**Income Tax Expense Impact.** Because the error resulted in an overstatement of pre-tax income for the affected periods, GAAP and non-GAAP adjusted income tax expense was overstated by approximately $3.3 million for each of the three and six months ended June 30, 2014, as well as the year-to-date results for the nine months ended September 30, 2014 and the preliminary results for the year ended December 31, 2014. *Income tax expense (GAAP and non-GAAP adjusted) reported for the three months ended March 31, 2014 and September 30, 2014 and reflected in the preliminary results for the three months ended December 31, 2014 were not impacted by this error.*

**Net Income & EPS Impact.** The net impact of the error resulted in an overstatement of both GAAP and non-GAAP adjusted net income and GAAP diluted EPS and non-GAAP adjusted diluted EPS, of approximately $5.6 million and $0.05, respectively, for the three and six months ended June 30, 2014, as well as the year-to-date results for the nine months ended September 30, 2014 and the preliminary results for the year ended December 31, 2014. ***GAAP diluted EPS and non-GAAP adjusted diluted EPS reported for the three months ended March 31, 2014 and September 30, 2014 and reflected in the preliminary results for the three months ended December 31, 2014 were not impacted by this error.***

**No Impact to Cash & Cash Equivalents.** The error and subsequent restatement is non-cash in nature and does not have an impact on the Company's cash and cash equivalents balances for any of the affected periods or the Company's liquidity or capital position.

The Company will file a Form 8-K today containing additional information on this matter.

**Frequently Asked Questions about the Restatement**

**Q1. What caused the error and subsequent restatement?**

A1. An error in the manual reconciliation of chargeback reserve data for one of the Company's customers resulted in a duplication and overstatement of the chargeback reserve of approximately $8.9 million for the Company's opening balance sheet of Hi-Tech as of April 17, 2014. Specifically, an erroneous query of an electronic data interface was made that overstated the amount of inventory reportedly held by the customer, which in turn caused the Company to overstate chargeback reserves. The chargeback reserve at the end of the quarter ended June 30, 2014 was then calculated correctly, resulting in the earlier overstated reserve amount being included in revenue during the quarter ended June 30, 2014. The error was limited to one customer and only to the process of creating the opening balance sheet of Hi-Tech following the close of the acquisition.

**Q2. What periods does the restatement cover?**

A2. The following table describes the periods affected by the restatement.

| 2014 Periods Affected | 2014 Periods Not Affected |
| --- | --- |
| Second quarter ended June 30 | Three months ended March 31 |
| - and as a direct result -- | Three months ended September 30 |
| Six months ended June 30 | Preliminary results for three months ended December 31 |
| Nine months ended September 30 | |
| Preliminary results for year ended December 31 | |

**Q3. What impact does the error and subsequent restatement have on Akorn's Income Statement, cash balance or liquidity?**

- 57 -

A3. The effect to the impacted periods (as described in Answer 2 above) is the following:

| Income Statement Metric | Adjustment |
|---|---|
| Revenue | Decrease by $8.853 million in all affected periods |
| Pre-Tax Income | Decrease by $8.853 million in all affected periods |
| Income Tax | Decrease by $3.282 million in all affected periods |
| Net Income | Decrease by $5.571 million in all affected periods |
| Diluted EPS | Decrease by $0.05 in all affected periods |

The error and subsequent restatement is non-cash in nature and does not have an impact on the Company's cash and cash equivalents balances for any of the affected periods or the Company's liquidity or capital position.

## Q4. Is Akorn's 2015 guidance affected by the restatement?

A4. Akorn's 2015 guidance, furnished as part of the Company's Form 8-K on February 26, 2015 and affirmed in a press release on March 10, 2015, remains unchanged. That guidance calls for revenue between $960 million and $980 million and adjusted non-GAAP adjusted diluted EPS between $1.88 and $1.98.

## Q5. What is Akorn doing to address the situation that led to the restatement?

A5. In connection with its assessment of the effectiveness of its internal control over financial reporting at December 31, 2014, the Company concluded there were certain material weaknesses in internal control over financial reporting, including an additional material weakness that it had inadequate controls in place to prevent or detect material errors in the financial statements of acquired subsidiaries. The error described herein, which requires the restatement of the Company's condensed consolidated financial statements for the quarter and six-months ended June 30, 2014 and the nine months ended September 30, 2014, is a result of this material weakness. The Company has also concluded that its disclosure controls and procedures were not effective as of December 31, 2014, due to these material weaknesses in its internal control over financial reporting. These conclusions are described further in the Company's Annual Report on Form 10-K, which will be filed today. The Company is actively engaged in remediating its material weaknesses and plans to do the following to address the events that led to the restatement.

- Akorn will conduct manual data validation procedures on certain reports related to gross to net adjustments.
- Akorn will enhance the design of management review controls for gross to net adjustments to increase the level of precision.
- Akorn is in the process of establishing a dedicated revenue accounting team focused primarily on significant gross to net revenue adjustments.
- Akorn will continue to develop and expand upon controls specifically designed to identify material errors within subsidiary financial statements.
- Akorn will deploy appropriate personnel with public company accounting experience at the subsidiary level, as needed.

- Akorn will add dedicated personnel within the finance and accounting departments to focus exclusively on acquisitions and acquisition integration.
- Akorn is in the process of bolstering the Company's information technology department to facilitate faster system integration of acquired entities. The Company anticipates full system integration of Hi-Tech during the second quarter of 2015.

210. The statements made in the press releases the Company issued on March 2, 2015 and March 17, 2015, as set forth above, were materially false and/or misleading because they omitted the following adverse facts, which were known to the Individual Defendants or recklessly disregarded by them:

A) Akorn had errors in its manual reconciliation of chargeback reserve data for a customer;

B) that, as a result, Akorn overstated Hi-Tech's charge back reserve;

C) Akorn understated rebates and other sales allowances;

D) Akorn did not properly integrate Hi-Tech's and VersaPharm's accounting systems;

E) that, as a result, Akorn's revenue was overstated;

F) Akorn's financial statements were not prepared in accordance with GAAP; and

G) Akorn's internal control over financial reporting was ineffective and material weaknesses existed relating to the completeness and accuracy of underlying data used in the determination of significant estimates and accounting transactions and accurate and timely reporting of its financial results and disclosures.

211. After close of trading on April 24, 2015, the Company issued a press release titled, "Akorn to Make Additional Financial Restatements," from which the truth emerged. Akorn stated in the press release, in pertinent part:

**Company Affirms 2015 Adjusted Diluted Earnings Per Share Guidance**

LAKE FOREST, Ill., April 24, 2015 (GLOBE NEWSWIRE) -- Akorn, Inc. (Nasdaq:AKRX) today announced that it will restate its previously issued financial statements for the annual period ending December 31, 2014 and the quarterly periods ending June 30, 2014, September 30, 2014 and December 31, 2014 due to errors identified during the first quarter 2015 financial review process.

On April 20, 2015, the Audit Committee of the Board of Directors of Akorn, Inc. (the Audit Committee), upon the recommendation of the Company's management concluded that the financial statements for the quarterly periods ending June 30, 2014, September 30, 2014 and December 31, 2014 along with the annual period ending December 31, 2014 should not be relied upon because of errors in the financial statements in those associated periods. Furthermore, management's report on the effectiveness of internal control over financial reporting as of December 31, 2014 should no longer be relied upon. Additionally, the opinion of Akorn's independent registered public accounting firm, KPMG LLP (KPMG) on the consolidated financial statements for the year ended December 31, 2014, as well as KPMG's opinion on the effectiveness of the Company's internal control over financial reporting as of December 31, 2014, should no longer be relied upon.

During the review process with respect to the quarter ended March 31, 2015, the Company identified errors related to understatements of rebates and other sales allowances that have resulted in an overstatement of the Company's net revenue for the affected periods described above. A substantial majority of these errors are related to companies and products acquired in 2014, the formation of purchasing alliances among several of the Company's customers and changing competitive dynamics for select acquired products during 2014.

Akorn is in the process of analyzing the impact of the restatements on its previously reported financial statements, including previously restated results for the quarters ending June 30, 2014 and September 30, 2014. The errors will be corrected through amendments to Forms 10-Q for the fiscal quarters ended June 30, 2014 and September 30, 2014 and Form 10-K for the year ended December 31, 2014. The amended forms will be filed prior to the filing of Akorn's Form 10-Q for the fiscal quarter ended March 31, 2015.

**Initial Assessment of Impact**

While the exact impact to the Company's financial statements has not been determined, based on management's preliminary assessment, the errors related to the understatements of rebates and other sales allowances are estimated to have resulted in an overstatement to net revenue and pretax income from continuing operations of $20 million to $35 million for the year ending December 31, 2014. The allocation of the impact of the errors among the affected quarterly periods has not been determined. The estimated impact of

- 60 -

the errors could materially change based on further review and analysis of the affected periods, including due to potential identification of other errors. Additional material weaknesses in the internal control over financial reporting may be identified in connection with known or potential errors noted above. In concert with determining the ultimate impact to the Company's financial statements, Akorn is working to remediate the issues that caused these errors.

**Timely Filing of First Quarter Financials Is Not Expected**

Akorn anticipates that it will not be able to file its Form 10-Q for the first quarter of 2015 in a timely manner because of the pending restatements to prior-period results. While the Company plans to request a five-day extension to file its Form 10-Q with the U.S. Securities and Exchange Commission, the Company does not anticipate it will meet the extended deadline.

**Independent Investigation Commissioned by the Audit Committee**

The Audit Committee will be conducting an independent investigation into the circumstances surrounding the errors that resulted in the misstatements, which will involve retaining outside advisors to assist in the investigation.

<u>**DAMAGES TO AKORN**</u>

212. As a direct and proximate result of the Individual Defendants' conduct, Akorn has lost and has expended and will continue to expend millions of dollars.

213. Such expenditures include, but are not limited to, legal fees associated with the two federal securities fraud class action lawsuits filed against the Company and its management, the internal investigation, and amounts paid to outside lawyers, accountants, and investigators in connection with the investigations and lawsuits.

214. Such losses include those due to the unjust enrichment of Defendants and Company employees who were improperly over-compensated by the Company in connection with Defendants' false and misleading statements that were made intentionally or with reckless disregard, including all ill-gotten gains from insider selling by the Individual Defendants -- including insider sales by Silverberg and exercise of warrants by Kapoor made during the five-

and-a-half-week period between the Company's two announcements of 2014 financials restatements on March 17, 2015, and April 24, 2015.

215.     As a direct and proximate result of the Individual Defendants' conduct, Akorn has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

216.     Plaintiff brings this action derivatively and for the benefit of Akorn to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Akorn, gross mismanagement, abuse of control, and unjust enrichment, as well as the aiding and abetting thereof.

217.     Akorn is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

218.     Plaintiff is, and at all relevant times has been, an Akorn shareholder.  Plaintiff will adequately and fairly represent the interests of Akorn in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

219.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

220.     A pre-suit demand on the Board of Akorn is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following Individual Defendants:  Kapoor,

Abramowitz, Graves, Johnson, Meyer, Tambi, and Weinstein (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors that are on the Board at the time this action is commenced.

221.     Defendant Kapoor as the Company's chairman and owner of over $1.8 billion in Akorn stock before the fraud was exposed is not a disinterested or independent director.   Indeed, the Company acknowledges that Kapoor controls the Company including the appointment of its Directors.  As the Company's admitted controller, he is clearly not independent.  His insider sales before the fraud was exposed that yielded net proceeds of over $3 million demonstrates his motive in facilitating and participating in the fraud.  Moreover, with knowledge of material non-public information he exercised 7.2 million warrants only two weeks before the fraud was exposed -- during the five-and-a-half-week period between the Company's two announcements of 2014 financials restatements on March 17, 2015, and April 24, 2015!  His gargantuan stock holding reveals his interest in keeping the Company stock price as high as possible.  He is also a substantial creditor of the Company through EJ Financial Enterprises, Inc.  He knowingly caused the 2014 Proxy Statement to fail to disclose that he was the CEO, president, and controlling shareholder at Option Care, Inc., at which many of the Individual Defendants were officers, including Rai, Kutinsky, Dick, Bonaccorsi, and at which one, Abramowitz, was a director, and that he is not just the chairman, but the executive chairman and largest shareholder at INSYS Therapeutics, Inc., at which Tambi and Meyer are directors; this demonstrates that he knowingly engaged in securities fraud.   As a result, Kapoor breached his fiduciary duties.  Moreover, Kapoor conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false

and misleading statements in connection with the receipt of excessive compensation by the Individual Defendants and their making lucrative insider sales, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Thus, as Kapoor is not independent or disinterested and faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

222.    Defendant Tambi is not an independent Director, but is beholden to Kapoor, Rai, and other Company officers as he received almost half a million dollars in compensation for being merely a Director in 2014, and as he is a director at two of Kapoor's other companies. Tambi is a director at EJ Funds LP, Kapoor's company that makes substantial loans to Akorn. Moreover, Tambi is a director at INSYS Therapeutics, Inc., at which Meyer is also a director, and at which Kapoor is the executive chairman and largest shareholder.  Yet, the 2014 Proxy Statement disclosed that Kapoor was merely the chairman at INSYS Therapeutics, Inc.  Tambi's ownership of over $5 million worth of Akorn stock before the fraud was exposed reveals his interest in keeping the Company stock price as high as possible. His insider sales made with knowledge of material non-public information before the fraud was exposed that yielded net proceeds of almost $550 thousand demonstrates his motive in facilitating and participating in the fraud.  Moreover, Tambi conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements in connection with the receipt of excessive compensation by the Individual Defendants and their making lucrative insider sales, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and

consciously disregarded his duties to protect corporate assets. Thus, as Tambi is not independent or disinterested and faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

223. Defendant Graves is not an independent Director, but is beholden to Kapoor, Rai, and other Company officers as she not only received over one hundred and seventy-five thousand dollars in compensation for being a Director in 2014, but she is a consultant to and was the former CEO at Santen Inc., which entered two material transactions with Akorn, and she is a director-designate at Nicox SA, which entered a material transaction with Akorn. The significance of her involvement at Santen Inc. and Nicox to Akorn's aforementioned material transactions is palpable as the Company failed to disclose her current positions at those companies! Her ownership of over $1.69 million worth of Akorn stock before the fraud was exposed reveals her interest in keeping the Company stock price as high as possible. Her insider sales made with knowledge of material non-public information before the fraud was exposed that yielded net proceeds of almost $400 thousand demonstrates her motive in facilitating and participating in the fraud. Moreover, Graves conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements in connection with the receipt of excessive compensation by the Individual Defendants and their making lucrative insider sales, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Thus, as Graves is not independent or disinterested and faces a substantial likelihood of liability, demand upon her is futile and, therefore, excused.

224.    Defendant Johnson is not an independent Director, but is beholden to Kapoor, Rai, and other Company officers as he not only received over one hundred and seventy-five thousand dollars in compensation for being a Director in 2014, but his ownership of over $11.51 million worth of Akorn stock before the fraud was exposed reveals his interest in keeping the Company stock price as high as possible. His insider sales made with knowledge of material non-public information before the fraud was exposed that yielded net proceeds of over $2.12 million demonstrates his motive in facilitating and participating in the fraud.  Moreover, as a member of the Company's Audit Committee, Johnson conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements in connection with the receipt of excessive compensation by the Individual Defendants and their making lucrative insider sales, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, as Johnson is not independent or disinterested and faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

225.    Defendant Weinstein is not an independent Director, but is beholden to Kapoor, Rai, and other Company officers as he not only received over one hundred and seventy-four thousand dollars in compensation for being a Director in 2014, but his ownership of over $7.65 million worth of Akorn stock before the fraud was exposed reveals his interest in keeping the Company stock price as high as possible. His insider sales made with knowledge of material non-public information before the fraud was exposed that yielded net proceeds of over $192,450 demonstrates his motive in facilitating and participating in the fraud.  Moreover, Weinstein

conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements in connection with the receipt of excessive compensation by the Individual Defendants and their making lucrative insider sales, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, as Weinstein is not independent or disinterested and faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

226. Defendant Abramowitz is not an independent Director, but is beholden to Kapoor, Rai, and other Company officers as he received almost one hundred and seventy thousand dollars in compensation for being a Director in 2014, and as he was a director at Kapoor's Option Care, Inc. (at which many of the Officer Defendants were officers), at which Kapoor's position was not disclosed in the 2014 Proxy Statement. His ownership of over $4.16 million worth of Akorn stock before the fraud was exposed reveals his interest in keeping the Company stock price as high as possible. His insider sales made with knowledge of material non-public information before the fraud was exposed that yielded net proceeds of about $233 thousand demonstrates his motive in facilitating and participating in the fraud. Moreover, as a member of the Company's Audit Committee, Abramowitz conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements in connection with the receipt of excessive compensation by the Individual Defendants and their making lucrative insider sales, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme,

and consciously disregarded his duties to protect corporate assets. Thus, as Abramowitz is not independent or disinterested and faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

227. Defendant Meyer is not an independent Director, but is beholden to Kapoor, Rai, and other Company officers as he received one hundred and seventy-seven thousand dollars in compensation for being a Director in 2014, and as he is a director at INSYS Therapeutics, Inc., at which Kapoor is the executive chairman and largest shareholder. Indeed, the 2014 Proxy Statement disclosed that Kapoor was merely the chairman at INSYS Therapeutics, Inc. His ownership of over $5.79 million worth of Akorn stock before the fraud was exposed reveals his interest in keeping the Company stock price as high as possible. Moreover, as chairman of the Company's Audit Committee, Meyer conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements in connection with the receipt of excessive compensation by the Individual Defendants and their making lucrative insider sales, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, as Meyer is not independent or disinterested and faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

228. Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the aforementioned lack of oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements in

- 68 -

connection with the receipt of excessive compensation by the Individual Defendants and their making lucrative insider sales, *including by each of the Directors except for Meyer*, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

229.    In complete abdication of their fiduciary duties, all of the Directors either participated in or were recklessly unaware of the fraudulent scheme to make the Company appear more profitable and attractive to investors, and to increase the Company stock price. As a result, the Directors breached their fiduciary duties. Thus, the Directors face a substantial likelihood of liability, and demand upon them is futile.

230.    The Directors, as members of the board, were and are subject to the Code of Ethics. The Code of Ethics went well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code of Ethics required the Directors to also adhere to Akorn's standards of business conduct. The Directors did not comply with the requirements of the Code of Ethics. The Directors violated the Code of Ethics by causing the Company to fail to maintain adequate internal controls, to make false and misleading statements and omissions of material fact, and to engage in the scheme to make false and misleading statements in connection with the receipt of excessive compensation by the Individual Defendants and their making lucrative insider sales. Because the Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

231.    Furthermore, demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other, especially to Defendants Kapoor and Rai.

232.    Members of the board have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  These conflicts of interest precluded the board from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand on the Directors would be futile.

233.    Akorn has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Akorn any part of the damages Akorn suffered and will continue to suffer thereby.  Thus, any demand on the Directors would be futile.

234.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgments as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

235.    The acts complained of herein constitute violations of fiduciary duties owed by Akorn's officers and directors and these acts are incapable of ratification.

236.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Akorn.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of Akorn, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

237.    If there is no directors' and officers' liability insurance, then the Directors will not cause Akorn to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

238.    Thus, for the reasons set forth above, all of the Directors, and, if not all of them, certainly a majority of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Directors is excused as futile.

239.    Overall, the Company has and will expend millions of dollars in legal fees associated with the two federal securities fraud class action lawsuits, the internal investigation,

and has suffered huge losses due to the unjust enrichment of the Individual Defendants and Company employees who were improperly over-compensated by the Company in connection with the Individual Defendants' false and misleading statements that were made intentionally or with reckless disregard and who handsomely profited from their insider sales made with material non-public information.  The Company has otherwise also wasted a substantial amount of money in compensating the Individual Defendants as directors and officers.  Moreover, the Company's reputation has been severely damaged.   All of this substantial damage to Akorn stems proximately from the Directors' conscious and willful breaches of their fiduciary duties, abuse of control, and other malfeasance.

240.    Plaintiff has not made any demand on the other shareholders of Akorn to institute this action because such demand would be a futile and useless act for at least the following reasons:

(a) Akorn is a publicly held company with over 114.4 million shares outstanding and hundreds of shareholders;

(b) Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c) Making demand on all shareholders would force Plaintiff to incur expensive expenses, even assuming all shareholders could be individually identified.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

241.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

242.  Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Akorn's business and affairs.

243.  Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

244.  The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Akorn.

245.  In breach of their fiduciary duties owed to Akorn, the Individual Defendants willfully participated in misrepresentation of the Company's business operations and prospects, failed to correct the Company's public statements, and failed to properly oversee Akorn's business and internal controls, rendering them personally liable to the Company for breaching their fiduciary duties.

246.  The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly misrepresent its business operations, prospects, and financial condition, and relationships between certain of its Directors and Officers with each other, and they failed to correct the Company's public statements.  Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted

with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Akorn's securities and making lucrative insider sales with material non-public information.

247. The Individual Defendants had actual or constructive knowledge that that they had caused the Company to fail to maintain adequate internal controls and facilitated a scheme for the Individual Defendants to make lucrative insider sales on material non-public information, or acted with reckless disregard for the truth. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Akorn's securities and engaging in self-dealing transactions.

248. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

249. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Akorn has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

## SECOND CLAIM

### Against Individual Defendants for Abuse of Control

250. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

251. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Akorn, for which they are legally responsible.

252.    As a direct and proximate result of the Individual Defendants' abuse of control, Akorn has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Akorn has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## THIRD CLAIM

### Against Individual Defendants for Gross Mismanagement

253.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

254.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Akorn in a manner consistent with the operations of a publicly-held corporation.

255.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Akorn has sustained and will continue to sustain significant damages.

256.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

257.    Plaintiff, on behalf of Akorn, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Unjust Enrichment

258. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

259. By their wrongful acts and the omissions of material fact that they caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Akorn.

260. During the Relevant Period, the Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales and received unjustly excessive compensation tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Akorn that was tied to the performance or artificially inflated valuation of Akorn, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

261. Plaintiff, as a shareholder and a representative of Akorn, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

## **FIFTH CLAIM**

### **Against Individual Defendants for Violations of § 14(a) of the Exchange Act**

262. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

263. This claim for relief is not based on any allegations of knowing or reckless conduct by any defendant. This claim does not allege, and does not sound in fraud, and Plaintiffs disclaim any reliance upon or reference to allegations of fraud.

264. Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of ant security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. §78l.]" 15 U.S.C. § 78n(a).

265. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

266. Specifically, the Company's 2014 Proxy Statement filed April 10, 2014 violated Section 14(a) and Rule 14a-9 because it omitted material information regarding the Individual Defendants' background, and included by reference materially false and misleading financial statements.

267. In the exercise of reasonable care, the Individual Defendants should have known that the 2014 Proxy Statement was materially false and misleading.

268. The misrepresentations and omissions in the 2014 Proxy Statement were material to Plaintiff and the Company's shareholders in casting an informed vote on the subjects under consideration. The 2014 Proxy Statement was an essential link in the accomplishment of the execution of the Individual Defendants' lucrative insider sales made with material non-public information, continuation of Individual Defendants' concealment of the Company's financial condition, business operations, and relationships between the Company's Directors and Officers, and the Individual Defendants' failure to exercise their oversight duty in connection with the Company's risk management -- because revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the Directors' positions, the executive officers' compensation, and the Company's compensation policies.

269. The Company was damaged as a result of the material misrepresentations and omissions in the 2014 Proxy Statement.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Akorn, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Akorn and have committed violations of Section 14(a) of the Exchange Act;

(c)    Determining and awarding to Akorn the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally,

together with pre-judgment and post-judgment interest thereon;

(d)   Directing Akorn and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Akorn and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Akorn to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)   Awarding Akorn restitution from Individual Defendants, and each of them;

(f)   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)   Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

- 79 -

Dated: August 19, 2015           Respectfully submitted,


**/s/ Matthew T. Heffner**
_____


**HEFFNER HURST**
Matthew T. Heffner
30 N. LaSalle Street
Suite 1210
Chicago, Illinois 60602
Telephone:  (312) 346-3466
Facsimile:  (312) 346-2829
mheffner@heffnerhurst.com


**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Email: pkim@rosenlegal.com
Laurence M. Rosen
Email: lrosen@rosenlegal.com
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile:  (212) 202-3827


*Counsel for Plaintiff*