**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BRUCE SAFRIET, *et ano.*, Derivatively on Behalf of Nominal Defendant AKORN, INC.,<br><br>Plaintiff,<br><br>v.<br><br>RAJAT RAI, TIMOTHY A. DICK, BRUCE KUTINSKY, JOSEPH BONACCORSI, JOHN R. SABAT, MARK M. SILVERBERG, JOHN N. KAPOOR, RONALD M. JOHNSON, BRIAN TAMBI, STEVEN J. MEYER, ALAN WEINSTEIN, KENNETH S. ABRAMOWITZ, AND ADRIENNE L. GRAVES<br><br>Defendants,<br><br>and<br><br>AKORN, INC.,<br><br>Nominal Defendant. | Case No. 15-cv-07275<br><br>Honorable Gary Feinerman<br><br>**AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Bruce Safriet and Felix Glaubach ("Plaintiffs"), by their undersigned attorneys, derivatively and on behalf of Nominal Defendant Akorn, Inc. ("Akorn" or the "Company"), file this Amended Verified Shareholder Derivative Complaint against the Individual Defendants (as defined herein) for breaches of their fiduciary duties, as members of the Board of Directors (the "Board") and/or officers of Akorn, gross mismanagement, abuse of control, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), (the "Exchange Act"). Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings

made by Akorn with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Akorn; (iii) other publicly available information, including media and analyst reports, concerning Akorn; (iv) pleadings, papers, and any documents filed with and publicly available from the related pending securities fraud class action, *Yeung v. Akorn, Inc., et al.*, Case No. 1:15-cv-01944 (N.D. Ill.) (the "Securities Class Action").

## INTRODUCTION

1. This is a shareholder derivative action brought on behalf of Nominal Defendant Akorn, against the Individual Defendants seeking to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law.

2. Akorn engages in the manufacture and marketing of diagnostic and therapeutic ophthalmic pharmaceuticals products, hospital drugs, and injectable pharmaceuticals in the United States and internationally. The Company offers products in various specialty areas, including ophthalmology, antidotes, anti-infectives, pain management, anesthesia, and vaccines.

3. In 2014, the Company completed two critical acquisitions. On April 17, 2014 the Company completed its acquisition of Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") for $640 million, and on August 12, 2014, the Company completed its acquisition of VersaPharm Incorporated ("VersaPharm") for $440 million.

4. Subsequent to these acquisitions, the Individual Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (1) as of December 31, 2014, more than eight months after it acquired Hi-Tech and four months after it acquired VersaPharm, Akorn had not yet integrated those subsidiaries into the Company's centralized accounting department and accounting systems; (2)

certain financial and other related data related to Hi-Tech and VersaPharm, which require inclusion in Akorn's annual report to be filed with the SEC on Form 10-K, could not be timely collected and compiled; (3) due to the aforementioned factors, the Company would be unable to timely complete its assessment of the effectiveness of its internal control over financial reporting as of December 31, 2014; (4) Akorn's internal control over financial reporting was ineffective and material weaknesses existed relating to the completeness and accuracy of underlying data used in the determination of significant estimates and accounting transactions and accurate and timely reporting of its financial results and disclosures in its Form 10-K; (5) and as a result of the foregoing, Akorn's public statements were materially false and misleading at all relevant times.

5. On March 2, 2015, after the close of trading, the Company issued a press release and filed a Form 12b-25, Notification Of Late Filing, with the SEC, announcing that it would need an extension to file its annual report on Form 10-K for the year ending December 31, 2014. The basis for this extension was ostensibly unforeseen delays in collecting and compiling certain financial and other related data that would be included in the Form 10-K relating to the VersaPharm and Hi-Tech Pharmacal subsidiaries which were not integrated into the Company's centralized accounting department and accounting systems as of December 31, 2014. The issue was downplayed by the Individual Defendants who maintained that the finalization of financial information was not expected to result in any material change to previously reported financial statements or the financial results reported in the Company's earnings release on February 26, 2015.

6. On March 17, 2015, the Individual Defendants caused the Company to file an 8-K and 10-K with the SEC stating that, contrary to their March 2, 2015 statements, there would

in fact be a restatement in connection with previous cited problems. The Individual Defendants, however, mollified the marketplace when it came to the extent of the restatement. The filings stated the restatement was "limited to the Company's financial results for the three and six month periods ended June 30, 2014" and was merely a result of an error in the fair value allocation of assets acquired and liabilities assumed in connection with the acquisition of Hi-Tech, which resulted in an overstated chargeback reserve as of April 17, 2014. Per the Individual Defendants, the effect of this "error" was a reduction of previously reported revenue by $8.9 million, a reduction of previously reported pre-tax income by $8.9 million and a reduction of previously reported net income, goodwill and retained earnings by $5.6 million, for the Company's three and six month periods ended June 30, 2014.

7. Just a little over a month later, on April 24, 2015, the Individual Defendants were forced to reveal the ugly truth to the marketplace. On that date, the Company announced that it would restate its previously issued financial statements for the annual period ending December 31, 2014 and the quarterly periods ending June 30, 2014, September 30, 2014 and December 31, 2014 due to errors identified during the first quarter 2015 financial review process. While the exact impact to the Company's financial statements had not been determined, based on management's preliminary assessment, the errors related to the understatements of rebates and other sales allowances were estimated to have resulted in an overstatement to net revenue and pretax income from continuing operations of $20 million to $35 million for the year ending December 31, 2014. This was a far cry from the Individual Defendants previous admonitions.

8. Egregiously, Defendants John N. Kapoor ("Kapoor" or "Dr. Kapoor"), Kenneth S. Abramowitz ("Abramowitz"), Adrienne L. Graves ("Graves"), Ronald M. Johnson ("Johnson"), Brian Tambi ("Tambi"), Alan Weinstein ("Weinstein"), Rajat Rai ("Rai"),

Timothy Dick ("Dick"), Joseph Bonaccorsi ("Bonaccorsi"), Mark M. Silverberg ("Silverberg") and John R. Sabat ("Sabat") (the "Insider Selling Defendants") were able to profit from the Company's false and misleading statements regarding the Company's lack of internal controls, 2014 revenue, and the need for a restatement, as each of these defendants sold Akorn stock at artificially inflated prices prior to the Individual Defendants finally making truthful announcements regarding the restatement and its magnitude.

9. On May 10, 2016, Akorn restated its consolidated financial statements a second time for each quarter during the 2014 fiscal year. In total, the Company disclosed that it artificially inflated its revenue 8.4% and its net income a staggering 194.7%. As a result of the Restatement (defined as the combined first restatement on March 17, 2015 and second restatement on May 10, 2016), $46.9 million of revenue and $27.0 million of net income evaporated. Indeed, the Restatement wiped out the vast majority of the Company's net income originally reported during the year, reducing it from $40.9 million to just $13.9 million. Akorn also admitted to continuing material weaknesses in its internal controls, which the Company hoped to remediate by early 2017.

10. The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and other misconduct. Therefore, Plaintiffs bring this action against the Individual Defendants to remedy their breaches of fiduciary duty.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Exchange Act. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28

U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

12. Additionally, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

13. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of Illinois or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

14. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

15. Plaintiffs are current shareholders of Akorn. Plaintiffs have continuously held Akorn common stock at all relevant times. Plaintiff Safriet is a citizen of Ohio and Plaintiff Glaubach is a citizen of New York.

16. Defendant Akorn is a Louisiana corporation. In 1997, the Company relocated its corporate headquarters to the Chicago, Illinois area with its principal executive offices located at 1925 West Field Court, Suite 300, Lake Forest, IL. The Company does not maintain any operations in Louisiana. The Company also have other corporate offices in Ann Arbor,

Michigan and Gurgaon, Haryana, India. Akorn's common stock trades on the NASDAQ under the ticker symbol "AKRX."

17. Defendant Kapoor has served as the Chairman of the Board since October 1990. Dr. Kapoor served as the Company's interim Chief Executive Officer ("CEO") from March 2001 to May 2002 and as CEO from May 2002 to December 2002. Dr. Kapoor is the President of EJ Financial Enterprises, Inc., a health care consulting and investment company. Dr. Kapoor is the chairman of the board of directors of INSYS Therapeutics, Inc. ("INSYS"), a publicly held drug development company focused on pain and oncology, into which NeoPharm, Inc. (also a previously publicly held biopharmaceutical company) merged in October 2010. Prior to NeoPharm's merger, Dr. Kapoor was the chairman of its board of directors. Under agreements between Akorn and the John N. Kapoor Trust dated 9/20/89 (the "Kapoor Trust"), the beneficiary and sole trustee of which is Defendant Kapoor, the Kapoor Trust is entitled to designate one individual to be nominated and recommended by the Company's Board for election as a director. Dr. Kapoor was designated by the Kapoor Trust for this purpose. Dr. Kapoor sold the following shares with insider information regarding the Akorn's lack of internal controls and the need for the Company to restate its financials, all of which resulted in Akorn stock trading at artificially inflated prices at the time of his stock sales:

| **Date** | **Shares** | **Transaction** | **Value** |
|---|---|---|---|
| Dec 11, 2014 | 32,300 | Sale at $41.17 per share. | $1,329,791 |
| Dec 10, 2014 | 17,700 | Sale at $41.22 per share. | $729,594 |
| Aug 26, 2014 | 50,000 | Sale at $38.99 per share. | $1,949,500 |

Upon information and belief, Dr. Kapoor is a citizen of the State of Illinois.

18. Defendant Abramowitz was elected to the Board in May 2010. Abramowitz is a co-founder and Managing General Partner of NGN Capital. He joined NGN Capital from The

Carlyle Group in New York where he was Managing Director from 2001 to 2003. Prior to that, Abramowitz worked as an Analyst at Sanford C. Bernstein & Company where he covered the medical supply, hospital management and Health Maintenance Organization (HMO) industries for 23 years. Abramowitz earned a B.A. from Columbia University in 1972 and an M.B.A. from Harvard Business School in 1976. Abramowitz currently sits on the Board of Directors of EKOS Corporation, OptiScan Biomedical Corporation, Cerapedics, Inc., Valtech Cardio and Small Bone Innovations, Inc. He previously served as a director at Option Care, Inc. ("Option Care"), Sightline Technologies Ltd and Power Medical Interventions, as well as MedPointe and ConnectiCare Holdings, Inc. Abramowitz sold the following shares with insider information regarding the Akorn's lack of internal controls and the need for the Company to restate its financials, all of which resulted in Akorn stock trading at artificially inflated prices at the time of his stock sales:

| **Date** | **Shares** | **Transaction** | **Value** |
|---|---|---|---|
| Sep 8, 2014 | 4,500 | Sale at $36.54 per share. | $164,430 |
| May 14, 2014 | 2,557 | Sale at $26.79 per share. | $68,502 |
| Mar 17, 2014 | 4,500 | Sale at $23.68 per share. | $106,560 |

Upon information and belief, Abramowitz is a citizen of the State of Connecticut.

19. Defendant Graves was appointed a director by the Board in March 2012. Graves is a visual scientist by training and a global industry leader in ophthalmology. From 2002 to 2010, Graves was President and CEO of Santen Inc. ("Santen"), the U.S. subsidiary of Santen Pharmaceutical Co., Ltd. Defendant Graves joined Santen Inc. in 1995 as Vice President of Clinical Affairs to initiate the company's clinical development efforts in the U.S. Prior to joining Santen Inc., Graves spent nine years with Alcon Laboratories, Inc. in various roles. Defendant Graves currently serves on the Boards of TearLab Corporation, Encore Vision,

the American Academy of Ophthalmology Foundation, the Pan-American Ophthalmology Foundation, the American Association for Cataract and Refractive Surgery, the Glaucoma Research Foundation, KeepYourSight Foundation, the Corporation Committee for the Brown University Medical School, Aerpio Therapeutics, Himalayan Cataract Project and the Advisory Board for Amach Capital Partners. Defendant Graves also co-founded Ophthalmic Women Leaders and Glaucoma 360, having received her B.A. in Psychology with honors from Brown University, her Ph.D. in Psychobiology from the University of Michigan and completed a postdoctoral fellowship in visual neuroscience at the University of Paris. Graves sold the following shares with insider information regarding the Akorn's lack of internal controls and the need for the Company to restate its financials, all of which resulted in Akorn stock trading at artificially inflated prices at the time of her stock sales:

| **Date** | **Shares** | **Transaction** | **Value** |
|---|---|---|---|
| Dec 12, 2014 | 9,557 | Sale at $41.09 per share. | $392,697 |

Upon information and belief, Dr. Graves is a citizen of the State of California.

20. Defendant Johnson was appointed a director by the Board in May 2003. Johnson served as president of Becker & Associates Consulting, a firm which provides consulting services to the pharmaceutical, biologics and medical device industries on United States Food and Drug Administration ("FDA") regulatory requirements, until retiring from that firm April 2013. Johnson currently serves as an independent consultant. Previously, Johnson was Executive Vice President of The Lewin Group, a subsidiary of Quintiles Transnational, Inc., which provides various healthcare consulting services to state and federal governments, healthcare insurers and healthcare institutions. Prior to joining The Lewin Group, Johnson served as Executive Vice President of Quintiles Consulting, a business unit of Quintiles

Transnational, Inc. from 1997 to 2006. Quintiles Consulting provides consulting services to the pharmaceutical, medical device, biologic and biotechnology industries in their efforts to meet FDA regulatory requirements. Johnson also spent 30 years with the FDA, holding various senior level positions primarily in the compliance and enforcement areas. Johnson sold the following shares with insider information regarding the Akorn's lack of internal controls and the need for the Company to restate its financials, all of which resulted in Akorn stock trading at artificially inflated prices at the time of his stock sales:

| **Date** | **Shares** | **Transaction** | **Value** |
|---|---|---|---|
| Feb 10, 2015 | 17,173 | Sale at $46.44 per share. | $797,514 |
| Jan 9, 2015 | 17,173 | Sale at $40.46 per share. | $694,819 |
| Jan 2, 2015 | 14,300 | Sale at $36.12 per share. | $516,516 |
| Sep 4, 2014 | 2,947 | Sale at $38.51 per share. | $113,488 |

Upon information and belief, Johnson is a citizen of the State of California.

21. Defendant Steven J. Meyer ("Meyer") was appointed a director by the Board in June 2009. Since 2005, Meyer has served as the Chief Financial Officer of JVM Realty, a private firm specializing in the acquisition, re-positioning and management of multi-family housing for qualified investors. Meyer sits on the Board of Directors for INSYS. Meyer also served as the Corporate Treasurer and International Controller and VP of Global Operations during a 23-year career at Baxter International, Inc. Upon information and belief, Meyer is a citizen of the State of Illinois.

22. Defendant Tambi was appointed a director by the Board in June 2009. Since August 2006, Tambi has served as the Chairman of the Board, President and CEO of BrianT Laboratories and has been a member of the Board of Directors of INSYS since July 2007. From November 1995 to July 2006, Tambi was the Chairman of the Board, President and CEO of

Morton Grove Pharmaceuticals, Inc., a leading manufacturer and marketer of oral liquid and topical pharmaceuticals. Tambi has over 30 years of executive management experience with companies such as IVAX Corporation, Fujisawa Pharmaceutical Company USA, LyphoMed Inc. ("LyphoMed"), and Bristol-Myers International Group. EJ Funds nominated Tambi to serve on the Board of Directors pursuant to its rights under the April 13, 2009 Modification, Warrant and Investor Rights Agreement with EJ Funds that, among other things, granted EJ Funds the right to require the Company to nominate two directors to serve on the Board. Tambi sold the following shares with insider information regarding the Akorn's lack of internal controls and the need for the Company to restate its financials, all of which resulted in Akorn stock trading at artificially inflated prices at the time of his stock sales:

| **Date** | **Shares** | **Transaction** | **Value** |
|---|---|---|---|
| Dec 15, 2014 | 1,200 | Sale at $41.86 per share. | $50,232 |
| Sep 12, 2014 | 13,800 | Sale at $38 per share. | $524,400 |

Upon information and belief, Tambi is a citizen of the State of Illinois.

23. Defendant Weinstein was appointed a director by the Board in July 2009. Since 2000, Weinstein has provided consulting services to supplier clients in the areas of hospital organization, hospital operations, and working with group purchasing organizations. Previously, Weinstein was the Founder and President of Premier, Inc., an organization which provides various shared services to member hospitals. Weinstein serves as a director on the boards of Vascular Pathways, Inc., Precyse, SutureExpress and OpenMarkets, and serves on the board of trustees of the Rosalind Franklin University of Medicine and Science. Weinstein sold the following shares with insider information regarding the Akorn's lack of internal controls and the need for the Company to restate its financials, all of which resulted in Akorn stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Transaction | Value |
|---|---|---|---|
| Sep 4, 2014 | 5,000 | Sale at $38.49 per share. | $192,450 |

Upon information and belief, Weinstein is a citizen of the State of Illinois.

24. Defendant Terry A. Rappuhn ("Rappuhn") has served on the Board since April 2015. Upon information and belief, Rappuhn is a citizen of the State of Tennessee.

25. Defendant Rai has served as Akorn's CEO at all relevant times. Rai sold the following shares with insider information regarding the Akorn's lack of internal controls and the need for the Company to restate its financials, all of which resulted in Akorn stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Transaction | Value |
|---|---|---|---|
| Jan 26, 2015 | 219,000 | Sale at $42.55 per share. | $9,318,450 |
| Jan 23, 2015 | 314,375 | Sale at $42.10 per share. | $13,235,187 |
| Jan 22, 2015 | 340,610 | Sale at $41.26 per share. | $14,053,568 |
| Sep 8, 2014 | 147,000 | Sale at $36.78 per share. | $5,406,660 |
| Aug 7, 2014 | 903,659 | Sale at $33.62 per share. | $30,381,015 |

Upon information and belief, Rai is a citizen of the State of Illinois.

26. Defendant Dick served as Akorn's Chief Financial Officer ("CFO") from June 2009 until his resignation on August 3, 2015. Dick sold the following shares with insider information regarding the Akorn's lack of internal controls and the need for the Company to restate its financials, all of which resulted in Akorn stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Transaction | Value |
|---|---|---|---|
| Jan 2, 2015 | 30,150 | Sale at $36.03 per share. | $1,086,304 |
| Dec 1, 2014 | 30,875 | Sale at $39.23 per share. | $1,211,226 |

| | | | |
|---|---|---|---|
| Nov 3, 2014 | 122,222 | Sale at $44.08 per share. | $5,387,545 |
| Oct 1, 2014 | 122,222 | Sale at $35.24 per share. | $4,307,103 |
| Sep 8, 2014 | 45,000 | Sale at $37.61 per share. | $1,692,450 |
| Sep 2, 2014 | 122,222 | Sale at $38.78 per share. | $4,739,769 |

Upon information and belief, Dick is a citizen of the State of Illinois.

27. Defendant Bruce Kutinsky ("Kutinsky") has served as Akorn's Chief Operating Officer ("COO") at all relevant times. Upon information and belief, Kutinsky is a citizen of the State of Illinois.

28. Defendant Bonaccorsi has been the Company's Senior Vice President, Secretary and General Counsel since 2009. Prior to joining Akorn, Bonaccorsi was the senior vice president, general counsel, secretary, and compliance officer at Option Care, Inc. Bonaccorsi sold the following shares with insider information regarding the Akorn's lack of internal controls and the need for the Company to restate its financials, all of which resulted in Akorn stock trading at artificially inflated prices at the time of his stock sales:

| **Date** | **Shares** | **Transaction** | **Value** |
|---|---|---|---|
| Feb 18, 2015 | 40,827 | Sale at $47.33 per share. | $1,932,341 |
| Sep 11, 2014 | 116,800 | Sale at $37.89 per share. | $4,425,552 |

Upon information and belief, Bonaccorsi is a citizen of the State of Illinois.

29. Defendant Silverberg is the Company's Executive Vice President, Global Quality Assurance and Alliance Management. Silverberg sold the following shares with insider information that Akorn stock was trading at artificially inflated prices:

| **Date** | **Shares** | **Transaction** | **Value** |
|---|---|---|---|
| Apr 21, 2015 | 29,000 | Sale at $55 per share. | $1,595,000 |
| Jan 12, 2015 | 38,602 | Sale at $41 per share. | $1,582,682 |

| | | | |
|---|---|---|---|
| Nov 3, 2014 | 24,311 | Automatic Sale at $44.27 per share. | $1,076,247 |
| Oct 21, 2014 | 72,491 | Sale at $40 per share. | $2,899,640 |

Upon information and belief, Silverberg is a citizen of the State of Illinois.

30. Defendant Sabat has been the Company's Senior Vice President, National Accounts and Trade Relations since June 2009. Sabat sold the following shares with insider information that Akorn stock was trading at artificially inflated prices:

| **Date** | **Shares** | **Transaction** | **Value** |
|---|---|---|---|
| Dec 9, 2014 | 18,173 | Sale at $41.21 per share. | $748,909 |
| Dec 8, 2014 | 25,000 | Sale at $40.04 per share. | $1,001,000 |

Upon information and belief, Sabat is a citizen of the State of Illinois.

31. The defendants referenced above in ¶¶ 17-30 are sometimes referred to herein as the "Individual Defendants."

32. The defendants referenced above in ¶¶ 17-24 are sometimes referred to herein as the "Director Defendants."

33. Akorn and the Individual Defendants are referred to herein, collectively, as "Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

34. By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and

its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

35. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

36. In addition, as officers and/or directors of a publicly held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock will be based on truthful and accurate information

37. To discharge their duties, the officers and directors of Akorn were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Akorn were required to, among other things:

a. ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b. conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c. properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate

statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d. remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e. ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

38. Each Individual Defendant, as an executive officer and/or director, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

39. The Company also maintains a Code of Ethics (the "Code"). The Code sets forth legal and ethical standards of conduct for directors, officers, employees and consultants of Akorn and its subsidiaries.

40. Pursuant to the Code, the employees and directors of Akorn are responsible for helping Akorn maintain its good reputation and the trust and confidence of its stockholders, its employees, the public and those with whom Akorn does business.

41. Pursuant to the Code:

## B. Distribution and Commitment

Each Akorn employee and director will be given a copy of the Code. Each of you will be required to certify that you (i) have read and understand the guidelines contained in the Code, (ii) will comply with the Code, (iii) do not have a conflict of interest in connection with the services you render to Akorn and (iv) agree, in the event of a conflict of interest to give notice to Akorn in the terms contained in the Code.

If you are a senior managerial employees of Director level or higher, you will be required to certify annually that you: (i) have complied and do currently comply fully with the guidelines in the Code, (ii) have discussed with those employees who report to you of their continuing obligation to observe the Code, and (iii) know of no situation that is or was a violation of the guidelines set forth in the Code. Other employees may be required to periodically provide similar certification regarding the Code.

## C. Personal Responsibility

You are responsible for acquainting yourself with the guidelines set forth in the Code and the standards of conduct and restrictions applicable to you, and for conducting yourself accordingly. If you are a supervisor or manager, you are also responsible for ensuring that the employees within your supervision know these standards and know that failure to abide by these guidelines will subject her or him to disciplinary action up to and including termination of the employment relationship.

Akorn recognizes that the guidelines contained in this Code are extensive and that some of them may have little or no bearing on the conduct, activities, or relationships necessary for you to carry out your current duties and responsibilities. Nevertheless, we want all of our employees to be aware of the standards of conduct set forth in these guidelines. If you have any questions about whether any section of these guidelines pertains to your activities in performing the duties and responsibilities of your particular position with Akorn, you should discuss the matter with your supervisor. In general, you should discuss any questions or difficulties with your immediate supervisor, who is responsible for seeing that the matter is resolved promptly. The Ethics Officer is also available to answer questions about these guidelines.

## D. Consequences of Violating the Code

If you violate the Code, disciplinary action may be taken against you, up to and including termination from employment.

* * *

## X. BUSINESS AND ACCOUNTING PRACTICES

### A. Internal Controls

You should ensure that:

• Transactions are executed in accordance with the management authority; and

• Transactions are recorded in sufficient detail to maintain and keep proper accounting systems.

### B. SEC Reporting

If you assist with preparation of reports to be filed with the Securities and Exchange Commission or with preparation of information to be included in such reports you must strive to provide full, fair, accurate, timely, and understandable disclosure.

### C. Accounting Irregularities

If Employees have any complaints about handling of Akorn's SEC reporting, internal accounting, or auditing matters, it should be immediately reported through Akorn's anonymous, confidential reporting system using the means described in Akorn's Whistleblower Policy, which is accessible on Akorn's website.

### D. Written Terms of Purchase and Sale

All terms of purchase and sale and other significant business transactions must be in writing. No oral agreements or amendments should be made.

### E. Undisclosed Funds Prohibited

You should not under any circumstances keep Akorn funds in undisclosed or unrecorded accounts for any purpose. All accounts must be disclosed to Akorn's Chief Financial Officer.

### F. No False Entries

No false or misleading entries should be made in Akorn's books or records for any reason.

### G. Proper Documentation

No payment (or reimbursement) of expenses should be made without adequate supporting original documentation or authentic and official invoices which establish the business purpose for such expenditure.

42. In addition, the Company's Audit Committee is specifically tasked with the Board's oversight responsibilities. The conduct of the Audit Committee is governed by the Audit Committee Charter (the "Charter").

43. Pursuant to the Charter:

> The primary function of the Audit Committee (the "Audit Committee") of Akorn, Inc. (the "Company") is to assist the Board of Directors (the "Board") in fulfilling its oversight responsibilities by reviewing: the financial reports and other financial information provided by the Company to designated regulatory bodies or the public; the Company's systems of internal controls regarding finance, accounting, legal compliance and ethics that management has established; and the Company's auditing, accounting and financial reporting processes.
>
> Management is responsible for (a) the preparation, presentation and integrity of the Company's financial statements; (b) accounting and financial reporting principles; and (c) the Company's internal controls and procedures designed to promote compliance with accounting standards and applicable laws and regulations.
>
> *    *    *
>
> All members of the Audit Committee shall be "financially literate" under the rules of the Amex Company Guide or the NASDAQ Marketplace Rules, as applicable to the Company at such time, meaning they have the ability to read and understand fundamental financial statements, including a company's balance sheet, income statement, and cash flow statement. All members of the Audit Committee also shall not have participated in the preparation of the financial statements of the Company at any time during the past three years.
>
> At least one member of the Audit Committee shall be an "audit committee financial expert" as defined by the rules and regulations of the Securities and Exchange Commission and shall be financially sophisticated under the Amex Company Guide or the NASDAQ Marketplace Rules, as applicable to the Company at such time, in that he or she has past employment experience in finance or accounting, requisite professional certification in accounting, or any other comparable experience or background which results in the individual's financial sophistication, including but not limited to being or having been a chief executive officer, chief financial officer or other senior officer with financial oversight responsibilities.
>
> *    *    *

## III. RESPONSIBILITIES, DUTIES AND POWERS

- Evaluate whether management is setting the appropriate "tone at the top" by communicating the importance of the Company's ethical and business practice standards, including the importance of internal accounting controls. Establish, review and update periodically the Company's Code of Ethics and ensure that management has established a system to enforce this Code.

- Serve as an independent and objective party to monitor the Company's financial reporting process and internal control system.

- Review and discuss reports from the independent auditor on (a) all critical accounting policies and practices used by the Company, (b) alternative accounting treatments within GAAP related to material items that have been discussed with management, including the ramifications of the use of the alternative treatments and the treatment preferred by the independent auditor, and (c) other material written communications between the independent auditor and management.

- Review and discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work and management's responses, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

- Review with the independent auditor its judgments as to the quality, not just the acceptability, of the Company's accounting principles and such matters as are required to be discussed with the Audit Committee under generally accepted auditing standards.

- (a) Discuss with management and the independent auditor (i) quarterly earnings press releases, including the interim financial information included therein, and (ii) all annual and quarterly reports to be filed with the Securities and Exchange Commission, (b) review the year-end audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and, (c) if deemed appropriate, recommend to the Board that the audited financial statements be included in the Annual Report on Form 10-K.

- Review and discuss with management and the independent auditor various topics and events that may have significant financial impact on the Company or that are the subject of discussions between management and the independent auditor.

- Review and discuss with management and the independent auditor: (a) the adequacy and effectiveness of the Company's internal controls (including any significant deficiencies and significant changes in internal controls reported to the Audit Committee by the independent auditor or management; (b) the Company's internal audit procedures; and (c) the adequacy and effectiveness of the Company's disclosures controls and procedures, and management reports thereon.

- Obtain and review annually a report by the independent auditor describing such independent auditor's internal quality-control procedures; any material issues raised by the most recent internal quality-control review or peer review or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues.

44. In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants Meyer (Chair), Johnson, and Abramowitz, who were members of the Audit Committee conducted little, if any, oversight of the Company's internal controls over public reporting of the acquisitions or the integration of the acquired companies finances into those of Akorn, resulting in materially false and misleading statements regarding the Company's business, operational and compliance policies, and consciously disregarded their duties to monitor such controls over reporting. The Audit Committee members' complete failure to perform their duties in good faith resulted in fraudulent misrepresentations to the SEC, the investing public, and the Company's shareholders.

45. In addition, as executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including false and misleading information

about the acquisitions, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Akorn to make false and misleading statements of material fact about the Company's financials and about Akorn's maintaining adequate internal controls.

46. Each of the Individual Defendants further owed to Akorn and its shareholders the duty of loyalty requiring that each favor Akorn's interest and that of its shareholders over their own while conducting the affairs the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

**AKORN'S RELEVANT ACCOUNTING POLICIES**

47. In its 2014 Form 10-K filed on March 17, 2015, Akorn disclosed its accounting policies regarding revenue recognition, chargeback and rebates as follows:

> *Revenue Recognition:* Revenue is recognized when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the sales price is fixed or determinable, and collectability is reasonably assured. Revenues from product sales are recognized when title and risk of loss have passed to the customer.
>
> Provision for estimated chargebacks, rebates, discounts, managed care rebates, product returns and doubtful accounts is made at the time of sale and is ***analyzed and adjusted, if necessary, at each balance sheet date***.
>
> *Allowance for Chargebacks and Rebates:* The Company enters into contractual agreements with certain third parties such as hospitals, group-purchasing and managed care organizations to sell certain products at predetermined prices. The parties have elected to have these contracts administered through wholesalers that buy the product from the Company and subsequently sell it to these third parties. ***When a wholesaler sells products to one of these third parties that are subject to a contractual price agreement, the difference between the price paid to the Company by the wholesaler and the price under the specific contract is charged back to the Company by the wholesaler. The Company tracks sales and submitted chargebacks by product number and contract for each wholesaler. Utilizing this information, the Company estimates a chargeback percentage for each product and records an allowance as a reduction to gross***

***sales when the Company records its sale of the products.*** The Company reduces the chargeback allowance when a chargeback request from a wholesaler is processed. Actual chargebacks processed by the Company can vary materially from period to period based upon actual sales volume through the wholesalers. However, the Company's provision for chargebacks is fully reserved for at the time when sales revenues are recognized.

***Management obtains certain wholesaler inventory reports to aid in analyzing the reasonableness of the chargeback allowance. The Company assesses the reasonableness of its chargeback allowance by applying the product chargeback percentage based on historical activity to the quantities of inventory on hand at the wholesaler per the wholesaler inventory reports. In accordance with its accounting policy, the Company estimates the percentage amount of wholesaler inventory that will ultimately be sold to third parties that are subject to contractual price agreements based on a trend of such sales through wholesalers.*** The Company uses this percentage estimate until historical trends indicate that a revision should be made. On an ongoing basis, the Company evaluates its actual chargeback rate experience, and new trends are factored into its estimates each quarter as market conditions change.

Similarly, the Company maintains an allowance for rebates related to contract and other programs with certain customers. Rebate percentages vary by product and by volume purchased by each eligible customer. The Company tracks sales by product number for each eligible customer and then applies the applicable rebate percentage, using both historical trends and actual experience to estimate its rebate allowance. ***The Company reduces gross sales and increases the rebate allowance by the estimated rebate amount when the Company sells its products to its rebate-eligible customers.*** The Company reduces the rebate allowance when it processes a customer request for a rebate. ***At each balance sheet date, the Company analyzes the allowance for rebates against actual rebates processed and makes necessary adjustments as appropriate.*** Actual rebates processed can vary materially from period to period.

* * *

*Advertising and Promotional Allowances to Customers:* The Company routinely sells its consumer health products to major retail drug chains. From time to time, the Company may arrange for these retailers to run in-store promotional sales of the Company's products. ***The Company reserves an estimate of the dollar amount owed back to the retailer, recording this amount as a reduction to revenue at the later of the date on which the revenue is recognized or the date the sales incentive is offered.*** When the actual invoice for the sales promotion is received from the retailer, the Company adjusts its estimate accordingly. ***Advertising and promotional expenses paid to customers are expensed as incurred in accordance with Accounting Standards Codification ("ASC") 605-50, Customer Payments and Incentives.***

(Emphasis added.)

## RELEVANT ACCOUNTING STANDARD

48. Generally Accepted Accounting Principles ("GAAP") are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures in accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

49. According to GAAP and SEC regulations, revenue generally is realized or realizable and earned when all of the following criteria are met:

- persuasive evidence of an arrangement exists;
- delivery has occurred or services have been rendered;
- the seller's price to the buyer is fixed or determinable; and
- collectability is reasonably assured.

Accounting Standards Codification ("ASC") 605-10-S99.

50. Consideration provided by a vendor to a customer is generally presumed to be a reduction of the selling prices and is reported as a reduction of revenue:

> Consideration [i]ncludes items that the customer can apply against trade amounts owed to the vendor. Consideration may take a variety of different forms including cash payments by a vendor to a customer, credits that the customer can apply, equity instruments of the vendor (regardless of whether a measurement date has been reached), and free products or services given to the customer by the vendor. Consideration may be referred to by terms such as sales incentives, discounts, coupons, rebates, price reductions, and so forth.

ASC 605-50-20.

> Cash consideration[[1]] (including a sales incentive) given by a vendor to a customer is presumed to be a reduction of the selling prices of the vendor's products or services and, therefore, shall be characterized as a reduction of revenue when recognized in the vendor's income statement. That presumption is overcome and the consideration should be characterized as a cost incurred if, and to the extent that, both of the following conditions are met:
>
> a) The vendor receives, or will receive, an identifiable benefit (goods or services) in exchange for the consideration. In order to meet this condition, the identified benefit must be sufficiently separable from the recipient's purchase of the vendor's products such that the vendor could have entered into an exchange transaction with a party other than a purchaser of its products or services in order to receive that benefit.
>
> b) The vendor can reasonably estimate the fair value of the benefit identified under the preceding condition. If the amount of consideration paid by the vendor exceeds the estimated fair value of the benefit received, that excess amount shall be characterized as a reduction of revenue when recognized in the vendor's income statement.

ASC 650-50-45-2. The separability aspect generally will require slotting fees and similar product development or placement fees to be characterized as a reduction of revenue. Buydowns could never meet the separability aspect of the condition and, therefore, should always be characterized as a reduction of revenue. ASC 650-50-45-4.[2]

[1] GAAP defines cash consideration primarily as "cash payments and credits that the customer can apply against trade amounts owed to the vendor." ASC 650-50-20.

[2] Buydowns are defined as "vendor reimbursements to a reseller or retailer up to a specified amount for shortfalls in the sales price received by the retailer for the vendor's products over a specified period of time. Buydown programs generally involve a vendor agreeing to reimburse, compensate, or issue credit memos to a reseller or retailer for the retailer's decreased revenue per unit for specific products during a specified promotion period. In contrast to cooperative advertising, buydown programs generally require no expenditures by the retailer for advertising or promotion. Other related forms of vendor consideration to a

51. A company is required to follow accounting guidance for loss contingencies in determining the amount of consideration to be reported. GAAP defines a loss contingency to be "an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur. The term loss is used for convenience to include many charges against income that are commonly referred to as expenses and others that are commonly referred to as losses." ASC 450-10-20. A loss contingency is accrued in the company's books and records if both of the following conditions are met:

- the information is available before the financial statements are issued or are available to be issued indicates that is its **probable** that an asset had been impaired or a liability had been incurred at the date of the financial statements, and

- the amount of loss can be reasonably estimated.

ASC 450-20-25-2.

52. GAAP states that "when . . . information available indicates that the estimated amount of loss is within a range of amounts, it follows that some amount of loss has occurred and can be reasonably estimated." ASC 450-20-25-5. "If some amount within a range of loss appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued. When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued." ASC 450-20-30-1.

53. SEC Regulation G applies to any entity required to file reports pursuant to Sections 13(a) or 15(d) of the Exchange Act (other than a registered investment company) that

---

retailer include, but are not limited to, shortfalls, factory incentives, dealer holdbacks, price protection, and factory-to-dealer incentives." ASC 650-50-20.

discloses a "non-GAAP financial measure," whether the disclosure is made in a press release, analyst call, SEC filing or other communication. A company making such disclosure must:

- present as part of the disclosure or release the most directly comparable financial measure calculated and presented in accordance with GAAP; and
- reconcile the differences between the non-GAAP financial measure and the "most directly" comparable GAAP measure.

**RELEVANT INTERNAL CONTROL STANDARDS**

54. Management plays a critical role in the operation and growth of a company, such as establishing the internal control environment within which employees function. The Committee of Sponsoring Organizations ("COSO") of the Treadway Commission Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. COSO Report, Executive Summary.

55. To prepare financial statements in conformity with GAAP, management's responsibility is acknowledged in a set of standards known as generally accepted auditing standards ("GAAS"). COSO Report, Executive Summary. GAAS outlines the responsibilities of an auditor, but also explains that management is responsible for its own financial reporting:

> The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. ***Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control*** that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, ***the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility***.

AU §110.03 (emphasis added).

56. Internal control over financial reporting, as defined in Rules 13a-15(f) and 15d- 15(f) under the Exchange Act, is a process designed by, or under the supervision of, the CEO and CFO and is effected by the Board of Directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. GAAP. Internal control over financial reporting includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with US GAAP, and that the receipts and expenditures of the Company are being made only in accordance with appropriate authorization of management and the board of directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

57. Everyone in an organization has responsibility for internal controls. However, the CEO of a company sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment. "In any organization, 'the buck stops' with the chief executive. He or she has ultimate ownership responsibility for the internal control system. . . . The influence of the CEO on an entire organization cannot be overstated." COSO Report, Chapter 8, p. 84. The CEO fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business.

## SUBSTANTIVE ALLEGATIONS

### AKORN'S BUSINESS

58. Akorn, Inc. develops, manufactures, and markets ophthalmic and injectable pharmaceutical products. The Company sells various diagnostic and therapeutic pharmaceutical products focused primarily on ophthalmology, anesthesia, antidotes, and rheumatology. Akorn also markets ophthalmic surgical instruments and other supplies, and provides contract manufacturing for third parties.

59. In April 2015, JP Morgan reported that the prescription pharmaceuticals segment of Akorn's business accounted for approximately 92% of the Company's sales, while over-the-counter consumer health care products and animal health pharmaceuticals accounted for approximately 8%.

60. Although Akorn sells some products *directly* to retinal surgeons, ophthalmologists, and hospitals through its field sales team(s), most parties elect to have their contracts with Akorn managed through wholesalers that buy the product from Akorn and subsequently sell it to the third party (also referred to as the "end user"). End users are typically retailers, pharmacies, and hospitals. This distribution channel is referred to as the "wholesale channel."

61. Overall, a significant portion of Akorn's gross and net sales, as well as its accounts receivable for the 2014 fiscal year, occurred in the Company's wholesale channel, with three large wholesale drug distributors – AmerisourceBergen Corporation, Cardinal Health, Inc., and McKesson Corporation – accounting for approximately 76.9% of gross sales, 61.9% of net revenue, and 85.0% of gross accounts receivable in the 2014 fiscal year.

62. To maintain standard pricing between wholesalers, Akorn enters into contractual agreements to sell wholesalers certain products at predetermined prices, which is referred to as

the Wholesaler Acquisition Price ("WAP"). Accordingly, while wholesalers are responsible for managing third parties' contracts with Akorn to receive products at predetermined prices, the wholesalers themselves are also subject to contractual agreements to purchase these products from Akorn at the agreed upon WAP. If the wholesaler sells a product to a third party for a predetermined price that is less than the WAP, then Akorn pays the wholesaler the difference. This payment from Akorn to the wholesaler is referred to as a "chargeback" or "billback."

## AKORN'S LONG HISTORY OF DEFICIENT INTERNAL FINANCIAL CONTROLS

63. Unfortunately, the Company has a long history of suffering from inadequate internal controls over financial reporting.

64. In Akorn's 2012 Form 10-K, filed on March 1, 2013, the "Management's Report on Internal Control Over Financial Reporting" stated:

> [O]ur management concluded that, as of December 31, 2012, our internal control over financial reporting was not effective due to the identification of a material weakness related to our controls over our financial statement close process. More specifically, we did not maintain financial close process and procedures that were adequately designed, documented and executed to support the accurate and timely reporting of our financial results, and we did not maintain effective controls to provide reasonable assurance that accounts were complete and accurate and agreed to detailed support, and that account reconciliations were properly performed, reviewed and approved.

65. Akorn's independent auditor at 2012 year-end, Ernst & Young LLP ("E&Y"), audited the Company's internal control over financial reporting as of December 31, 2012. In the independent auditor's report included in Akorn's 2012 Form 10-K, E&Y concluded: "In our opinion, because of the effect of the material weakness . . . on the achievement of the objectives of the control criteria, Akorn, Inc. has not maintained effective internal control over financial reporting as of December 31, 2012."

66. On March 3, 2014, the Company issued a press release and filed a Form 12b-25, *Notification Of Late Filing*, with the SEC, announcing that it would need an extension to file its annual report on Form 10-K for the year 2013. In the press release, the Company disclosed that the delay was due to the discovery of material weaknesses in its internal controls relating to accounting transactions, as well as the existence of inadequate segregation of duties. Specifically, the Company stated:

> The Company has not completed its testing and assessment of the effectiveness of its internal control over financial reporting due in part to identified control deficiencies related to completeness and accuracy of underlying data used in the determination of certain significant estimates and accounting transactions as well as the existence of inadequate segregation of duties. The Company believes that these deficiencies, or combination of deficiencies, represent material weaknesses in its internal control over financial reporting. There is a possibility that upon completion of its testing and assessment of the effectiveness of internal controls over financial reporting, the Company may determine that there are additional material weaknesses. The Company expects to file within the 15-day extension period and expects final financial results will be consistent with those reported in this release.

67. In Akorn's 2013 Form 10-K, filed on March 14, 2014, the "Management's Report on Internal Control Over Financial Reporting" stated:

> [O]ur management concluded that, as of December 31, 2013, our internal control over financial reporting was not effective because of the identification of material weaknesses described as follows:
>
> - ***We did not have controls designed to validate the completeness and accuracy of underlying data*** *used in the determination of significant estimates and accounting transactions. As a result,* ***errors were identified in the underlying data used to support significant estimates and accounting transactions, primarily relating to gross to net revenue adjustments****, inventory reserves and the determination of useful lives of acquired intangible assets. . . .*
>
> - *We did not have an adequate process in place to support the accurate and timely reporting of our financial results and disclosures in our Form 10-K. As a result, errors were identified primarily related to accounts payable and inventory balances at year end. Additionally, we did not have an*

> *adequate process in place to complete our testing and assessment of the design and effectiveness of internal controls over financial reporting in a timely manner. .. .*
>
> - *We did not have sufficient segregation of duties over information system access such that employees had the ability to inappropriately initiate and record transactions, and there were no compensating, preventative or detective controls. . . .*

(Emphasis added.)

68. In its 2013 "Remediation Plan," as stated in the 2013 Form 10-K, Akorn represented that, "[w]ith the oversight of senior management and our audit committee, we have begun taking steps and plan to take additional measures to remediate the underlying causes of the material weaknesses." Specifically, "[w]ith respect to completeness and accuracy concerns, ***management intends to add additional accounting and internal audit personnel and design, document, and test controls that are intended to validate the completeness and accuracy of the data*** used in our significant estimates and accounting transactions." Akorn further assured that ***"senior management and our audit committee are closely monitoring the implementation of these remediation plans[.]"*** Indeed, the Company represented that it had already made improvements to its internal controls, including the "implementation of new systems and software applications related to the gross to net revenue process."

69. Akorn's independent auditor at 2013 year-end, KPMG LLP ("KPMG"), audited the Company's internal control over financial reporting as of December 31, 2013. In the independent auditor's report included in Akorn's 2013 Form 10-K, KPMG concluded: "[I]n our opinion, because of the effect of the aforementioned material weaknesses on the achievement of the objectives of the control criteria, Akorn, Inc. has not maintained effective internal control over financial reporting as of December 31, 2013[.]"

70. Unfortunately for the Company and its shareholders, these "control deficiencies" and "material weaknesses in its internal control over financial reporting" proved to be the norm at Akorn.

**THE HI-TECH ACQUISITION**

71. On April 17, 2014, the Company issued a press release and filed a Form 8-K with the SEC, announcing the completion of Akorn's acquisition of Hi-Tech. In the press release, the Company stated, in part:

> LAKE FOREST, Ill.--(BUSINESS WIRE)--April 17, 2014--Akorn, Inc. (NASDAQ: AKRX), a niche pharmaceutical company, announced today that it has completed its previously announced acquisition of Hi-Tech Pharmacal Co., Inc. (NASDAQ: HITK) for $640 million in cash. The combination of Akorn and Hi-Tech will transform the Company into a larger, more diversified generic player. This combination also brings critical mass and scale to Akorn's business and strengthens the Company's position with retail and institutional customers.
>
> **Key Acquisition Highlights:**
>
> - Diversifies revenue base and strengthens R&D pipeline
> - Expands manufacturing capabilities into additional niche dosage forms including nasal sprays, topical gels, creams, ointments, and oral liquids
> - Provides additional breadth in retail OTC market
> - Expect $15-20 million in annual run-rate synergies within 12 months post-close
> - Anticipate strong combined cash flow to allow for rapid debt pay-down
> - "We are excited to announce that we have completed the acquisition of Hi- Tech, our largest acquisition to date," said Raj Rai, Chief Executive Officer of Akorn. "This transformative acquisition diversifies our revenue base and strengthens our capabilities in both manufacturing and R&D."

72. Defendant Rai further added, "We welcome our new colleagues from the Hi-Tech team and look forward to collaborating with them on the future direction of our company.

Our priority now turns to executing on our integration plan. We expect that the acquisition will be immediately accretive to non-GAAP earnings."

73. On May 6, 2014, the Company issued a press release announcing results for the first quarter ended March 30, 2014. For the quarter, the Company achieved record first quarter consolidated revenue of $90.6 million, an increase of 23% over the prior year's first quarter; generated record operating cash flow of $23.4 million; and completed the acquisition of Hi-Tech on April 17. According to the press release, the Hi-Tech "acquisition adds scale, breadth of products and dosage forms, and further diversification of the Company's product portfolio." Moreover, with respect to the Hi-Tech acquisition, the press release further stated:

- ***Cost synergies that result from the Hi-Tech acquisition are expected to be realized throughout the year and will accelerate as the year progresses. The Company anticipates ending the year at a $20 million annual run-rate for synergies***.
- The Company anticipates that it will incur approximately $20-22 million in one-time acquisition-related expenses to close the Hi-Tech transaction and realize synergies. These expenses are reflected as add-backs to adjusted net income per diluted share in the GAAP to non-GAAP reconciliation later in this release.

(Emphasis added).

74. On May 12, 2014, the Company filed its quarterly financial report on Form 10-Q with the SEC which was signed by Defendant Dick, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q included certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Rai and Dick, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

75. With respect to the Company's internal controls and procedures, the Form 10-Q stated:

> With the oversight of senior management and our audit committee, we have begun taken steps and plan to take additional measures to remediate the underlying causes of the material weaknesses. With respect to completeness and accuracy concerns, management intends to add additional accounting and internal audit personnel and design, document, and test controls that are intended to validate the completeness and accuracy of the data used in our significant estimates and accounting transactions. With respect to timely and accurate filing of our financial results, management intends to add additional accounting personnel, and to design, document, and test controls that are intended to ensure timely filing. With respect to segregation of duties, management intends to implement information technology tools to identify and assess segregation of duties issues, and to design, document and test controls to either eliminate or mitigate potential segregation of duties concerns. While the Company believes it will remediate the material weaknesses prior to filing its Form 10-K for the period ending December 31, 2014, the Company can provide no assurance at this time that management will be able to report that our internal control over financial reporting is effective as of December 31, 2014.
>
> ***Notwithstanding the identified material weaknesses, management believes the consolidated financial statements included in this Quarterly Report on Form 10-Q fairly represent in all material respects our financial condition, results of operations and cash flows at and for the period presented in accordance with U.S. GAAP***.

(Emphasis added).

**THE VERSAPHARM ACQUISITION**

76. On August 5, 2014, the Company issued a press release announcing results for the second quarter ended June 30, 2014. For the quarter, the Company achieved record second quarter consolidated revenue of $150.7 million, an increase of 96% over the prior year's second quarter and record adjusted net income per diluted share of $0.25, an increase of 79% over the prior year's second quarter; raised 2014 outlook to a revenue range of $580 to $600 million and an adjusted net income per diluted share range of $1.00 to $1.05; and announced acquisition of VersaPharm, which was expected to add $90 to $100 million in annual revenue and $0.10 to $0.12 adjusted net income per diluted share. The Company announced that the acquisition was projected to close mid-August. Moreover, with respect to

the Hi-Tech acquisition, the press release further stated that **"[c]ost synergies that result from the Hi-Tech acquisition are expected to be realized throughout the year and will accelerate as the year progresses. The Company anticipates ending the year at a $20 million annual run-rate for synergies."** (Emphasis added).

77. On August 11, 2014, the Company filed its quarterly financial report on Form 10- Q with the SEC which was signed by Defendant Dick, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q included signed SOX certifications by Defendants Rai and Dick, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

78. With respect to the Company's internal controls and procedures, the Form 10-Q stated:

> With the oversight of senior management and our audit committee, we have begun taken steps and plan to take additional measures to remediate the underlying causes of the material weaknesses. With respect to completeness and accuracy concerns, management intends to add additional accounting and internal audit personnel and design, document, and test controls that are intended to validate the completeness and accuracy of the data used in our significant estimates and accounting transactions. With respect to timely and accurate filing of our financial results, management intends to add additional accounting personnel, and to design, document, and test controls that are intended to ensure timely filing. With respect to segregation of duties, management intends to implement information technology tools to identify and assess segregation of duties issues, and to design, document and test controls to either eliminate or mitigate potential segregation of duties concerns. While the Company believes it will remediate the material weaknesses prior to filing its Form 10-K for the period ending December 31, 2014, the Company can provide no assurance at this time that management will be able to report that our internal control over financial reporting is effective as of December 31, 2014.
>
> ***Notwithstanding the identified material weaknesses, management believes the consolidated financial statements included in this Quarterly Report on Form 10-Q fairly represent in all material respects our financial***

> ***condition, results of operations and cash flows at and for the period presented in accordance with U.S. GAAP***.

(Emphasis added).

79. On August 12, 2014, the Company issued a press release and filed a Form 8-K with the SEC, announcing the completion of Akorn's acquisition of VersaPharm. In the press release, the Company stated, in part:

> LAKE FOREST, Ill., Aug.12, 2014 (GLOBE NEWSWIRE) -- Akorn, Inc. (Nasdaq:AKRX), a niche pharmaceutical company, announced today that it has completed its previously announced acquisition of VPI Holdings Corp., the parent company of VersaPharm Incorporated, for $440 million.
>
> **Key Acquisition Highlights:**
>
> - Increases Akorn's presence in the highly attractive niche dermatology market
> - Provides a complementary product portfolio to bolt on to the Hi-Tech acquisition that closed earlier this year
> - Straightforward integration process due to VersaPharm's outsource manufacturing model
> - Expected to add $90 to $100 million in annual revenues and $0.10 to $0.12 in earnings per share, excluding new pipeline launches, deal amortization and acquisition-related expenses

80. In the same press release, Defendant Rai stated "[w]e are excited to announce that we have completed the acquisition of VersaPharm." "This highly strategic acquisition further strengthens our niche portfolio and accelerates our long-term growth opportunities."

81. On November 6, 2014, the Company issued a press release announcing results for the second quarter ended June 30, 2014. Consolidated revenues for the third quarter were $132.7 million and included $39.9 million of costs associated with price increases. Excluding these costs, third quarter adjusted net income per diluted share was $0.27. The Company's prior

full year guidance for revenue and adjusted net income per diluted share included an estimated $25 million in costs associated with price increases. Defendant Rai further stated:

> Our strong business momentum continued this quarter, with double digit organic growth and strong performance from the acquisitions that were completed over the last 12 months. Our strategic initiatives to diversify our portfolio of products have allowed us to reinvent the business, which has opened numerous new market opportunities and has positioned Akorn as a much broader provider of specialty generics. Our current portfolio of marketed and pipeline products operate in strong markets with favorable competitive dynamics, which will provide us with sustainable growth opportunities as we move forward. ***We expect to close 2014 with record sales and earnings, which will set us firmly on the path to achieve over $1 billion in annual sales in the future***. (Emphasis added).

82. On November 10, 2014, the Company filed its quarterly financial report on Form 10-Q with the SEC, which was signed by Defendant Dick, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10- Q included signed SOX certifications by Defendants Rai and Dick, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

83. With respect to the Company's internal controls and procedures, the Form 10-Q stated:

> With the oversight of senior management and our audit committee, we have begun taken steps and plan to take additional measures to remediate the underlying causes of the material weaknesses. With respect to completeness and accuracy concerns, management intends to add additional accounting and internal audit personnel and design, document, and test controls that are intended to validate the completeness and accuracy of the data used in our significant estimates and accounting transactions. With respect to timely and accurate filing of our financial results, management intends to add additional accounting personnel, and to design, document, and test controls that are intended to ensure timely filing. With respect to segregation of duties, management intends to implement information technology tools to identify and assess segregation of duties issues, and to design, document and test controls to either eliminate or mitigate potential segregation of duties concerns. While the Company believes it will remediate the material weaknesses prior to filing its

> Form 10-K for the period ending December 31, 2014, the Company can provide no assurance at this time that management will be able to report that our internal control over financial reporting is effective as of December 31, 2014.
>
> ***Notwithstanding the identified material weaknesses, management believes the consolidated financial statements included in this Quarterly Report on Form 10-Q fairly represent in all material respects our financial condition, results of operations and cash flows at and for the period presented in accordance with U.S. GAAP.***

(Emphasis added).

84. On February 26, 2015, the Company issued a press release announcing preliminary fourth quarter and full year 2014 results. Consolidated revenue for the fourth quarter was $227.8 million and included $12.4 million of costs associated with competitive pricing actions during the fourth quarter. GAAP diluted earnings per share (EPS) was $0.29 in the fourth quarter of 2014, compared to GAAP EPS of $0.14 in the prior year period. Adjusted non-GAAP diluted EPS for the fourth quarter 2014 increased to $0.50 compared to $0.14 in the fourth quarter of 2013. Consolidated revenue for full year 2014 was $601.9 million and included $52.2 million of costs associated with competitive pricing actions during the second half of the year. GAAP diluted EPS was $0.38 for the full year 2014, compared to GAAP EPS of $0.46 for the full year 2013. Adjusted non-GAAP diluted EPS for full year 2014 increased to $1.16 compared to $0.55 in full year 2013.

85. The press release further stated:

> **2014 Represented a Key Transformative Year for Akorn**
>
> - In 2014, Akorn received 14 unique product approvals, representing a combined IMS annual market size of $850 million.
> - Akorn launched five of these products in 2014 and expects to be in a position to launch the remaining nine products approved in 2014 throughout 2015.

- The Company completed the acquisition of Hi-Tech Pharmacal on April 17, adding over 50 new products to the Akorn portfolio.

- Akorn completed the acquisition of VersaPharm on August 12, complementing the Hi-Tech acquisition through the addition of 20 products along with a robust pipeline of dermatology-focused pipeline products.

- In early October, Akorn acquired rights to Xopenex® Inhalation Solution from Sunovion, adding a leading established respiratory product to the Akorn portfolio.

- Akorn acquired five marketed and four pipeline veterinary products from Lloyd, Inc. in early October, supplementing Akorn's growing presence in the veterinary market.

86. "2014 was a transformative and rewarding year for Akorn," said Defendant Rai. "In a short period of time we have built a robust and well-diversified specialty generics platform that will provide future growth opportunities through a growing pipeline of products and a reliable acquisition strategy. I remain confident in the long term prospects of our business."

87. The statements referenced in ¶¶ 71-86 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to the Individual Defendants or recklessly disregarded by them, including that: (1) as of December 31, 2014, more than eight months after it acquired Hi-Tech and four months after it acquired VersaPharm, Akorn had not yet integrate those subsidiaries into the Company's centralized accounting department and accounting systems; (2) certain financial and other data related to Hi-Tech and VersaPharm, which were required to be included in Akorn's annual report to be filed with the SEC on Form 10-K, were not timely collected and compiled; (3) due to the aforementioned factors, the Company was unable to timely complete its assessment of the effectiveness of its internal controls over financial reporting as of December 31, 2014; (4) Akorn's internal control over financial reporting was ineffective

and material weaknesses existed relating to the completeness and accuracy of underlying data used in the determination of significant estimates and accounting transactions and accurate and timely reporting of the Company's financial results and disclosures in its Form 10-K; and (5) and as a result of the foregoing, Akorn's public statements were materially false and misleading at all relevant times.

## <u>THE TRUTH EMERGES</u>

88. On March 2, 2015, after the close of trading, Akorn issued a press release and filed another Form 12b-25, *Notification Of Late Filing*, with the SEC, announcing that it would need an extension to file its annual report on Form 10-K for the year 2014. In the press release, the Company stated, in part:

> Akorn, Inc. (Nasdaq:AKRX), today announced that the Company filed a Form 12b-25, *Notification of Late Filing* with the U.S. Securities and Exchange Commission that allows the Company to extend the deadline to file its Form 10-K for the year ended December 31, 2014. The Company has experienced unforeseen delays in collecting and compiling certain financial and other related data that would be included in the Form 10-K relating to the VersaPharm and Hi-Tech Pharmacal subsidiaries which were not integrated into the Company's centralized accounting department and accounting systems as of December 31, 2014.
>
> In addition, the Company has not yet completed its assessment of the effectiveness of its internal control over financial reporting as of December 31, 2014 due to the aforementioned factors. The Company believes that material weaknesses exist as of December 31, 2014 relating to the completeness and accuracy of underlying data used in the determination of significant estimates and accounting transactions and accurate and timely reporting of its financial results and disclosures in its Form 10-K. There is a possibility that upon completion of its assessment, the Company may determine that there are additional material weaknesses as of December 31, 2014.
>
> ***The Company is in the process of completing the Form 10-K and its assessment of the effectiveness of internal control over financial reporting as of December 31, 2014. The finalization of financial information is not expected to result in any material change to previously reported financial statements or the financial results reported in our earnings release on February 26, 2015. Additionally, the Company expects to be able to complete its Form 10-K by the extended deadline of March 17, 2015.***

(Emphasis added).

89. The narrative contained in the Form 12b-25, *Notification Of Late Filing* filed with the SEC was equally innocuous:

> Akorn, Inc. (the "Company") is unable to file its Annual Report on Form 10-K for the year ended December 31, 2014 (the "Form 10-K") within the prescribed time period without unreasonable effort or expense due to the circumstances described below.
>
> On April 17, 2014, the Company completed its acquisition of Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") and on August 12, 2014, the Company completed its acquisition of VersaPharm Incorporated ("VersaPharm" and together with Hi-Tech, the "Acquired Entities"). The Acquired Entities are consolidated entities whose total assets and total revenues each individually represent significant portions of the related consolidated financial statement amounts of the Company as of and for the year ended December 31, 2014. Due to the scale of the Acquired Entities, the extensive and complex nature of the actions required to consummate each transaction and the subsequent process of integration of the Acquired Entities into the business and financial systems of the Company, significant management time and resources were diverted from the Company's normal process of reviewing and completing financial and other information in the Form 10-K. ***Furthermore, the Company has experienced unforeseen delays in collecting and compiling certain financial and other related data that would be included in the Form 10-K regarding the Acquired Entities. The Company could not have obtained this information in a more timely fashion without unreasonable effort and expense***.
>
> Management is in the process of completing the Form 10-K. ***The finalization of financial information related to the Acquired Entities and the Company as a whole is not expected to result in any material change to previously reported financial statements or the financial results reported in our earnings release on February 26, 2015.*** Except for accounting for the change in our year to year revenues and earnings due to the acquisitions described above and the resulting growth of our business, as reported in our February 26, 2015 earnings release, our management believes there will not be any significant change in results of operations from the corresponding period for the 2013 fiscal year.
>
> In addition, the Company has not yet completed its assessment of the effectiveness of its internal control over financial reporting as of December 31, 2014 due to the aforementioned factors. The Company believes that material weaknesses exist as of December 31, 2014 relating to the completeness and accuracy of underlying data used in the determination of significant estimates and accounting transactions and accurate and timely reporting of its financial results and disclosures in its Form 10-K. There is a possibility that upon

> completion of its assessment, the Company may determine that there are additional material weaknesses as of December 31, 2014.
>
> ***The Company is working diligently to finalize this data and its assessment of the effectiveness of internal control over financial reporting as of December 31, 2014 and anticipates filing its Form 10-K within the 15-day extension period permitted under Rule 12b-25.***

(Emphasis added).

90. On March 17, 2015, after the close of trading, the Individual Defendants caused the Company to file an 8-K with the SEC stating a restatement of the Company's financials would be necessary, but downplaying the amount of the restatement and the reasons for the restatement. The 8-K stated:

> On March 17, 2015, the Company issued a press release announcing that the Audit Committee, upon the recommendation of the Company's management, concluded that the previously issued financial statements contained in the Company's Quarterly Reports on Form 10-Q for the quarters ended June 30, 2014 and September 30, 2014 should not be relied upon because of an error in the financial statements as of and for the three and six month periods ended June 30, 2014, which then impacted the financial statements as of and for the nine month period ended September 30, 2014, and that those financial statements would be restated to make the necessary accounting adjustments.
>
> On April 17, 2014, the Company completed its acquisition of Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") for a total purchase price of approximately $650.0 million. During the 2014 year-end audit process, an error was identified in the fair value allocation of assets acquired and liabilities assumed in connection with the acquisition of Hi-Tech, which resulted in an overstated chargeback reserve as of April 17, 2014. The error, which was identified on March 11, 2015, resulted from an overstatement of Hi-Tech's chargeback reserve in connection with applying the acquisition method of accounting at the closing of the Hi-Tech acquisition.
>
> ***The overstatement in the chargeback reserve was caused by a manual error made in preparing the data whereby there was a duplication of inventory units held by one customer utilized in the calculation of the reserve amount for Hi-Tech products at the acquisition date.*** The duplication resulted in an overstatement of chargeback reserves by approximately $8.9 million for the opening balance sheet of Hi-Tech as of April 17, 2014. The chargeback reserve at the end of the quarter ended June 30, 2014 was then calculated correctly, resulting in the earlier overstated reserve amount being included in revenue

> during the quarter ended June 30, 2014. The correction of the error in the quarter ended June 30, 2014 resulted in a reduction of previously reported revenue by $8.9 million, a reduction of previously reported pre-tax income by $8.9 million and a reduction of previously reported net income, goodwill and retained earnings by $5.6 million, for the Company's three and six month periods ended June 30, 2014.
>
> ***The error was limited to the Company's financial results for the three and six month periods ended June 30, 2014, but the error did impact the Company's previously filed results for the nine months ended September 30, 2014 (which were filed in connection with the Company's Form 10-Q for the quarter ended September 30, 2014) and the Company's previously furnished preliminary results for the full year ended December 31, 2014 (which were furnished as part of the Company's Form 8-K on February 26, 2015 in connection with the Company's earnings announcement for the fourth quarter of 2014) because the second quarter results were included within those periods. The estimated impact of this error for the restated three and six month periods ended June 30, 2014 is to reduce basic and diluted net income per share by approximately $0.05 per share. The estimated impact of this error for the restated nine month period ended September 30, 2014, and the year ended December 31, 2014, is to reduce both basic and diluted net income per share by approximately $0.06 and $0.05 per share, respectively.***
>
> ***The error and subsequent restatement is non-cash in nature and does not have an impact on the Company's cash and cash equivalents balances for any of the affected periods or the Company's liquidity or capital position.***

(Emphasis added).

91. The March 17, 2015 8-K also attached a copy of an after hour's press release the Company issued entitled, "Akorn Files Annual Report on Form 10-K for Year Ended December 31, 2014; Restates Second and Third Quarter 2014 Financial Statements." This after hour's press release, made the 8-K look like child's play in its efforts to minimize Akorn's restatement. The press release stated, in pertinent part:

> **Second Quarter and Third Quarter 2014 Restatement Related to an Error in Hi- Tech's Opening Balance Sheet**
>
> During the 2014 year-end audit process, an error was identified in the fair value allocation of assets acquired and liabilities assumed in connection with the acquisition of Hi-Tech Pharmacal Co., Inc. (Hi-Tech), which resulted in an overstated chargeback reserve as of April 17, 2014. The error, which was

identified on March 11, 2015, resulted from an overstatement of Hi-Tech's chargeback reserve in connection with applying the acquisition method of accounting at the closing of the Hi-Tech acquisition.

The overstatement in the chargeback reserve was caused by a manual error made in preparing the data related to the chargeback reserve whereby there was a duplication of inventory units held by one customer utilized in the calculation of the reserve amount for Hi-Tech products at the acquisition date. The duplication resulted in an overstatement of chargeback reserves by approximately $8.9 million for the opening balance sheet of Hi- Tech as of April 17, 2014. The chargeback reserve at the end of the quarter ended June 30, 2014 was then calculated correctly, resulting in the earlier overstated reserve amount being included in revenue during the quarter ended June 30, 2014. The correction of the error in the quarter ended June 30, 2014 resulted in a reduction of previously reported revenue by approximately $8.9 million, a reduction of previously reported pre-tax income by approximately $8.9 million and a reduction of previously reported net income, goodwill and retained earnings by approximately $5.6 million, for the Company's three and six month periods ended June 30, 2014.

As a result of that error, the Audit Committee of the Akorn Board of Directors, upon the recommendation of the Company's management, concluded that the previously issued financial statements contained in the Company's Quarterly Reports on Form 10-Q for the quarters ended June 30, 2014 and September 30, 2014 should not be relied upon due to an error in the financial statements as of and for the three and six month periods ended June 30, 2014 and as of and for the nine month period ended September 30, 2014, and that those financial statements would be restated to make the necessary accounting adjustments.

The relevant financial statements for the fiscal quarters ended June 30, 2014 and September 30, 2014 will be restated to make the necessary accounting adjustments in Forms 10-Q/A that the Company expects to file shortly. The error has been corrected in the full year financial statements included in the Company's Annual Report on Form 10- K that will be filed today. In addition, corrected GAAP financial statements (and GAAP reconciliations for adjusted non-GAAP measures) for the year ended December 31, 2014 accompany this release.

The error had the following effects:

**Revenue & Pre-Tax Income Impact.** The error resulted in an overstatement of revenue and pre-tax income of approximately $8.9 million (GAAP and non-GAAP adjusted) for each of the three and six months ended June 30, 2014, as well as the year-to-date results for the nine months ended September 30, 2014 and the preliminary results for the year ended December 31, 2014. ***The revenue and pre-tax income (GAAP and non-GAAP adjusted) reported for the three months ended March 31, 2014 and September 30, 2014 and reflected in the***

***preliminary results for the three months ended December 31, 2014 were not impacted by this error.***

**Income Tax Expense Impact.** Because the error resulted in an overstatement of pre-tax income for the affected periods, GAAP and non-GAAP adjusted income tax expense was overstated by approximately $3.3 million for each of the three and six months ended June 30, 2014, as well as the year-to-date results for the nine months ended September 30, 2014 and the preliminary results for the year ended December 31, 2014. ***Income tax expense (GAAP and non-GAAP adjusted) reported for the three months ended March 31, 2014 and September 30, 2014 and reflected in the preliminary results for the three months ended December 31, 2014 were not impacted by this error.***

**Net Income & EPS Impact.** The net impact of the error resulted in an overstatement of both GAAP and non-GAAP adjusted net income and GAAP diluted EPS and non-GAAP adjusted diluted EPS, of approximately $5.6 million and $0.05, respectively, for the three and six months ended June 30, 2014, as well as the year-to-date results for the nine months ended September 30, 2014 and the preliminary results for the year ended December 31, 2014. ***GAAP diluted EPS and non-GAAP adjusted diluted EPS reported for the three months ended March 31, 2014 and September 30, 2014 and reflected in the preliminary results for the three months ended December 31, 2014 were not impacted by this error.***

**No Impact to Cash & Cash Equivalents.** The error and subsequent restatement is non-cash in nature and does not have an impact on the Company's cash and cash equivalents balances for any of the affected periods or the Company's liquidity or capital position.

The Company will file a Form 8-K today containing additional information on this matter.

**Frequently Asked Questions about the Restatement**

**Q1. What caused the error and subsequent restatement?**

A1. An error in the manual reconciliation of chargeback reserve data for one of the Company's customers resulted in a duplication and overstatement of the chargeback reserve of approximately $8.9 million for the Company's opening balance sheet of Hi- Tech as of April 17, 2014. Specifically, an erroneous query of an electronic data interface was made that overstated the amount of inventory reportedly held by the customer, which in turn caused the Company to overstate chargeback reserves. The chargeback reserve at the end of the quarter ended June 30, 2014 was then calculated correctly, resulting in the earlier overstated reserve amount being included in revenue during the quarter ended June 30, 2014. The error was limited to one customer and only to the

process of creating the opening balance sheet of Hi-Tech following the close of the acquisition.

**Q2. What periods does the restatement cover?**

A2. The following table describes the periods affected by the restatement.

| 2014 Periods Affected | 2014 Periods Not Affected |
|---|---|
| Second quarter ended June 30 | Three months ended March 31 |
| *- and as a direct result --* | Three months ended September 30 |
| Six months ended June 30 | Preliminary results for three months ended December 31 |
| Nine months ended September 30 | |
| Preliminary results for year ended December 31 | |

**Q3. What impact does the error and subsequent restatement have on Akorn's Income Statement, cash balance or liquidity?**

A3. The effect to the impacted periods (as described in Answer 2 above) is the following:

| Income Statement Metric | Adjustment |
|---|---|
| Revenue | Decrease by $8.853 million in all affected periods |
| Pre-Tax Income | Decrease by $8.853 million in all affected periods |
| Income Tax | Decrease by $3.282 million in all affected periods |
| Net Income | Decrease by $5.571 million in all affected periods |
| Diluted EPS | Decrease by $0.05 in all affected periods |

The error and subsequent restatement is non-cash in nature and does not have an impact on the Company's cash and cash equivalents balances for any of the affected periods or the Company's liquidity or capital position.

**Q4. Is Akorn's 2015 guidance affected by the restatement?**

A4. Akorn's 2015 guidance, furnished as part of the Company's Form 8-K on February 26, 2015 and affirmed in a press release on March 10, 2015, remains unchanged. That guidance calls for revenue between $960 million and $980 million and adjusted non- GAAP adjusted diluted EPS between $1.88 and $1.98.

**Q5. What is Akorn doing to address the situation that led to the restatement?**

A5. In connection with its assessment of the effectiveness of its internal control over financial reporting at December 31, 2014, the Company concluded there were certain material weaknesses in internal control over financial reporting, including an additional material weakness that it had inadequate controls in place to prevent or detect material errors in the financial statements of acquired subsidiaries. The error described herein, which requires the restatement of the Company's condensed consolidated financial statements for the quarter and six-months ended June 30, 2014 and the nine months ended September 30, 2014, is a result of this material weakness. The Company has also concluded that its disclosure controls and procedures were not effective as of December 31, 2014, due to these material weaknesses in its internal control over financial reporting. These conclusions are described further in the Company's Annual Report on Form 10-K, which will be filed today. The Company is actively engaged in remediating its material weaknesses and plans to do the following to address the events that led to the restatement.

- Akorn will conduct manual data validation procedures on certain reports related to gross to net adjustments.

- Akorn will enhance the design of management review controls for gross to net adjustments to increase the level of precision.

- Akorn is in the process of establishing a dedicated revenue accounting team focused primarily on significant gross to net revenue adjustments.

- Akorn will continue to develop and expand upon controls specifically designed to identify material errors within subsidiary financial statements.

- Akorn will deploy appropriate personnel with public company accounting experience at the subsidiary level, as needed.

- Akorn will add dedicated personnel within the finance and accounting departments to focus exclusively on acquisitions and acquisition integration.

- Akorn is in the process of bolstering the Company's information technology department to facilitate faster system integration of acquired entities. The Company anticipates full system integration of Hi-Tech during the second quarter of 2015.

92. In Akorn's 2014 Form 10-K, also filed on March 17, 2015, the "Management's Report on Internal Control Over Financial Reporting" section noted that the

Company "excluded from our assessment of the effectiveness of our internal control over financial reporting as of December 31, 2014, Hi-Tech's and VersaPharm's internal control over financial reporting." The report then stated:

> [O]ur management concluded that, as of December 31, 2014, our internal control over financial reporting was not effective because of the identification of material weaknesses described as follows:
>
> - ***We did not have controls designed to validate the completeness and accuracy of underlying data*** used in the determination of significant estimates and accounting transactions. As a result, ***errors were identified in the underlying data used to support significant estimates and accounting transactions, primarily relating to gross to net revenue adjustments*** and income taxes. . . .
>
> - ***We did not have an adequate process or appropriate controls in place to support the accurate and timely reporting of our financial results*** and disclosures in our Form 10-K. As a result, ***errors were identified primarily related to gross to net revenue adjustments*** and income tax balances at year end. . . .
>
> - ***We did not have an adequate process or appropriate controls in place to prevent or detect material errors in the financial statements of acquired subsidiaries.*** *As a result,* ***errors were identified primarily related to gross to net revenue adjustments, expenses, inventory and accrued liabilities in the financial statements at the acquisition date and at year-end****.* One of the aforementioned errors related to the chargeback reserve of Hi-Tech recognized at the acquisition date and required the restatement of our condensed consolidated financial statements for the quarter and six-months ended June 30, 2014 and the nine months ended September 30, 2014, as disclosed in our Form 8-K dated March 17, 2015.

(Emphasis added.)

93. Thus, the very material weakness that was identified during the 2013 year-end audit – the absence of controls designed to validate the completeness and accuracy of data, leading to errors in the data used to calculate gross to net revenue adjustments – were not remediated and were again identified as a material weakness during the 2014 year-end audit. Moreover, Akorn lacked adequate process or appropriate controls to prevent or detect material

errors in the financial statements of its acquired subsidiaries, which also led to errors in the calculation of gross to net revenue adjustments.

94. The statements made in the press releases the Company issued on March 2, 2015 and March 17, 2015, as set forth above, were materially false and/or misleading because they omitted the following adverse facts, which were known to the Individual Defendants or recklessly disregarded by them:

- Akorn had errors in its manual reconciliation of chargeback reserve data for a customer;
- that, as a result, Akorn overstated Hi-Tech's charge back reserve;
- Akorn understated rebates and other sales allowances;
- Akorn did not properly integrate Hi-Tech's and VersaPharm's accounting systems;
- that, as a result, Akorn's revenue was overstated;
- Akorn's financial statements were not prepared in accordance with GAAP; and
- Akorn's internal control over financial reporting was ineffective and material weaknesses existed relating to the completeness and accuracy of underlying data used in the determination of significant estimates and accounting transactions and accurate and timely reporting of its financial results and disclosures.

95. After close of trading on April 24, 2015, the Company issued a press release titled, "Akorn to Make Additional Financial Restatements," from which the truth emerged. Akorn stated in the press release, in pertinent part:

> **Company Affirms 2015 Adjusted Diluted Earnings Per Share Guidance**
>
> LAKE FOREST, Ill., April 24, 2015 (GLOBE NEWSWIRE) -- Akorn, Inc. (Nasdaq:AKRX) today announced that it will restate its previously issued financial statements for the annual period ending December 31, 2014 and the quarterly periods ending June 30, 2014, September 30, 2014 and December

31, 2014 due to errors identified during the first quarter 2015 financial review process.

On April 20, 2015, the Audit Committee of the Board of Directors of Akorn, Inc. (the Audit Committee), upon the recommendation of the Company's management concluded that the financial statements for the quarterly periods ending June 30, 2014, September 30, 2014 and December 31, 2014 along with the annual period ending December 31, 2014 should not be relied upon because of errors in the financial statements in those associated periods. Furthermore, management's report on the effectiveness of internal control over financial reporting as of December 31, 2014 should no longer be relied upon. Additionally, the opinion of Akorn's independent registered public accounting firm, KPMG LLP (KPMG) on the consolidated financial statements for the year ended December 31, 2014, as well as KPMG's opinion on the effectiveness of the Company's internal control over financial reporting as of December 31, 2014, should no longer be relied upon.

During the review process with respect to the quarter ended March 31, 2015, the Company identified errors related to understatements of rebates and other sales allowances that have resulted in an overstatement of the Company's net revenue for the affected periods described above. A substantial majority of these errors are related to companies and products acquired in 2014, the formation of purchasing alliances among several of the Company's customers and changing competitive dynamics for select acquired products during 2014.

Akorn is in the process of analyzing the impact of the restatements on its previously reported financial statements, including previously restated results for the quarters ending June 30, 2014 and September 30, 2014. The errors will be corrected through amendments to Forms 10-Q for the fiscal quarters ended June 30, 2014 and September 30, 2014 and Form 10-K for the year ended December 31, 2014. The amended forms will be filed prior to the filing of Akorn's Form 10-Q for the fiscal quarter ended March 31, 2015.

**Initial Assessment of Impact**

While the exact impact to the Company's financial statements has not been determined, based on management's preliminary assessment, the errors related to the understatements of rebates and other sales allowances are estimated to have resulted in an overstatement to net revenue and pretax income from continuing operations of $20 million to $35 million for the year ending December 31, 2014. The allocation of the impact of the errors among the affected quarterly periods has not been determined. The estimated impact of the errors could materially change based on further review and analysis of the affected periods, including due to potential identification of other errors. Additional material weaknesses in the internal control over financial reporting may be identified in connection with

> known or potential errors noted above. In concert with determining the ultimate impact to the Company's financial statements, Akorn is working to remediate the issues that caused these errors.
>
> **Timely Filing of First Quarter Financials Is Not Expected**
>
> Akorn anticipates that it will not be able to file its Form 10-Q for the first quarter of 2015 in a timely manner because of the pending restatements to prior-period results. While the Company plans to request a five-day extension to file its Form 10-Q with the U.S. Securities and Exchange Commission, the Company does not anticipate it will meet the extended deadline.
>
> **Independent Investigation Commissioned by the Audit Committee**
>
> The Audit Committee will be conducting an independent investigation into the circumstances surrounding the errors that resulted in the misstatements, which will involve retaining outside advisors to assist in the investigation.

96. In the wake of the restatement announcement on April 24, 2015, Defendant Dick and Corporate Controller Hebeda lost their positions leading Akorn's accounting operations.

97. Randall Pollard was hired as the new Corporate Controller and Hebeda was appointed Vice President of Finance, a position removed from the accounting function.

98. On August 4, 2015, Akorn issued a press release announcing that on August 3, 2015, Dick tendered his resignation as CFO, effective immediately, "to pursue other interests." He has yet to find another position with a company. Akorn did not have a replacement CFO, and the new Corporate Controller, Pollard, had to fill in as Interim CFO. On October 13, 2015, Akorn announced that Duane Portwood would join the Company as the new permanent CFO, effective October 30, 2015.

99. In a Form 8-K filed on January 14, 2016, Akorn announced that its Board of Directors dismissed KPMG as the Company's independent auditor on January 10, 2016, and that on January 14, 2016, the Board approved the engagement of BDO USA, LLP ("BDO") as

the new independent auditor.

100. Among other things, Akorn stated in its January 14, 2016 Form 8-K the following:

> ***KPMG advised us that information had come to its attention, that if further investigated may***: (i) materially impact the fairness or reliability of either: a previously issued audit report or the underlying financial statements; or the financial statements issued or to be issued covering the fiscal period(s) subsequent to the date of the most recent financial statements covered by an audit report (including information that may prevent it from rendering an unqualified audit report on those financial statements), or (ii) ***cause it to be unwilling to rely on management's representations or be associated with the registrant's financial statements***. KPMG also advised us that, in addition to the Audit Committee's conclusion that our audited consolidated financial statements for the year ended December 31, 2014 and our unaudited condensed consolidated financial statements for the quarters ended June 30, 2014 and September 30, 2014 and the disclosures and related communications for each of these periods should not be relied, information has come to its attention, that if further investigated may significantly impact our unaudited condensed consolidated financial statements for the quarter ended March 31, 2014 and our audited consolidated financial statements for the year ended December 31, 2013.

(Emphasis added.)

101. On January 27, 2016, Akorn filed an amendment to its Form 8-K filed on January 14, 2016, attaching KPMG's response letter to the SEC relating to its dismissal. This letter made the following clarifications:

> ***The information . . . that had come to our attention relates to errors identified by the Company related to understatements of rebates and other sales allowances which have resulted in an overstatement to net revenue and pretax income from continuing operations for the year ended December 31, 2014, and two additional accounting matters identified by the Company's investigation that warranted further investigation and review: (i) customer payment term modifications and related revenue recognition practices, timing and disclosures for 2013 through 2015, and (ii) returns processing delays in 2015.*** We advised the Company that this information necessitated a significant expansion of the scope of our audits, and that information discovered in the Company's investigation or in our expanded audit procedures may: (i) materially impact the fairness or reliability of the Company's unaudited condensed consolidated financial statements as of and for the three months ended March 31,

> 2014 and consolidated financial statements as of and for the year ended December 31, 2013 or (ii) cause us to be unwilling to rely on management's representations or to be associated with the Company's financial statements, including the previously audited financial statements as of and for the year ended December 31, 2013.

(Emphasis added.)

102. Even by the end of 2015, Akorn had still failed to remediate the critical material weakness that was identified during the ***2013*** year-end audit—the absence of controls designed to validate the completeness and accuracy of data, leading to errors in the data used to calculate gross to net revenue adjustments. The Company had also failed to remediate a critical material weakness identified during the 2014 year-end audit—the absence of an adequate process or appropriate controls to prevent or detect material errors in the financial statements of its acquired subsidiaries, which also led to errors in the calculation of gross to net revenue adjustments. Hence, Akorn expanded its material weaknesses to include senior management's failure to timely remediate existing material weaknesses and its failure to commit personnel adequate to the task.

103. In Akorn's 2015 Form 10-K filed on May 10, 2016, the Company touted the fact that it had replaced Dick and Hebeda and that a new CFO and new Corporate Controller would be leading the remediation of the many material weaknesses in the Company's internal controls. Undoubtedly referring to Dick and Hebeda, Akorn stated that "the key employees involved in the accounting and financial reporting functions in which misstatements were identified are no longer involved in the accounting or financial reporting functions."

104. In its 2015 "Remediation Plan," this time Akorn emphasized new senior management, noting that a new CFO, who was hired in October 2015 to replace Defendant Dick, and a new Corporate Controller, who was hired in April 2015 to replace Dave Hebeda,

would be leading the remediation process. The Company also stated that: "During 2015 and 2016, we hired personnel with the appropriate experience, certification, education, and training for all key positions in the financial reporting and accounting functions, in many cases creating new positions. Consequently, ***the key employees involved in the accounting and financial reporting functions in which misstatements were identified [i.e., Dick and Hebeda] are no longer involved in the accounting or financial reporting functions***." (Emphasis added.)

105. Among other specific remediation actions, such as implement the automation of significant gross to net revenue accruals, Akorn represented that it would:

- ***Conduct data validation procedures on certain reports related to gross to net revenue adjustments*** and inventory.
- ***Establish a dedicated revenue accounting team focused primarily on significant gross to net revenue adjustments***. We have also taken steps to increase the communication between the accounting and contracts departments.
- Ensure all systems relied upon in the financial reporting process are subject to ***Information Technology General Controls (ITGCs) which are intended to prevent system changes that could affect the completeness and accuracy of the data used.***

(Emphasis added.)

Each of these three remediation actions, however, had been set forth in the Company's 2014 Remediation Plan but had not been completed.

106. Akorn's new independent auditor at 2015 year-end, BDO, audited the Company's internal control over financial reporting as of December 31, 2015. As did E&Y and KPMG before it, BDO concluded in the independent auditor's report included in Akorn's 2015 Form 10-K, that: "In our opinion, Akorn, Inc. did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2015[.]"

107. The Individual Defendants failed to remediate known material weakness in its internal controls in a timely manner, which ultimately led to a material misstatement of the Company' financial statements in 2014. The Individual Defendants had direct responsibility for the design, maintenance, and effectiveness of Akorn's internal control system. They each had a responsibility to oversee the implementation of proper internal controls over the Company's accounting and financial reporting functions.

**THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES**

108. The Company's false and misleading statements were the direct result of the Individual Defendants' breaches of fiduciary duties. Specifically, as discussed herein, the Individual Defendants' false and misleading statements artificially inflated Akorn's stock price by misrepresenting and concealing the truth regarding the following: (1) the integration of Hi-Tech and VersaPharm, as of December 31, 2014, into the Company's centralized accounting department and accounting systems; (2) the timeliness of certain financial and other related data associated with the Hi-Tech and VersaPharm purchases, which were required to be included in Akorn's annual report to be filed with the SEC on Form 10-K; (3) the Company's ability to timely complete its assessment of the effectiveness of its internal controls over financial reporting as of December 31, 2014; and (4) the effectiveness of Akorn's internal controls over financial reporting.

109. The Individual Defendants prepared and reviewed all the false and misleading statements issued by the Company. As such, the Individual Defendants knew of the reporting problems but did nothing to rectify or prevent them.

110. Moreover, based on their knowledge of the foregoing material non-public information regarding the Company, the Insider Selling Defendants, also in contravention of their fiduciary duties, unloaded millions of dollars' worth of their personally held Akorn stock for their own illicit benefit.

## THE SECURITIES CLASS ACTION

111. On March 6, 2017, the District Court entered its Memorandum Opinion and Order (the "Opinion")[3] denying defendants' motion to dismiss in the Securities Class Action.

112. In the Opinion, not only did the District Court find that Dick, Rai, and Akorn made material misrepresentations in connection with the wrongdoing referenced herein, but that defendants Dick and Rai did so with an "intent to deceive, manipulate or defraud." Opinion at p. 23 (internal citations omitted).

113. The Court made these findings even though "[p]laintiffs' § 10(b) claims are subject to the heightened pleading standards of Rule 9(b), which requires them to plead the "circumstances constituting fraud" with particularity." Opinion at p. 14.

114. As noted by the District Court:

> Dick and Rai had the duty to design or supervise Akorn's internal controls over financial reporting. Doc. 82 at ¶ 47. Under their leadership, Akorn suffered from serious deficiencies in its internal controls for several years. *Id.* at ¶¶ 64-77. Three independent auditing firms concluded that Akorn's internal controls were ineffective, *id.* at ¶¶ 66, 69, 75, 80, but Defendants dismissed the first two firms instead of remediating the weaknesses that those firms uncovered, *id.* at ¶¶ 64-77, 104, 107, 123. Akorn's internal control deficiencies were well-known among employees, *id.* at ¶¶ 94-96, 99-101, 104-07, 109, and known to Dick and Rai personally, *id.* at ¶¶ 67, 71, 107. Moreover, Dick and Rai knew that those deficiencies could cause inaccuracies in Akorn's reported financial performance. Doc. 93-2 at 5; Doc. 93-8 at 8; Doc. 93-21 at 6. But Dick and Rai did not

[3] *See Yeung v. Akorn, Inc., et al.*, No. 1:15-cv-01944 (N.D. Ill. May 6, 2017). References to "Opinion" are to the Memorandum Opinion and Order, ECF 112, which is incorporated herein by reference.

> remediate those deficiencies, even though many of the remedial measures they described in public filings were not particularly complex, such as hiring additional personnel. Doc. 82 at ¶¶ 68, 76. Instead, they exacerbated preexisting problems by acquiring subsidiaries without enabling the company's accounting department to prepare accurate financial statements. *Id.* at ¶¶ 8, 55, 70, 83, 89, 95. Dick and Rai did disclose that Akorn had deficient internal controls, but they also falsely represented that the company's 2014 financial results were accurate and prepared in accordance with GAAP notwithstanding those deficiencies. Doc. 93-12 at 5; Doc. 93-15 at 6; Doc. 93-18 at 6; Doc. 93-21 at 8. Assuming that Plaintiffs' allegations are true, Dick and Rai would not have had a good-faith basis to make those representations, which gives rise to the inference that it was, at the very least, reckless for them to convey to investors that Akorn's financial performance was substantially better than it actually was.

Opinion at pp. 24-25.

115. The District Court went on to state:

> The nature and extent of Defendants' misrepresentations of the 2014 financial results make the inference of scienter even more reasonable. As noted, Dick and Rai reported 2014 revenue that was artificially inflated by 8.4% and 2014 net income that was artificially inflated by 194.7%—significant inaccuracies.

Opinion at pp. 25-26.

116. The Court noted that these were not just random "significant inaccuracies," but significant inaccuracies with a purpose:

> Moreover, Akorn's accounting violations had the near-uniform effect of *increasing* its reported revenue and net income, Doc. 82 at ¶ 49, unlike what one might expect from a random series of innocent mistakes. Importantly, those violations made the difference between failure and success in meeting the annual revenue guidance that Akorn issued on August 5, 2014, *id.* at ¶ 51, and Wall Street consensus revenue estimates for two quarters of 2014, *id.* at ¶ 50. *See Stocke*, 615 F. Supp. 2d at 1191 (finding scienter adequately pleaded where "the mistakes allowed the Company's reported earnings to achieve consensus estimates"). Further reinforcing the case for scienter is the allegation that Dick resigned in the wake of the restatement, before a replacement CFO was selected.

Opinion at p. 26.

117. Accordingly, the District Court held "the inference that they [Dick and Rai] acted with scienter is 'cogent and at least as compelling as any opposing inference one could

draw from the facts alleged.' It follows that Plaintiffs have adequately pleaded Dick's and Rai's, and therefore Akorn's, state of mind." Opinion at p. 27 (internal citations omitted).[4]

**DAMAGES TO AKORN**

118. As a result of the Individual Defendants' wrongful conduct, Akorn disseminated false and misleading statements and omitted material information to the investing public and its own shareholders. These improper statements have devastated Akorn's credibility in the investor world. Akorn has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

---

[4] On April 24, 2017, the Akorn Board approved a proposed acquisition of Akorn by Fresenius Kabi AG ("Fresenius"), a subsidiary of Fresenius SE & Co. KGaA, pursuant to which Fresenius would acquire Akorn for approximately $4.3 billion, or $34.00 a share, plus the assumption of approximately $450 million of debt (the "Proposed Acquisition"). The Proposed Acquisition undervalues Akron for Akorn shares traded higher than $34 per share as recently as July 27, 2016. The Proposed Acquisition also hamstrings Akron, among other things, from getting competing offers, providing non-public information to interested parties or accepting a competing offer without giving Fresenius a chance to match it. The Akorn Board approved the inadequate Proposed Acquisition through a flawed process so that the Individual Defendants can extinguish their personal liability stemming from their breaches of their fiduciary duties and other violations of law in this action. In attempting to absolve its liability, the Board has taken deliberate steps to evade this Court's jurisdiction presumably because the Court issued an adverse Opinion in the Securities Class Action against certain of the Individual Defendants. Specifically, the Board amended its bylaws on April 24, 2017 - the same day it entered into the Proposed Acquisition - which provides:

> unless the Company consents in writing to the selection of an alternative forum, the sole and exclusive forum for certain legal actions involving the Company will be the Circuit Court of Cook County, Chancery Division, State of Illinois (or, if the Circuit Court of Cook County, Chancery Division, State of Illinois does not have jurisdiction, any state court located within the State of Illinois, or, if and only if all such state courts lack jurisdiction, the federal district court for the Northern District of Illinois) (the "By-Law").

With this amendment, the Board has barred all claims arising from the Proposed Acquisition from this Court. Plaintiffs question both the suspicious timing and propriety of the enactment of the By-Law. Accordingly, Plaintiffs anticipate pursuing claims arising from the Proposed Acquisition in the Circuit Court of Cook County on behalf of Akorn stockholders.

119. As a direct and proximate result of the Individual Defendants' actions as alleged above, Akorn's market capitalization has been substantially damaged, losing hundreds of millions of dollars in value as a result of the misconduct described herein. On April 24, 2015 Akorn's share price at closing was $55.24. By the markets close on April 27, 2015, the Company's share price had sunk to $43.10. Moreover, as recently as December 3, 2015, Akorn's stock traded at $33.97 a share, a far cry from April 24th's $55.24 closing price.

120. In a press release dated November 4, 2015, Akorn announced that: "The Chicago Regional Office of the [SEC] is conducting an investigation regarding the previously disclosed restatement, internal controls and other related matters. Additionally, the United States Attorney's Office for the Southern District of New York (USAO) has requested information regarding these matters."

121. As a direct and proximate result of the Individual Defendants' conduct, Akorn has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

a) costs incurred in investigating and defending Akorn and certain officers in the pending Securities Class Action, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

b) costs incurred in connection with the Company's internal investigation and the restatement; and

c) costs incurred from the loss of the Company's customers' and lenders' confidence in Akorn's financials.

**DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS**

122. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as if fully set forth herein.

123. Plaintiffs bring this action derivatively in his right and for the benefit of Akorn to redress injuries suffered, and to be suffered, by Akorn as a direct result of the breaches of fiduciary duties by the Individual Defendants. Akorn is named as a nominal defendant in this case solely in a derivative capacity.

124. As alleged above, Plaintiffs are currently Akorn stockholders. Plaintiffs also were Akorn stockholders at the time of the breaches of fiduciary duties complained of herein. Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in prosecuting this action. Because the Individual Defendants face a substantial likelihood of liability for the acts and omissions complained of herein, prosecution of this action, independent of the current Board, is in the best interests of the Company and its shareholders.

125. The wrongful acts complained of herein subjected, and continue to subject, Akorn to harm.

126. The Board is currently comprised of the following eight individuals: Defendants Kapoor, Abramowitz, Dr. Graves, Johnson, Meyer, Tambi, Weinstein, and Rappuhn. Plaintiffs did not make a demand upon the Board prior to instituting this action as any such demand would have been futile because a majority of the Company's directors either: (1) lack independence; (2) engaged in conduct that was not a legitimate exercise of business judgment and/or was *ultra vires* and, therefore, cannot enjoy the protections of the business judgment rule; and/or (3) are interested and therefore conflicted from and unable to fairly consider a demand because they face a substantial likelihood of liability for their failure to exercise their fiduciary duties of loyalty, good faith, candor and due care; and/or (4) financially benefited from the wrongdoing described herein.

127. The Director Defendants face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the wrongdoing described above, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate. Accordingly, demand is excused as to each of Defendants Kapoor, Abramowitz, Graves, Meyer, Tambi, Johnson and Weinstein.

128. Moreover, the Director Defendants, as directors (and, in some cases, also as Audit Committee members) owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and/or with reckless disregard reviewed, authorized and/or caused the publication of materially false and misleading statements that caused the Company's stock to trade at artificially inflated prices.

129. The Director Defendants' making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of fiduciary duties, for which the

Defendants Kapoor, Abramowitz, Graves, Meyer, Tambi, Johnson and Weinstein face a substantial likelihood of liability.

130. Defendants Kapoor, Tambi, Meyer, Graves and Abramowitz are not independent or disinterested given their prior ongoing and longstanding connections to each other.

a. Defendant Kapoor is also the Executive Chairman of INSYS. He has served on the INSYS Board of Directors since the company's formation in 1990. He served as Chairman from 1990 to 2004 and Executive Chairman since 2006. Defendant Kapoor also served as a director of INSYS Pharma, Inc. ("INSYS Pharma"), a subsidiary of INSYS, since its inception in 2002.

b. Defendant Tambi has also served as a director of INSYS since November 2010 and a director of INSYS Pharma from August 2007 until November 2010. In addition, defendant Tambi was appointed to the Akorn Board by EJ Funds LP. EJ Financial Enterprises, Inc., of which defendant Kapoor is President, is the general partner of EJ Funds LP.

c. Defendant Tambi's relationship with Defendant Kapoor spans decades. In the mid-1980's, Defendant Kapoor purchased LyphoMed, Inc., and Defendant Tambi was right there by his side. Defendant Kapoor was Chairman, President and Director of LyphoMed and Defendant Tambi was a Vice President of the company. As noted by Crain's in a 1995 article:

> By the mid-1980s, Messrs. Kapoor and Tambi (a recruit from New York-based Bristol-Myers Co.) hatched a plan to capture the lion's share of the nation's generic injectable drug business.
>
> "We isolated all the products from various lists of proprietary products that would go generic from the year 1986 to the year 2000," says Mr. Tambi. "So, we had this huge spreadsheet of 300 to 400 drugs, and then we modeled a strategy where we could start the process of formulating that product two years earlier."

d. Defendant Meyer also served alongside Defendant Kapoor as a director of INSYS Pharma from August 2007 until November 2010, at which time he joined Kapoor as a director at INSYS.

e. Defendant Abramowitz served as a director at Option Care, where Defendant Kapoor was Chairman, President and CEO.

f. In the late 1980s that Dr. Kapoor and his investment company, EJ Financial, began to display interest in Option Care as a network. In October 1990, Sutter Community Hospital sold its interest to Kapoor's EJ Financial. In the end, Kapoor had obtained an 80 percent stake in Option Care for $22.4 million. In spring of 2001, Defendant Rai was named CEO of Option Care. Rai joined Option Care in 1992 and held various positions in the areas of corporate finance and operations, including senior vice-president and executive vice-president.

g. Defendant Rai was not the only one at Akorn to join Defendant Kapoor at Option Care, Defendant Dick held various leadership positions in the areas of financial planning, analysis, and acquisitions at Option Care upon joining the company in September 2001.

h. In addition, Defendant Kutinsky joined Option Care in 1990. Prior to this, he was the Owner and President at one of Option Care's offices in Ann Arbor, Michigan. When Option Care purchased the office in 1997, Defendant Kutinsky joined Option Care as an Area Vice President. In 1998 he was promoted to Vice President of Operations and in 2000 was promoted to Senior Vice President. In June 2001, Defendant Kutinsky was promoted to Chief Operating Officer of Option Care. As of October 2002, he took on the role of Executive Vice President, Specialty Pharmacy, with responsibility for growing its specialty pharmacy business.

i. Defendant Bonaccorsi was the senior vice president, general counsel, secretary, and compliance officer at Option Care, Inc.

j. On January 29, 2000, Crain's announced that Michelle J. Tambi, wife of Defendant Tambi, had moved to director of business development at Option Care Inc. in Bannockburn, from business analyst at Walgreen Health Initiatives.

k. In January 2014, Akorn acquired the NDA and all rights to BETIMOL from Santen, which the Company expected to add $8 to $9 million in revenues in 2014. Santen entered a licensing agreement with an Akorn subsidiary in April 2014 in which Akorn was granted the rights to sell and market tafluprost, trademarked as ZIOPTAN. In addition, Santen and Akorn have established an alliance management between them. While Director Graves was the former CEO and president of Santen, she has continued on with Santen as a strategic consultant and advisor.

131. In July 2014, Nicox SA entered an agreement to acquire all of the outstanding equity of Aciex Therapeutics, Inc. for $120 million. According to a Nicox SA press release, "Existing investors in Aciex include Akorn, Inc., Bay City Capital, HealthCare Ventures, New Enterprise Associates and Ora Investment Group." According to the Company's Form 10-Q/A filed with the SEC on April 9, 2015, "As consideration for its carried investment in Aciex, the Company received from the Aciex Acquisition pro-rata shares of Nicox which are publically traded on the Euronext Paris exchange." According to the 2014 Proxy Statement, Defendant Rai is a director at Aciex. In August 2014, Director Graves was appointed director-designate at Nicox SA.

132. These longstanding and extensive professional relationships between Defendants Kapoor, Tambi, Meyer, Graves and Abramowitz renders them incapable of independently

considering a demand to sue one another, or Defendants Rai, Dick, Kutinsky and Bonaccorsi, rendering demand on these directors, futile.

133. Defendant Kapoor as the Company's chairman and owner of over $1.8 billion in Akorn stock before the fraud was exposed is not a disinterested or independent director. Indeed, the Company acknowledges that Kapoor controls the Company including the appointment of its Directors. As the Company's admitted controller, he is clearly not independent. His insider sales before the fraud was exposed that yielded net proceeds of over $3 million demonstrates his motive in facilitating and participating in the fraud. Moreover, with knowledge of material non-public information he exercised 7.2 million warrants only two weeks before the fraud was exposed -- during the five-and-a-half-week period between the Company's two announcements of 2014 financials restatements on March 17, 2015, and April 24, 2015. His extraordinarily large stock holding reveals his interest in keeping the Company stock price as high as possible. He is also a substantial creditor of the Company through EJ Financial Enterprises, Inc. He knowingly caused the 2014 Proxy Statement to fail to disclose that he was the CEO, president, and controlling shareholder at Option Care, Inc., at which many of the Individual Defendants were officers, including Rai, Kutinsky, Dick, Bonaccorsi, and at which one, Abramowitz, was a director, and that he is not just the chairman, but the executive chairman and largest shareholder at INSYS Therapeutics, Inc., at which Tambi and Meyer are directors; this demonstrates that he knowingly engaged in securities fraud. As a result, Kapoor breached his fiduciary duties. Moreover, Kapoor conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements in connection with the receipt of excessive compensation by the Individual Defendants and their making lucrative insider sales, consciously

disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, as Kapoor is not independent or disinterested and faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

134. Defendant Tambi is not an independent Director, but is beholden to Kapoor, Rai, and other Company officers as he received almost half a million dollars in compensation for being merely a Director in 2014, and as he is a director at two of Kapoor's other companies. Tambi is a director at EJ Funds LP, Kapoor's company that makes substantial loans to Akorn. Moreover, Tambi is a director at INSYS Therapeutics, Inc., at which Meyer is also a director, and at which Kapoor is the executive chairman and largest shareholder. Yet, the 2014 Proxy Statement disclosed that Kapoor was merely the chairman at INSYS Therapeutics, Inc. Tambi's ownership of over $5 million worth of Akorn stock before the fraud was exposed reveals his interest in keeping the Company stock price as high as possible. His insider sales made with knowledge of material non-public information before the fraud was exposed that yielded net proceeds of almost $550 thousand demonstrates his motive in facilitating and participating in the fraud. Moreover, Tambi conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements in connection with the receipt of excessive compensation by the Individual Defendants and their making lucrative insider sales, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, as Tambi is not independent or disinterested and faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

135. Defendant Graves is not an independent Director, but is beholden to Kapoor, Rai, and other Company officers as she not only received over one hundred and seventy-five thousand dollars in compensation for being a Director in 2014, but she is a consultant to and was the former CEO at Santen Inc., which entered two material transactions with Akorn, and she is a director-designate at Nicox SA, which entered a material transaction with Akorn. The significance of her involvement at Santen Inc. and Nicox to Akorn's aforementioned material transactions is palpable as the Company failed to disclose her current positions at those companies. Her ownership of over $1.69 million worth of Akorn stock before the fraud was exposed reveals her interest in keeping the Company stock price as high as possible. Her insider sales made with knowledge of material non-public information before the fraud was exposed that yielded net proceeds of almost $400 thousand demonstrates her motive in facilitating and participating in the fraud. Moreover, Graves conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements in connection with the receipt of excessive compensation by the Individual Defendants and their making lucrative insider sales, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Thus, as Graves is not independent or disinterested and faces a substantial likelihood of liability, demand upon her is futile and, therefore, excused.

136. Defendant Johnson is not an independent Director, but is beholden to Kapoor, Rai, and other Company officers as he not only received over one hundred and seventy-five thousand dollars in compensation for being a Director in 2014, but his ownership of over $11.51 million worth of Akorn stock before the fraud was exposed reveals his interest in keeping the

Company stock price as high as possible. His insider sales made with knowledge of material non-public information before the fraud was exposed that yielded net proceeds of over $2.12 million demonstrates his motive in facilitating and participating in the fraud. Moreover, as a member of the Company's Audit Committee, Johnson conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements in connection with the receipt of excessive compensation by the Individual Defendants and their making lucrative insider sales, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, as Johnson is not independent or disinterested and faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

137. Defendant Weinstein is not an independent Director, but is beholden to Kapoor, Rai, and other Company officers as he not only received over one hundred and seventy-four thousand dollars in compensation for being a Director in 2014, but his ownership of over $7.65 million worth of Akorn stock before the fraud was exposed reveals his interest in keeping the Company stock price as high as possible. His insider sales made with knowledge of material non-public information before the fraud was exposed that yielded net proceeds of over $192,450 demonstrates his motive in facilitating and participating in the fraud. Moreover, Weinstein conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements in connection with the receipt of excessive compensation by the Individual Defendants and their making lucrative insider sales, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously

disregarded his duties to protect corporate assets. Thus, as Weinstein is not independent or disinterested and faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

138. Defendant Abramowitz is not an independent Director, but is beholden to Kapoor, Rai, and other Company officers as he received almost one hundred and seventy thousand dollars in compensation for being a Director in 2014, and as he was a director at Kapoor's Option Care, Inc. (at which many of the Officer Defendants were officers), at which Kapoor's position was not disclosed in the 2014 Proxy Statement. His ownership of over $4.16 million worth of Akorn stock before the fraud was exposed reveals his interest in keeping the Company stock price as high as possible. His insider sales made with knowledge of material non-public information before the fraud was exposed that yielded net proceeds of about $233 thousand demonstrates his motive in facilitating and participating in the fraud. Moreover, as a member of the Company's Audit Committee, Abramowitz conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements in connection with the receipt of excessive compensation by the Individual Defendants and their making lucrative insider sales, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, as Abramowitz is not independent or disinterested and faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

139. Defendant Meyer is not an independent Director, but is beholden to Kapoor, Rai, and other Company officers as he received one hundred and seventy-seven thousand dollars in compensation for being a Director in 2014, and as he is a director at INSYS Therapeutics, Inc.,

at which Kapoor is the executive chairman and largest shareholder. Indeed, the 2014 Proxy Statement disclosed that Kapoor was merely the chairman at INSYS Therapeutics, Inc. His ownership of over $5.79 million worth of Akorn stock before the fraud was exposed reveals his interest in keeping the Company stock price as high as possible. Moreover, as chairman of the Company's Audit Committee, Meyer conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements in connection with the receipt of excessive compensation by the Individual Defendants and their making lucrative insider sales, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, as Meyer is not independent or disinterested and faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

140. Moreover, the Company's latest proxy statement, filed on April 10, 2014 (the "2014 Proxy"), specifically states that Defendants Kapoor and Tambi are not independent directors under the listing standards of NASDAQ. This undoubtedly is because of their connections to EJ Financial Enterprises, Inc. and EJ Funds, LP as noted above.

141. Defendants Meyer, Johnson, and Abramowitz, as members of the Audit Committee acted in violation of the Audit Committee Charter, as they conducted little, if any, oversight of the Company's internal controls over the integration of the acquired companies into the financials of Akorn or the public reporting of those financials, consciously disregarding their duties to implement and monitor adequate internal controls over the financial reporting of the Company. The Audit Committee members' complete failure to perform their duties in good faith resulted in fraudulent misrepresentations to the SEC, the investing public, and the

Company's shareholders. Thus, Defendants Meyer, Johnson, and Abramowitz face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

142. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Ethics. The Code of Ethics went well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code of Ethics required the Company's directors and officers to also adhere to Akorn's standards of business conduct. The Director Defendants did not comply with the requirements of the Code of Ethics. Defendants Kapoor, Abramowitz, Graves, Meyer, Tambi, Johnson and Weinstein violated the Code of Ethics by failing to ensure that the Company maintained proper internal controls to ensure accurate financial reporting and disseminating false and misleading financial statements. Because Defendants Dr. Kapoor, Abramowitz, Dr. Graves, Meyer, Tambi, Johnson and Weinstein violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

143. As noted above, Defendants Kapoor, Abramowitz, Graves, Johnson, Tambi and Weinstein personally benefited from the Individual Defendants false and misleading statements by having the opportunity to sell shares of Akorn stock at artificially inflated prices, a benefit not shared by the rest of Akorn's shareholders. Accordingly, demand is excused as to these directors.

144. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, the Director Defendants cannot claim

exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).

145. The acts complained of herein constitute violations of fiduciary duties owed by Akorn's officers and directors and these acts are incapable of ratification.

146. If the Director Defendants were to bring a suit on behalf of Akorn to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do and accordingly, demand is futile as to each of the Director Defendants.

147. Thus, for the reasons set forth above, at least a majority of the Board, made up of Defendants Kapoor, Abramowitz, Graves, Meyer, Tambi, Johnson and Weinstein, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon them is excused as futile.

148. Each Akorn director is, directly or indirectly, the recipient of remuneration paid by the Company, including benefits, stock options, and other payments by virtue of their position as directors and their control over the Company, the continuation of which is dependent on their cooperation with the other members of the Board and their participation and acquiescence in the wrongdoing set forth herein. The Akorn directors are, therefore, incapable of exercising independent objective judgment in deciding whether to bring this action

## CAUSES OF ACTION

### COUNT I
### Against The Individual Defendants For Breach Of Fiduciary Duties

149. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

150. The Individual Defendants owed and owe Akron fiduciary obligations, By reason of their fiduciary relationships, the Individual Defendants owed and owe Akron the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

151. The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, candor, loyalty, due care, reasonable inquiry, oversight, and supervision.

152. The Individual Defendants each knowingly, recklessly or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

153. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Akorn has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

154. Plaintiffs, on behalf of Akron, has no adequate remedy at law.

**COUNT II**
**Against Individual Defendants for Abuse of Control**

155. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

156. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Akorn, for which they are legally responsible.

157. As a direct and proximate result of the Individual Defendants' abuse of control, Akorn has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Akorn has sustained and continues to sustain significant damages. As a result of the misconduct alleged

herein, the Individual Defendants are liable to the Company.

**COUNT III**
**Against Individual Defendants for Gross Mismanagement**

158. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

159. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Akorn in a manner consistent with the operations of a publicly-held corporation.

160. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Akorn has sustained and will continue to sustain significant damages.

**COUNT IV**
**Against The Insider Selling Defendants For Unjust Enrichment**

161. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

162. The Insider Selling Defendants have been unjustly enriched at the expense of Akorn, in the form of their illegal stock sales as explained herein.

163. By their wrongful acts and omissions, the Insider Selling Defendants were unjustly enriched at the expense of and to the detriment of Akorn.

164. Plaintiffs, as stockholders and representatives of Akorn, seek restitution from the Insider Selling Defendants and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Insider Selling Defendants, and each of them, from their wrongful conduct and fiduciary breaches in connection their illegal stock sales.

**COUNT V**
**Against The Insider Selling Defendants For Breach Of Fiduciary Duties For Insider Selling And Misappropriation Of Information**

165. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

166. As officers and/or directors of the Company, each of the Defendants owed the Company and its stockholders the fiduciary obligations of loyalty, good faith and due care. The Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each officer and director of the Company owes to the Company and its stockholders the fiduciary duty to refrain from using Akorn's proprietary information for their own personal gain.

167. At the time of the stock sales set forth herein, the Insider Selling Defendants knew, but did not disclose publicly, the proprietary nonpublic and material information described herein, and the Insider Selling Defendants made the sales of Akorn stock described herein on the basis of and because of their knowledge of this proprietary nonpublic and material information.

168. The information described herein was proprietary nonpublic information concerning the Company's financial results. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Akorn stock. Unlike the Company's public stockholders, the Individual Defendants knew that Akorn's financial statements could not be relied on and the ultimate extent to which they could not be relied upon.

169. Since the use of the Company's proprietary information for their own gain

constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any proceeds the Insider Selling Defendants obtained thereby.

**COUNT VI**
**Against Individual Defendants for Violations of § 14(a) of the Exchange Act**

170. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

171. This claim for relief is not based on any allegations of knowing or reckless conduct by any defendant. This claim does not allege, and does not sound in fraud, and Plaintiffs disclaim any reliance upon or reference to allegations of fraud.

172. Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of ant security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. §78l.]" 15 U.S.C. § 78n(a).

173. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

174. Specifically, the Company's 2014 Proxy Statement filed April 10, 2014 violated Section 14(a) and Rule 14a-9 because it omitted material information regarding the Individual

Defendants' background, and included by reference materially false and misleading financial statements.

175. In the exercise of reasonable care, the Individual Defendants should have known that the 2014 Proxy Statement was materially false and misleading.

176. The misrepresentations and omissions in the 2014 Proxy Statement were material to Plaintiffs and the Company's shareholders in casting an informed vote on the subjects under consideration. The 2014 Proxy Statement was an essential link in the accomplishment of the execution of the Individual Defendants' lucrative insider sales made with material non-public information, continuation of Individual Defendants' concealment of the Company's financial condition, business operations, and relationships between the Company's Directors and Officers, and the Individual Defendants' failure to exercise their oversight duty in connection with the Company's risk management -- because revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the Directors' positions, the executive officers' compensation, and the Company's compensation policies.

177. The Company was damaged as a result of the material misrepresentations and omissions in the 2014 Proxy Statement.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment as follows:

A. Declaring that the derivative counts of this action properly maintainable as a derivative action;

B. Against the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, unjust enrichment, and waste of corporate assets;

C. Directing Akorn to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Akorn and its shareholders from a repeat of the damaging events described herein, including, but not limited to,

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;
- strengthening the Company's internal reporting and financial disclosure controls;
- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and
- strengthening the Company's internal operational control functions;

D. Awarding to Akorn restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

E. Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs hereby requests a jury on all issues so triable.

Dated: May 25, 2017

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Phillip Kim

Phillip Kim (*pro hac vice*)
Laurence M. Rosen
275 Madison Avenue
34th Floor
New York, New York 10016
Telephone: (212) 686-1060

Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
lrosen@rosenlegal.com

**HYNES KELLER & HERNANDEZ, LLC**

Michael J. Hynes (*pro hac vice*)
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116
Facsimile: (914) 752-3041
Email: mhynes@hkh-lawfirm.com
lhernandez@hkh-lawfirm.com

*Co-Lead Counsel for Plaintiffs*

**HEFFNER HURST**

Matthew T. Heffner
30 N. LaSalle Street, Suite 1210
Chicago, Illinois 60602
Telephone: (312) 346-3466
Facsimile: (312) 346-2829
Email: mheffner@heffnerhurst.com

*Liaison Counsel for Plaintiffs*

**THE LAW OFFICE OF DEBRA S. GOODMAN**
Debra S. Goodman
1301 Skippack Pike, Ste. 7A #133
Blue Bell, PA 19422
Telephone: (610) 277-6057
Facsimile:(484) 231-1922

*Additional Counsel for Plaintiffs*

**VERIFICATION**

I, Felix Glaubach, hereby verify that I have authorized the filing of the attached Amended Verified Shareholder Derivative Complaint, that I have reviewed the Amended Verified Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

DATE: 5/19/17

Felix Glaubach

## CERTIFICATE OF SERVICE

I, Phillip Kim, Co-Lead Counsel for Plaintiffs, hereby certify that on May 25, 2017 service of the foregoing Amended Verified Shareholder Derivative Complaint was accomplished pursuant to ECF as to Filing Users and in compliance with L.R. 5.5 as to any party who is not a Filing User or represented by a Filing User.

/s/ Phillip Kim